**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
(GREENVILLE DIVISION)**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | COMPLAINT |
| HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION; COVINGTON CREDIT OF ALABAMA, INC.; SOUTHERN FINANCE OF TENNESSEE, INC.; COVINGTON CREDIT OF GEORGIA, INC.; SOUTHERN FINANCE OF SOUTH CAROLINA, INC.; COVINGTON CREDIT OF TEXAS, INC.; COVINGTON CREDIT, INC.; and QUICK CREDIT CORPORATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

The Consumer Financial Protection Bureau (Bureau) brings this action against

Defendants Heights Finance Holding Co. f/k/a Southern Management Corporation and

the following of its wholly owned subsidiaries: Covington Credit of Alabama, Inc.;

Southern Finance of Tennessee, Inc.; Covington Credit of Georgia, Inc.; Southern

Finance of South Carolina, Inc.; Covington Credit of Texas, Inc.; Covington Credit, Inc.;

and Quick Credit Corporation (hereinafter, all defendants referred to collectively as

"Southern" or "Defendants") for violations of §§ 1031(a), 1036(a), and 1054(a) of the

1

Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C.

§§ 5531(a), 5536(a), 5564(a), and alleges as follows:

## INTRODUCTION

1.      Borrowers and lenders normally have a shared and mutually beneficial interest in the full and timely repayment of a loan. The borrower can obtain money for an expenditure, and the lender can profit by earning interest on loan principal over the course of the repayment term. When the borrower successfully repays the loan, the lender reaps a profit; when the borrower cannot repay the loan, the lender suffers a loss. So, lenders normally have an incentive to structure, underwrite, and service their loans to ensure that borrowers can successfully repay them.

2.      But Southern's business model turns this normal borrower-lender relationship on its head. Southern makes high-cost installment loans to borrowers in persistent financial distress. Southern's borrowers typically have low incomes, impaired credit, and few, if any, alternative loan options. And when they turn to Southern for a short-term loan, Southern frequently snares them in a multi-year cycle of debt from which they have no reasonable escape. Southern's business model, including even their incentive-compensation program for employees, is designed to induce their payment-stressed borrowers to repeatedly refinance their loans and harvest a new round of fees with each successive refinance. Southern derives approximately 40% of their net revenue through this process of "churning" borrowers in repeated, fee-laden refinances.

3.      Rather than ensure that their borrowers can successfully repay them on time, Southern aims to identify borrowers who are struggling to repay their existing loan and

2

thus need to refinance to avoid prolonged delinquency and default. Southern does this because they generate more revenue by harvesting fees from frequent, payment-stressed refinancers than from timely re-payers. To accomplish this, Southern employs an array of harmful underwriting, sales, and servicing practices for their refinanced loans that are designed to churn delinquent borrowers in continuous debt that they will struggle to ever repay.

4.     Southern's underwriting process for refinanced loans aims to identify borrowers who, as the company describes it, have exhibited a "propensity to refinance." Southern frequently refinances the loans of borrowers who are struggling to get out of debt and must refinance their loans with Southern under payment stress, including numerous borrowers for whom the total payments on their other debts exceed their meager monthly incomes. When these borrowers predictably fall behind on their refinanced-loan payments, Southern induces them to refinance again (and again, and again).

5.     Southern does so by presenting delinquent borrowers with a Hobson's choice: either make last month's payment and next month's payment at the same time or refinance to get current. Southern tilts the scales in favor of refinancing even more by imposing late fees on borrowers who must make at least two monthly payments to get current but waiving them for borrowers who refinance. And Southern complements these policies by making clear to their employees that pressuring delinquent borrowers to refinance is critical to the company's profitability. Southern's incentive-compensation programs reward employees who are most effective at pressuring their customers to

refinance their way out of delinquency, and the company regularly reprimands and punishes employees who fail to hit the company's refinance targets.

6.     Southern tells borrowers who refinance under payment stress that refinancing is a "fresh start" and "solution" to their problems. But for many of Southern's borrowers, refinancing merely prolongs and deepens those problems. And while the borrowers suffer, Southern profits. Not surprisingly, then, the vast bulk of the active loans in Southern's portfolio are refinances of previous loans. And nearly 10,000 Southern borrowers were in continuous, uninterrupted debt to the company over a seven-year period from 2013 to 2020, because Southern repeatedly churned their short-term loans. The Bureau brings this action to obtain relief for borrowers who were harmed by Southern's unfair and abusive loan-churning practices.

## JURISDICTION AND LEGAL AUTHORITY

7.     This court has subject-matter jurisdiction over this matter because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 12 U.S.C. § 1345.

8.     This Court has personal jurisdiction over Defendants because the causes of action against Defendants arise from their conduct in this state. 12 U.S.C. § 5564(f).

9.     Venue is proper here because Defendants are located and do business here. 12 U.S.C. § 5564(f).

## PARTIES

10.    The Bureau is an independent agency of the United States created by the CFPA to regulate the offering and provision of consumer-financial products and services under federal consumer-financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is authorized to initiate civil actions in federal district court to secure appropriate relief for violations of "Federal consumer financial law," 12 U.S.C. § 5564, including the CFPA itself.

11.    Under the CFPA, the Bureau has specific enforcement authority "to prevent a covered person or service provider from committing or engaging in any unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).

12.    Defendant Heights Finance Holding Co. f/k/a Southern Management Corporation (Heights) is a consumer lender headquartered at 301 N. Main St., 23rd Floor, Greenville, SC 29601. Heights is a wholly owned subsidiary of CURO Group Holdings—a publicly traded consumer-finance company with lending operations throughout the United States and Canada, whose 2022 revenue was $625.59M—and the parent company of the rest of the Defendants identified below. At all times relevant hereto, Heights exercised complete control over all of the subsidiaries identified below and directed all of their activities, including their lending operations. Heights does business throughout the United States, including in South Carolina, under a variety of trade names, including Covington Credit, Quick Credit, Southern Finance, and Heights Finance.

5

13.     Defendant Covington Credit of Alabama, Inc. (Covington Alabama) is an Alabama corporation and wholly owned subsidiary of Heights. Covington Alabama is Heights's principal license holder in Alabama, allowing its storefronts to conduct lending operations within the state. Because Covington Alabama is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

14.     Defendant Southern Finance of Tennessee, Inc. (Southern Tennessee) is a Tennessee corporation and wholly owned subsidiary of Heights. Southern Tennessee is Heights's principal license holder in Tennessee, allowing its storefronts to conduct lending operations within the state. Because Southern Tennessee is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

15.     Defendant Covington Credit of Georgia, Inc. (Covington Georgia) is a Georgia corporation and wholly owned subsidiary of Heights. Covington Georgia is Heights's principal license holder in Georgia, allowing its storefronts to conduct lending operations within the state. Because Covington Georgia is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

16.     Defendant Southern Finance of South Carolina, Inc. (Southern South Carolina) is a South Carolina corporation and wholly owned subsidiary of Heights. Southern South Carolina is one of Heights's principal license holders in South Carolina, allowing its

storefronts, namely its "Southern Finance" and "Covington Credit" storefronts, to conduct lending operations within the state. Because Southern South Carolina is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

17.     Defendant Quick Credit Corporation is a South Carolina corporation and wholly owned subsidiary of Heights. Quick Credit Corp. is one of Heights's principal license holders in South Carolina, allowing its storefronts, namely its "Quick Credit" storefronts, to conduct lending operations within the state. Because Quick Credit Corp. is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

18.     Defendant Covington Credit of Texas, Inc. (Covington Texas) is a Texas corporation and wholly owned subsidiary of Heights. Covington Texas is Heights's principal license holder in Texas, allowing its storefronts to conduct lending operations within the state. Because Covington Texas is a wholly owned subsidiary of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

19.     Defendant Covington Credit, Inc. (Covington Oklahoma) is an Oklahoma corporation and wholly owned subsidiary of Heights. Covington Oklahoma is Heights's principal license holder in Oklahoma, allowing its storefronts to conduct lending operations within the state. Because Covington Oklahoma is a wholly owned subsidiary

of Heights and performs all of its activities and lending operations at Heights's direction, it shares a primary business location at 301 N. Main St., 23rd Floor, Greenville, SC 29601.

20.     Defendants are "covered persons" under the CFPA because they extend credit and service loans to consumers. 12 U.S.C. § 5481(5), (6), (15)(A)(i).

## STATEMENT OF FACTS

21.     Southern makes high-cost installment loans to borrowers through a network of over 250 brick-and-mortar storefronts located in the states of Texas, Oklahoma, Alabama, Georgia, Tennessee, and South Carolina. Southern operates in these states via a variety of subsidiaries, identified above, which it wholly owns, manages, and controls. Southern operates in these states under a variety of trade names, including Covington Credit, Southern Finance, Quick Credit, and, more recently, Heights Finance.

22.     Southern's installment loans have a median annual interest rate of 92%, a median loan principal of $585, and are typically repayable in nine to eleven monthly installments. The terms of Southern's installment loans are non-negotiable and offered on a take-it-or-leave-it basis.

23.     As recently as 2019, Southern had annual gross loan receivables of over $250 million, and more than 70% of those receivables were attributable to refinanced loans. In other words, the majority of loans in Southern's portfolio are refinanced loans to existing borrowers, many of whom have had to refinance their Southern loans numerous times before.

24.     Refinancing as many their borrowers as possible—and as often as possible—is a central component of Southern's business model. Nearly 10% of Southern's borrowers refinance their loans with Southern a dozen times or more. But while these borrowers make up just under 10% of Southern's total customer base, their refinances generate 40% of the company's net revenue. In many of these instances, Southern pressures payment-stressed borrowers to refinance to avoid prolonged delinquency or default. But this reprieve is often only temporary: many payment-stressed borrowers end up in continuous and costly refinancing sequences that span several years.

25.     Southern's borrowers who refinance under payment stress—that is, after becoming 14 or more days delinquent on their existing loan payments—are also more likely than other refinancers to eventually default.

26.     Southern's borrowers are financially vulnerable:

a.  Southern's median borrower has an annual income of less than $25,000 and impaired credit;

b.  many of Southern's borrowers are older Americans, who survive on fixed incomes, such as Social Security;

c.  many of Southern's borrowers are single-parent wage earners, who struggle to make ends meet every month for themselves and their families; and

d.  many of Southern's borrowers have monthly expenses, including payments on other debts and for basic living expenses, that outstrip their incomes.

27.     Southern refinances and harvests fees from these borrowers on unaffordable terms because, by doing so, they can trap many of them in multi-year cycles of debt. Southern's

business model is built on generating an outsized proportion of their revenues from churning the same borrowers in one refinanced loan after another.

28.     Consequently, Southern uses an array of harmful underwriting, sales, and servicing practices that are designed to create conditions under which refinancing, rather than full and timely repayment, is more likely.

### Southern's credit-scoring model for refinanced loans prioritizes borrowers with a "propensity to refinance," including numerous borrowers who have exhibited objective indicia of payment stress.

29.     Southern uses a credit-applicant scoring method that enables loans to borrowers who are likely to experience (or who have already exhibited) payment stress and who are likely to repeatedly refinance their loans when they are struggling to repay them on time.

30.     Until 2019, Southern used a manual applicant-scoring worksheet that scored applicants in five different categories: residential stability, employment stability, time living in the area, credit history, and free income (as defined by Southern, see infra ¶¶ 34-36). The applicant's cumulative score across these five categories was supposed to determine whether, and how much, the applicant could borrow.

31.     So, if the applicant scored highly enough in some categories, like residential stability and time living in the area, that would be sufficient to overcome a lower score in other categories, like free income.

32.     As a result, from at least as early as 2013, Southern has refinanced the loans of numerous borrowers who had:

        a.  calculated free incomes of less than $0 per month;

    b. an uninterrupted series of refinanced loans from Southern dating back for the full five-year look-back period in their credit reports;

    c. two or more loans outstanding from different Southern subsidiaries (e.g., Quick Credit and Covington Credit) at the same time;

    d. multiple other loans from other high-cost installment lenders during the same period; or

    e. a series of open accounts from other creditors that were in serious delinquency or collections.

33. Southern knew that these borrowers had more monthly bills to pay than they had income to pay them. Southern also knew about these borrowers' long histories of refinancing. But these facts did not stop Southern from refinancing their loans again—saddling them with monthly payments that either exceeded their calculated free incomes of less than $0 per month, or were in excess of what they could reasonably afford to repay, or both. Southern refinanced these loans because it predicted that if the borrowers fell behind on their payments again, they could be expected to refinance their way out of delinquency again.

34. Further, even if, per Southern's manual scoring model, these applicants had positive free monthly incomes, Southern calculated these figures without regard to the applicants' living expenses.

35. To calculate free income under their manual model, Southern subtracted from the applicant's monthly income only (a) the minimum payments that the applicant had to make to stay current on other, recurring debts, and (b) any rent or mortgage payments

that the applicant self-reported on their application. Crucially, this calculation did not include the applicant's necessary living expenses, including their expenditures for food, transportation, healthcare, or childcare.

36.    In this light, even many of Southern's refinanced-loan applicants with positively weighted "free incomes" in their credit-scoring worksheet were nevertheless likely to have more expenses than income every month.

37.    Southern's borrowers who have more monthly expenses than monthly income can't reasonably afford to make timely payments on their Southern loans and thus are very likely to experience payment stress.

38.    Since 2019, Southern has shifted to an automated loan-decisioning model, which they commissioned from a third-party developer that specializes in providing credit-scoring solutions for small-dollar lenders like Southern.

39.    This developer created two different models for Southern: one devoted to scoring first-time loan applicants (the new customer model), and the other devoted to scoring applicants for refinances (the existing customer model). Both models were developed using historical loan-performance data from Southern's portfolio to score applicants on two principal components: (i) the likelihood that the loan would go "bad," which was defined as becoming 90 or more days delinquent; and (ii) the "propensity of the loan applicant to refinance their loan."

40.    Southern requested that the developer include this second measurement because, per the statement of work for the project, "[t]his analysis will identify those customers most likely to refinance their loan multiple times in the future."

41.    To develop this measurement, the developer analyzed over one million refinanced loans in Southern's portfolio and found that the factor with the greatest power to predict future refinances was past refinances. In other words, each time a Southern borrower refinanced their loan, they became even more likely to do so again in the future. As a result, the automated loan-decisioning model that Southern currently uses weights an applicant's past, repeated refinancing as a positive attribute in refinanced-loan applications.

42.    Because Southern positively weights past, repeated refinancing in their refinance-approval process, the company routinely lends to borrowers who have refinanced multiple times in the past even if they clearly cannot afford to service their debt to Southern without refinancing.

43.    Because Southern routinely lends to borrowers with meager or negative free incomes, and because their refinanced-loan-approval model prioritizes frequent refinancers, rather than timely re-payers, many of Southern's borrowers predictably have trouble repaying and thus become delinquent.

### *Southern rewards employees who churn payment-stressed borrowers in fee-laden refinances and punishes those who fail to meet the company's refinance targets.*

44.    Once borrowers become 14 or more days past due on their payments, Southern engages in a systematic effort to induce them to refinance their way out of delinquency and avoid the negative consequences of defaulting.

45.    Southern's central office delivers weekly "14-day Contact Effectiveness Reports" to the company's regional and district managers, which are designed to help them

monitor whether branches under their supervision have refinanced at least 33% of all accounts that became 14 or more days delinquent, as Southern requires of its employees.

46.     Southern's branch-level employees bombard these payment-stressed borrowers daily with solicitation letters, text messages, and repeated phone calls. Consistent with Southern's refinance training and employee-coaching materials, these communications emphasize that, by refinancing, borrowers can: (i) obtain additional cash; (ii) pay off their delinquent loan with the proceeds of their new loan; and (iii) improve their credit by keeping the account open.

47.     Consistent with Southern's refinance training and employee-coaching materials, these solicitations characterize refinanced loans as "fresh starts" and "solutions" for the borrower's payment stress and the "best option" to resolve the borrower's delinquency.

48.     But while these solicitations refer to refinanced loans as "fresh starts," they do not explain that a refinanced loan on the same price terms, which were already unaffordable for the borrower, is merely extending the borrower's debt term to Southern and increasing their total cost of borrowing.

49.     Similarly, while these solicitations refer to refinanced loans as "solutions" for the borrower's payment stress, they do not explain that refinancing under payment stress once means that the borrower is even likelier to have to refinance (potentially many times) under payment stress again in the future or default.

50.     Similarly, while these solicitations refer to refinancing as the "best option" for resolving the payment-stressed borrower's delinquency, Southern's servicing practices

are designed to sharply limit the payment-stressed borrower's available options so that refinancing becomes the *only* reasonable option for getting out of their delinquency.

51.     Southern's training and employee-coaching materials make this fact explicit for branch-level personnel. Emails from regional- and district-level supervisors instruct Southern's employees to give delinquent borrowers just two options, make all past-due payments or refinance to get the loan current. For example:

     a.   "Team look at the accounts that are begging for help. They are past due and are screaming they don't have the money to pay you so get to work selling them the benefits, if they don't want to refi then ask for your money don't give an extra week or two don't let it be their option!"

     b.   "Give them two options today: refinance up to date or pay up to date. There are no other options. Everyone must come into the office today and bring their account current!!"

     c.   "Managers make sure when calling past due customers with money we are using the refi as a resolution, these people are already screaming at you they don't have the money to pay. Give them the only option to pay today or refi up to date."

     d.   "With three days left, we need to be creating a sense of urgency for every collection customer to either refinance up to date or pay up to date. They only have those two options."

     e.   "They will have your money and we need to make sure we get them to do the right thing. Either by paying, paying enough to refi or refinancing without paying. Either way, it is YOUR call, not theirs if they are past due."

52.     These emails reflect a common understanding at Southern: borrowers who have become 14 or more days delinquent simply do not have enough money to make their payment, let alone the two or more payments that have become due. The only exception, in ¶ 51(e) above, is from an email to employees following the delivery of Covid-era stimulus checks to many of Southern's payment-stressed borrowers.

53.     In this light, the two options that Southern presents to payment-stressed borrowers—make two or more payments, or refinance, to get current—are really just one option (refinance), and Southern knows this. Similar emails to Southern employees reflect this fact:

a.  "Let's make sure we are working our past dues to the office to refi up to date and our 14+ these people are begging us for money and they are already running past due and don't have any money."

b.  "They are already telling you they don't have the money to pay you because they are past due! Don't take no for an answer on any customer that has cash available and [is] past due! We cannot afford to miss any opportunities of moving delinquency or refinancing a customer!"

54.     Delinquent borrowers not having enough money to make their payment is a boon for Southern because refinancing under payment stress is a central component of the company's business model and profitability.

55.     Southern views full loan payoff as a negative outcome. During tax-refund season and when Covid stimulus checks were sent to many of their customers, Southern emails reflect the importance of keeping customers who want to get out of debt on the hook.

56.     In a March 15, 2021 email, a district supervisor in Georgia makes this clear: "It is crucial we focus and get the team in a mindset that as much [tax and covid-stimulus] money is out there, your great customers will be trying to pay you and not refinance. This is where the relationship you have built with them comes in handy. FLIP THAT LOAN!" Another such email puts it succinctly: "When a customer has paid the loan down to just a few payments, they start focusing on paying us out. We can combat that by refinancing them now!"

57.    Refinancing delinquent borrowers and combatting loan payoffs are what drive Southern's loan-servicing and sales practices. And they accomplish this by sharply limiting the reasonable alternatives to refinancing for borrowers who, as company managers acknowledge, "don't have the money" to make the payment on their Southern loans and "are begging for help."

58.    One of the practices that Southern employs is to refuse partial payments or to extend due dates for delinquent borrowers. For example, in a June 20, 2019 email, a district supervisor in Alabama chides employees for allowing customers to remain past due after making a partial payment because these payment-stressed borrowers are, in the supervisor's view, "the perfect customers to sell to":

> Team look over this. I want you to email me what happen on each account that stayed past due after payment. Why aren't you refinancing your accounts that are running late. These are the perfect customers to sell to yet most of you didn't sell to any of them last week. Team I can tell you for a fact if your not getting these 14 day accounts current through refinancing your numbers will only get worse. It is your job to sell loans and these are customers that should be the easiest to sell to. You can't have success in our business like this.

59.    This policy against accepting partial payments or extending borrower due dates, which company managers refer to by the shorthand "pay 2 or renew," complements Southern's policy of waiving late fees on delinquent payments only if the customer has agreed to refinance out of the delinquency.

60.    Southern's incentive-compensation programs reinforce these dynamics by rewarding employees who are the most successful in inducing payment-stressed borrowers to refinance. These programs make Southern's sales and collections functions explicitly interdependent.

61.     Southern offers bonus compensation to employees based on two factors: refinance rates and delinquency management. To qualify for bonus compensation, branches must refinance anywhere from 10-15% of the loans in their portfolio by the end of each month. The refinance standard is even higher for accounts that are 14 or more days delinquent, at 33%. And Southern constantly reminds branch-level personnel that failing to meet this goal will have a "direct impact on [the] profit" of their branch.

62.     For example, in a January 14, 2021 "Coaching Action Plan," a district supervisor in South Carolina instructs an employee to make sure that she's getting at least one in every three delinquent borrowers to refinance their way out of delinquency. Failure to meet this standard is "not optional":



63.     Similarly, in a November 8, 2019 email, a district supervisor who oversees stores in Alabama and Georgia plainly tells their employees that if they don't refinance their delinquent customers, they're not going to meet their monthly growth goals. The supervisor is incredulous because only 14 of the 73 delinquent borrowers who were eligible to refinance (meaning that they had at least $1 in available credit on their account) did so:

> Team if you do not refinance your past due customers you will not meet your goals its that simple. Why are we not taking this serious? We took 124 +14pmts and 73 of those were able to refi. Out of those 73 we only refinanced 14!!!!???? This is totally unacceptable. There is no way that 59 of our customers just refused to refinance their acct. I know better than that team. So do you all. Good job AL28. This is part of the reason right now that branch is @35.8% in refis, because he refinanced his delinquent customers. Plain and simple. Starting today if you have a +14 that is eligible to refi and anyone takes the payment without refinancing the acct I need you to email me the acct # and name so I can look at it BEFORE they leave the office or hang up the phone, put them on hold if you have to, you waited for them 14+ days they can wait a few mins for you.

64.     In addition to the refinance-pegged bonus program, Southern also has a bonus program that's tied to delinquency management. But in practice, the two programs are merely flip sides of the same coin, because this program also encourages the use of refinances to control delinquency rates.

65.     For example, Southern segments delinquent loans into thirty-day bands and assigns "buckets" to each band. Loans in bucket one are 1-30 days past due; loans in bucket two are 31-60 days past due; and so on and so forth until the loans are 151-180 days past due, at which point they're allocated to bucket six. To obtain the bonus for managing delinquencies, branches must move a certain percentage of loans in each bucket closer to current status each month.

66.     But because moving from one bucket to the next requires the collection of two or more past-due payments, and because Southern's delinquencies often arise because their borrowers can't afford to make even one payment, the quickest way for branches to bring delinquent loans closer to current status is by refinancing them.

67.     Southern's training materials and incentive-program descriptions make this fact explicit for employees. The company's "Guide to Supplemental Income" instructs employees to "always drive for the next refinance, since a refinance makes ALL buckets current." Other materials, including a presentation made at a June 2017 meeting of Southern's executive leadership, explain that "our focus when interacting with delinquent customers has not changed," and then lists refinancing as the top priority, ahead of even collecting the full past-due balance on the loan.

68.     Moreover, not only does Southern incentivize employees to refinance their payment-stressed customers; it also punishes those who don't. Numerous emails and company training materials threaten employees with overtime shifts at night and on weekends if they fail to meet the refinance and delinquency-management standards.

69.     Southern also leverages a variety of coercive collections tactics to induce payment-stressed borrowers to refinance.

70.     Southern requires that all accounts that are 14 or more days past due be handled by the branch manager. Southern closely monitors compliance with this requirement in store audits.

71.     Numerous audits refer to a store's failure to "work" these borrowers into the branch for a face-to-face conversation with the branch manager. They chide employees

for failing to document how the delinquency has been resolved and for failing to refinance the delinquent account.

72.     Further, Southern takes a notional security interest in their borrowers' household goods or car by requiring them to pledge one or more pieces of their personal property as loan collateral. But outside of a boilerplate attestation that Southern requires borrowers to sign in their loan agreements, the company makes no effort to assess the value—or even verify the existence—of the personal property pledged as collateral. Nor does Southern rely on the stated value of the collateral in their loan-approval process. Southern also never perfects their security interest in any of the collateral and only very rarely attempts to repossess collateral if the borrower defaults, despite threatening to do so.

73.     Of course, Southern's borrowers don't know that Southern is unlikely to come for their personal property if they default on their loans. Borrowers who believe that they stand to lose their personal property if they default are thus likely to either (a) skip payments on other, unsecured debts or forgo basic living expenses, or (b) refinance their way out of payment stress to gain a temporary reprieve from the underlying threat of repossession. Southern uses these security interests not to legitimately preserve their position in case a borrower defaults, but rather as leverage to induce borrowers to refinance.

74.     Finally, until the onset of the Covid pandemic, Southern also made in-person visits to the homes of delinquent borrowers. Southern did this routinely to request that the borrowers make multiple past-due payments on their account or, in the alternative, that they refinance. These so-called "courtesy visits" were made even in cases where the

company had the borrower's contact information and could reach the borrower over the phone or with correspondence to a confirmed home address.

75.    Southern pressured employees to make in-person visits to the homes of delinquent borrowers to create a "sense of urgency." As a February 21, 2020 email from a Southern field director put it: "If your customers are avoiding you because they are waiting on their tax refund, lets go out to their house today and remind them that we must get their account current today regardless of whether they are waiting on their refund! Create a sense of urgency!!"

76.    Since terminating their in-person visits, Southern has started to enroll borrowers in an autopay program, which grants the company access to their borrowers' bank accounts. Southern is thus able to draw money directly from payment-stressed borrowers' bank accounts when the borrowers can't afford to make a timely payment on their loans.

***Churning, or frequent refinancing, is central to Southern's business model because their loans are designed to harvest recurring, upfront fees; erode their borrowers' available credit; and increase the company's revenue with each successive refinance.***

77.    Southern's installment loans carry an array of fees that increase the total cost of borrowing each time a borrower refinances. Southern imposes three principal types of fees in their loans: (i) upfront, non-refundable origination fees; (ii) precomputed interest charges; and, where allowed by state law, (iii) insurance premiums.

78.    The first type of fee—the upfront, non-refundable origination fee—may vary in size or name by state, but they all share one crucial feature in common: Southern does not refund any portion of the fee to borrowers who repay their loans early, as through refinancing.

79.     Because refinancing entails taking out a new loan to pay off an existing loan, Southern's borrowers must pay origination fees every time they refinance their loans. Thus, Southern can increase the revenue on their loans the more often they are refinanced. By charging these origination fees on every new loan, Southern creates a powerful incentive for the company to churn borrowers in repeated refinances as early and as often as possible.

80.     Southern creates a similar incentive for the company with their precomputed interest and insurance-premium charges. Unlike with their origination fees, Southern is legally required to refund any unearned portion of these charges if the borrower repays their loan early by refinancing. But to do so, Southern uses an accounting method—the so-called Rule of 78's—that enables them to front-load a disproportionate share of the charges to the earlier months in the repayment term.

81.     For example, in a typical nine-month Southern loan, a borrower who refinances after making three payments would be entitled to a refund of the unearned portion of precomputed interest and insurance premiums. If Southern used an actuarial method to calculate this refund, the borrower would receive a refund of approximately 66% of unearned interest and insurance premiums. Under the Rule of 78's, however, the borrower only receives a refund of 46.66% of unearned interest and insurance premiums, because the Rule allows Southern to front-load these charges. Southern's use of the Rule thus allows the company to extract a well-disguised prepayment penalty from borrowers who refinance their loans before the maturity date.

82.     As with their reimposition of origination fees with every new loan, Southern's choice to use the Rule of 78's also provides a powerful incentive for the company to refinance their loans as early and as often as possible. This is so because the Rule enables Southern to retain more of the precomputed interest and insurance premiums than they have earned at any given point during the repayment term until the loan's maturity date.

83.     Southern makes this fact explicit for company leaders in internal documents, such as the following slide from a 2017 meeting of the company's executives:



**Impact on Business – TX Example**

Original Loan

| | | | |
|---|---|---|---|
| Gross Loan Receivable | 820 | | |
| Cash | 546.73 | | |
| Deferred Interest | 218.6 | | |
| Deferred Acquisition Charges | 54.67 | | |

| Month | Paid out | Every 5 Months | Every 4 Months | Every 3 Months |
|---|---|---|---|---|
| 1st  $ | 49.7 | 49.7 | 49.7 | 49.7 |
| 2nd | 44.7 | 44.7 | 44.7 | 44.7 |
| 3rd | 39.7 | 39.7 | 39.7 | 67.6 |
| 4th | 34.8 | 34.8 | 55.7 | 49.7 |
| 5th | 29.8 | 44.7 | 49.7 | 44.7 |
| 6th | 24.8 | 49.7 | 44.7 | 67.6 |
| 7th | 19.9 | 44.7 | 39.7 | 49.7 |
| 8th | 14.9 | 39.7 | 55.7 | 44.7 |
| 9th | 9.9 | 34.8 | 49.7 | 67.6 |
| 10th | 5.0 | 44.7 | 44.7 | 49.7 |
| **Revenue  $** | 273.3 | 427.3 | 474.0 | 535.6 |
| | | | | |
| Amount Back | | 196.3 | 138.2 | 84.0 |

02/06/2017                                                                                     5

84.     Here, imposed over a watermark of $100 bills, is an "impact on business" example in which Southern's revenue increases in direct correlation to the frequency with which their loans are refinanced. It compares Southern's revenue across four different repayment patterns: a loan that's repaid on time over the full repayment term; a loan that's refinanced every five months; a loan that's refinanced every four months; and a

loan that's refinanced every three months. Consistent with Southern's use of the Rule of 78's, the "paid out" column reflects the dollar amount of what portion of the cumulative precomputed interest (i.e., "deferred interest") and upfront origination fee (i.e., "deferred acquisition charge") they have earned at each monthly stage of the repayment cycle. The highlighted observations (which appear in the original document) show how a non-refundable origination fee and front-loaded interest increase Southern's revenue the more frequently a loan is refinanced.

85.    Southern's increased revenue comes at their borrowers' expense: borrowers who frequently refinance their loans see their available credit steadily eroded with each successive refinance.

86.    This erosion of available credit (i.e., the amount of money that the borrower is eligible to cash out when they refinance) is the upshot of Southern's combined imposition of upfront fees and front-loaded collection of unearned interest and insurance premiums. Borrowers who refinance early in the repayment term have had a disproportionate share of the payments made on their existing loan allocated to the payment of precomputed interest and insurance premiums, rather than to the reduction of their principal obligation. And the upfront fee that Southern imposes is taken off the top of whatever available credit the borrower would otherwise have had at the time of refinancing.

87.    As detailed in the following chart, which is drawn from over seven years of Southern's loan and payment data, Southern's borrowers receive a steadily decreasing amount of cash back with each successive refinance, even as their total amount financed increases over time:

25



**Fig. 1**

88.     The red bar in Figure 1 represents the average amount financed in a Southern loan; the blue bar represents the average amount of cash received by the borrower. The borrower receives the most cash in loan 1, the borrower's initial loan with Southern. But as the borrower repeatedly refinances (i.e., loans 2-6, and so on), two trends become apparent: (1) the amount financed steadily increases; and (2) the cash the borrower receives steadily decreases. As a result of these two phenomena, Southern's revenue will steadily increase the more often that their borrowers refinance their loans. Indeed, as recently as 2019, Southern earned more than $3 for every $1 that the company paid out on all refinanced loans.

89.    Further, approximately 45% of the refinanced loans across Southern's entire portfolio were for cash disbursements to the borrower of less than the first payment due on their refinanced loan—in many cases so low that they were just enough money to buy a cup of coffee. Approximately 25% of Southern's loans that were refinanced to resolve a delinquency during this period were for cash-out payments of $10 or less, and more than 10% of refinances to resolve delinquencies were for cash-out payments of less than $1.

90.    Again, Southern instructs employees to pressure payment-stressed borrowers to refinance, even when doing so would result in a minimal cash benefit. As a typical June 2019 email from a company field director put it: "Lead your collection calls today with a solicit of the cash available, even if they only have $3 available. Refinances are the most important driver of your business!!" Another such email instructs employees: "Looking at the accounts that are in the negative cash available, tell the customers all they have to pay is to get them $0.01 available, then they can refinance!!"

91.    These paltry cash disbursements confirm that many Southern borrowers use early-term refinances to obtain fleeting relief from unaffordable payments, and to avoid prolonged delinquency and default, rather than as a source of meaningful liquidity to weather an emergency hardship. This is especially true of the nearly 10,000 borrowers who were in continuous, uninterrupted debt to Southern from 2013 to at least 2020.

92.    Southern's business model is clear: put payment-stressed borrowers in unaffordable refinances; when they fall behind on their payments, refinance them again and again; with each refinance, front-load the collection of unearned interest and

insurance premiums while harvesting a new round of upfront fees; and repeat this cycle for as long as possible.

## CFPA VIOLATIONS

93.     The CFPA grants the Bureau authority to bring civil actions to seek legal and equitable relief for violations of the Act. 12 U.S.C. § 5564(a).

94.     The CFPA prohibits covered persons or service providers from engaging in deceptive, unfair, or abusive acts or practices in connection with offering or providing a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5481(6)(A).

95.     Defendants are "covered persons" under the Act because they extend credit and services loans to consumers. 12 U.S.C. §§ 5481(5), (15)(A)(i).

## COUNT I
## UNFAIR PRACTICES

*Southern's practice of churning payment-stressed borrowers*
*in fee-laden refinances is unfair.*

96.     The Bureau realleges and incorporates by reference paragraphs 1-92.

97.     An act or practice is unfair under the CFPA if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

98.     Southern's practice of churning payment-stressed borrowers in costly refinances is unfair. Southern's loan-churning practices collectively include:

　　　　a.  underwriting refinanced loans to prioritize borrowers with a "propensity to refinance," even when borrowers have exhibited objective indicia of

28

payment stress (e.g., delinquencies of 14 days or more) that demonstrated their inability to repay their existing loans;

b. touting refinances on similar terms as "fresh starts," "solutions," and "best options" for payment-stressed borrowers despite their exhibiting objective indicia of payment stress while struggling to repay their existing loans;

c. limiting the reasonable alternatives to refinancing for payment-stressed borrowers once they have fallen behind on their payments;

d. using an incentive-compensation scheme that rewards employees who induce payment-stressed borrowers into repeatedly refinancing their loans while punishing employees who fail to meet the company's refinance standards;

e. taking notional security interests in payment-stressed borrowers' household goods or vehicle and threatening repossession of collateral as leverage to induce payment-stressed borrowers to refinance; and

f. making in-person visits to the homes of payment-stressed borrowers and using collections calls to solicit refinances while emphasizing the negative consequences of prolonged delinquency and default.

99.     Payment-stressed borrowers whom Southern churns in costly refinances suffer substantial injury through Southern's repeated imposition of upfront fees and front-loading of their collection of unearned interest and insurance premiums, which steadily erodes borrowers' available credit and makes it harder for them to pay off their loans.

100. Payment-stressed borrowers whom Southern churns in costly refinances suffer substantial injury because refinancing increases the length of their indebtedness and their total cost of borrowing without meaningfully reducing their risk of eventual default in the future.

101. Payment-stressed borrowers whom Southern churns in costly refinances also suffer substantial injury when they must undertake harmful default-avoidance measures. That is, while each successive refinance may enable payment-stressed borrowers to pay some other debts or pay for some basic living expenses, Southern's practices steadily erode the borrowers' available credit and increase the likelihood that they will have to defer or forgo payment on other debts and for basic living expenses to repay their Southern loans in full. This is especially the case given Southern's reimposition of upfront origination fees at each successive refinance.

102. Southern's borrowers cannot reasonably avoid the substantial injury from repeated refinancing under payment stress that is caused or is likely to be caused by Southern's churning practices. This injury is not reasonably avoidable because payment-stressed borrowers' only means to avoid it are by defaulting or undertaking costly default-avoidance measures. An injury is not reasonably avoidable if the only means to avoid it would impose their own substantial harms.

103. Alternatively, this injury is not reasonably avoidable because payment-stressed borrowers cannot reasonably anticipate how the repeated imposition of upfront fees and front-loaded collection of unearned interest erodes their available credit with each successive refinance. These borrowers cannot reasonably avoid injury that they cannot

reasonably anticipate. Once Southern's payment-stressed borrowers fall behind on their loan payments, they have no reasonable alternatives other than refinancing to become current on their loan payments. This is so because: (a) these borrowers are a financially vulnerable population for whom credit access is already scarce; (b) Southern refuses to accept partial payments, modify repayment terms, or otherwise extend borrowers' due dates; and (c) these borrowers cannot afford to make two or more payments to get current.

104.    Further, Southern's payment-stressed borrowers cannot reasonably avoid the injury from repeated refinancing by remaining delinquent, because prolonged delinquency creates a cascading series of negative consequences, including Southern's imposition of late fees, negative credit reporting, in-person visits to the borrowers' homes, and threats to repossess collateral or file collections lawsuits.

105.    Nor is the unavoidable injury from repeated refinancing under payment stress outweighed by countervailing benefits to consumers or to competition. Although payment-stressed borrowers may theoretically benefit from delaying default and from the ability to skip an upcoming payment by refinancing, those benefits are outweighed by the cumulative injury from the long-term indebtedness and associated costs caused by Southern's churning of borrowers in costly refinances. The repeated imposition of upfront fees and front-loaded collection of unearned interest and insurance premiums steadily erodes borrowers' available credit with each successive refinance, many times resulting in small cash disbursements. And, ultimately, many of Southern's borrowers who refinance under payment stress eventually default or undertake costly default-

avoidance measures (or both) anyway—but not before Southern has harvested several new rounds of fees with each successive refinance.

106.    Southern therefore engaged in unfair acts or practices that violated §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

**COUNT II**
**ABUSIVE PRACTICES**

***Southern's practice of churning payment-stressed borrowers in fee-laden refinances is abusive because it takes unreasonable advantage of borrowers' lack of understanding of the material risks, costs, or conditions of repeatedly refinancing.***

107.    The Bureau realleges and incorporates by reference paragraphs 1-92.

108.    An act or practice is abusive under the CFPA if it "takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(A). Southern's practice of churning payment-stressed borrowers in costly refinances satisfies each element of this prong of abusiveness.

***Southern's payment-stressed borrowers lack an understanding of the material risks, costs, or conditions of a fee-laden refinanced Southern loan.***

109.    Many of Southern's borrowers lack an understanding of the material risks, costs, or conditions of refinancing a Southern loan under payment stress. Specifically, many of Southern's payment-stressed borrowers lack an understanding that:

a.  by refinancing, they are prolonging their time in debt by taking out a new loan on terms that they have a demonstrated inability to repay;

32

b. by refinancing, they are paying another upfront origination fee, which Southern immediately recoups, and paying more in cumulative pre-computed interest and insurance premiums;

c. by refinancing, they are paying another upfront origination fee and more in cumulative pre-computed interest and insurance premiums, which diminishes the amount of cash back they can receive with each successive refinance, even as their total amount borrowed remains constant or increases; and

d. by refinancing once, they become more likely to refinance again and incur a high risk of eventual default, which compounds the harms that result from repeated refinancing.

### *Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding.*

110.    Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding by exploiting and profiting from their asymmetric access to information about the material risks, costs, or conditions of a refinanced Southern loan.

111.    Southern's credit-scoring model enables them to identify and prioritize those of their borrowers who have a demonstrated "propensity to refinance" their loans despite exhibiting objective indicia of payment stress.

112.    Southern understands that many of the borrowers who take out the company's nine-month installment loans will fall behind on their payments and will have no reasonable alternatives to refinancing to resolve their delinquency and avoid default.

113.   Southern understands that by not accepting partial payments, extending payment due dates, or otherwise modifying loan terms to make them more affordable, the company will force payment-stressed borrowers to refinance to avoid prolonged delinquency or defaulting.

114.   Southern understands that borrowers who are forced to refinance under payment stress to avoid prolonged delinquency and default will, in many instances, incur long-term debts to the company that vastly exceed the nine-month repayment terms that they originally signed up for. Southern understands the inevitable result of these practices, as many of Southern's borrowers are in continuous, uninterrupted debt to the company for several years.

115.   Southern understands that their profitability hinges on their ability to keep payment-stressed borrowers in continuous debt, rather than on enabling them to repay their loans according to their disclosed terms. Southern understands that by keeping borrowers in continuous debt, they can harvest a new round of upfront fees with each successive refinance. And Southern understands that their interest in keeping borrowers in continuous debt is misaligned with their borrowers' interest in full and timely repayment of their Southern loans.

116.   By marketing refinances as solutions, fresh starts, and best options for payment-stressed borrowers, Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding that refinancing on the same unaffordable and non-negotiable terms serves only to prolong their time in debt and total cost of borrowing and does not offer a long-term solution to their inability to repay their current loan.

117.    By harvesting upfront fees and front-loading their collection of unearned interest and insurance premiums each time payment-stressed borrowers refinance, Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding of how repeatedly refinancing on Southern's terms erodes their available credit, increases their total cost of borrowing, and increases the difficulty of eventually paying off their debt to Southern.

118.    By sharply limiting the reasonable alternatives to refinancing that payment-stressed borrowers have to avoid prolonged delinquency and default, Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding of how likely they are to become trapped in a cycle of debt to Southern after they have fallen behind on their loan payments.

119.    By churning payment-stressed borrowers in costly refinances to avoid prolonged delinquency and default, making lending decisions that are driven by the goal of keeping borrowers in debt, then profiting from payment-stressed borrowers' failure to repay their loans according to their terms, Southern takes unreasonable advantage of payment-stressed borrowers' lack of understanding of the material risks, costs, and conditions of repeatedly refinancing with Southern.

120.    Southern therefore engaged in abusive acts or practices that violated §§ 1031(d)(2)(A) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

## COUNT III
## ABUSIVE PRACTICES

***Southern's practice of churning payment-stressed borrowers in fee-laden refinances is abusive because it takes unreasonable advantage of borrowers' inability to protect their interests in selecting or using a refinanced loan.***

121.    The Bureau realleges and incorporates by reference paragraphs 1-92.

122.    An act or practice is abusive under the CFPA if it "takes unreasonable advantage of the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B).

123.    Southern's practice of churning payment-stressed borrowers in costly refinances satisfies each element of this prong of abusiveness.

***Southern's payment-stressed borrowers cannot protect their interests in selecting or using a refinanced Southern loan.***

124.    Southern's payment-stressed borrowers' interests in selecting or using a refinanced loan include: (a) meeting their immediate cash needs, (b) repaying their loan according to its terms without needing to repeatedly re-borrow or undertake costly default-avoidance measures, and (c) mitigating their risk of eventual default.

125.    Once they are in an unaffordable loan, Southern's payment-stressed borrowers lack an ability to protect their interests in selecting or using a refinanced loan. Once they become legally obligated to repay a loan that they can't reasonably afford, Southern's payment-stressed borrowers face imminent harms from prolonged delinquency and default. To avoid these imminent harms, Southern's payment-stressed borrowers have limited options, all of which impose harms of their own.

126.   To come up with two or more unaffordable payments, these borrowers likely must either borrow from another high-cost lender that caters to this credit-constrained borrower population, or undertake harmful default-avoidance measures, such as deferring or forgoing payment on other debts and for basic living expenses.

*Southern takes unreasonable advantage of the inability of their payment-stressed borrowers to protect their interests.*

127.   Southern takes unreasonable advantage of payment-stressed borrowers' inability to protect their interests by making them refinanced loans that they can't reasonably afford to repay and then servicing the loans in a way that limits their reasonable alternatives to refinancing under payment stress again in the future.

128.   Southern takes unreasonable advantage of these refinancing borrowers by harvesting upfront fees and front-loading their collection of unearned interest and insurance premiums with each successive refinance. These practices erode the borrowers' available credit, impose a well-disguised prepayment penalty, prolong the borrowers' time in debt, and increase the borrowers' total cost of borrowing.

129.   Southern therefore engaged in abusive acts or practices that violated §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

## PRAYER FOR RELIEF

The Bureau thus requests that the Court:

      a.  permanently enjoin Defendants from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536;

b.  award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including but not limited to rescission or reformation of contracts, refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

c.  impose a civil money penalty against Defendants;

d.  order Defendants to pay the Bureau's costs incurred in connection with prosecuting this action; and

e.  award additional relief as the Court may deem just and proper.

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Cara Petersen
*Principal Deputy Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Kara Miller
*Assistant Litigation Deputy*

*/s/ David Hendricks*
John Thompson (NM Bar No. 139788)
Motion for Admission Pro Hac Vice forthcoming
Gregory W. Jones (IL Bar No. 6313157)
Motion for Admission Pro Hac Vice forthcoming
David Hendricks (SC Bar No. 10547)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7270 (Thompson)
202-573-1372 (Jones)
312-610-8967 (Hendricks)
Fax: 703-642-4585
john.thompson@cfpb.gov

gregory.jones@cfpb.gov
david.hendricks@cfpb.gov
*Attorneys for the Consumer Financial
Protection Bureau*