**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION; COVINGTON CREDIT OF ALABAMA, INC.; SOUTHERN FINANCE OF TENNESSEE, INC.; COVINGTON CREDIT OF GEORGIA, INC.; SOUTHERN FINANCE OF SOUTH CAROLINA, INC.; COVINGTON CREDIT OF TEXAS, INC.; COVINGTON CREDIT, INC.; and QUICK CREDIT CORPORATION,<br><br>Defendants. | ) | Civil Action No.: 6:23-CV-04177-JDA |

**DEFENDANTS HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION, COVINGTON CREDIT OF ALABAMA, INC., SOUTHERN FINANCE OF TENNESSEE, INC., COVINGTON CREDIT OF GEORGIA, INC., SOUTHERN FINANCE OF SOUTH CAROLINA, INC., COVINGTON CREDIT OF TEXAS, INC., COVINGTON CREDIT, INC., AND QUICK CREDIT CORPORATION'S ("DEFENDANTS") MEMORANDUM IN SUPPORT OF RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. TILA and Regulation Z Disclosure Requirements ..... 2

II. TILA and Regulation Z Ability-to-Repay Requirements ..... 3

III. Origination Fees and the Rule of 78 Accounting Method Under State Laws ..... 5

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. The CFPB Lacks Constitutionally-Authorized Funds to Prosecute this Case ..... 7

A. "Combined Earnings" Refers to the Federal Reserve System's Profits ..... 8

B. The CFPB's Unconstitutionally-Funded Actions Must Be Invalidated ..... 11

C. The CFPB Lacks Constitutionally-Appropriated Funds to Bring this Action ..... 12

II. The Court Should Dismiss the Complaint Because it is the Product of an Unconstitutional Delegation of Congressional Power ..... 14

A. The CFPB's Vast Authority to Determine What Constitutes Unfair or Abusive Acts or Practices Violates the Nondelegation Doctrine ..... 14

B. The Breadth of the CFPB's Authority Amplifies the Constitutional Violations ..... 15

III. The CFPB's Attempt to Create New Compliance Requirements Violates the Major Questions Doctrine ..... 16

IV. Administrative Law and Constitutional Principles of Fairness Require Dismissal of All Counts ..... 18

A. CFPA and APA Rulemaking Requirements ..... 19

B. Due Process ..... 20

V. The Court Should Dismiss Count I ..... 21

A. The Complaint Fails to State a Plausible Claim for Relief for Unfair Practices in Violation of the CFPA ..... 21

1. The Complaint Fails to Allege that Defendants' Acts or Practices Are Likely to Cause Substantial Injury to Consumers ..... 22
2. The Complaint Fails to Allege a Substantial Injury that is Not Reasonably Avoidable by Consumers ..... 25
3. The Complaint Fails to Allege the Purported Substantial Injury is Not Outweighed by Countervailing Benefits to Consumers or to Competition ..... 28

VI. The Court Should Dismiss Count II ..... 29

A. The Complaint Fails to State a Plausible Claim for Relief for Abusive Practices in Violation of the CFPA ..... 29

1. The Complaint Fails to Allege a Lack of Understanding ..... 29
2. The Complaint Fails to Allege that Defendants Took Unreasonable Advantage of Any Purported Lack of Understanding ..... 32

VII. The Court Should Dismiss Count III ..... 33

A. The Complaint Fails to State a Plausible Claim for Relief for Abusive Practices (Count III) in Violation of the CFPA ..... 33

VIII. All Counts are Barred, In Whole or In Part, by the Applicable Statute of Limitations ..... 34

CONCLUSION ..... 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Franklin*,
No. 2:09-cv-11096, 2010 WL 742765 (E.D. Mich. Feb. 26, 2010) ....................................33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................6, 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................6, 30

*Bittner v. United States*,
598 U.S. 85 (2023)..................................................................................................20

*Bradshaw v. SLM Corp.*,
No. C 12-06376 JSW, 2014 WL 12629968 (N.D. Cal. May 29, 2014)..............................33

*CFPB v. All American Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) (en banc) (Jones, J., concurring) ...........................................12

*CFPB v. Comm. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)..........................................................................7, 9, 11, 13, 14

*Chamber of Commerce of United States of America v. CFPB*,
691 F.Supp.3d 730 (E.D. Tex. 2023)...........................................................17, 22, 27

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000).....................................................................................8, 10, 19

*Collins v. Yellen*,
594 U.S. 220 (2021)............................................................................................11, 13

*Comm. Fin. Servs. Ass'n of Am. v. CFPB*,
51 F.4th 616 (5th Cir. 2022), *rev'd and remanded on other grounds, CFSA*,
601 U.S. 416 ......................................................................................................11, 13

*Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*,
673 F.2d 525 (D.C. Cir. 1982) ........................................................................................6

*Consumers' Rsch. v. Fed. Commc'ns Comm'n*,
__ F.4th __, No. 22-60008, 2024 WL 3517592 (5th Cir. July 24, 2024) ...............................14

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974)...........................................................................................8, 9

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................25, 26, 27, 29, 30

*De-Treville v. United States*,
445 F.2d 1306 (4th Cir. 1971) ....................11

*Deutsche Bank Nat'l Trust Co. v. I.R.S.*,
361 F. App'x 527 (4th Cir. 2010) ....................6

*Drager v. PLIVA USA, Inc.*,
741 F.3d 470 (4th Cir. 2014) ....................6

*Edwards v. Douglas*,
269 U.S. 204 (1925)....................11

*Field v. Mans*,
516 U.S. 59 (1995)....................8

*FTC v. Walmart Inc.*,
664 F. Supp. 3d 808 (N.D. Ill. 2023) ....................22

*Gen. Elec. Co. v. U.S. E.P.A.*,
53 F.3d 1324 (D.C. Cir. 1995) ....................20

*Gundy v. United States*,
588 U.S. 128 (2019) (plurality opinion) ....................14

*Hayrioglu v. Granite Cap. Funding, LLC*,
794 F.Supp.2d 405 (E.D.N.Y. 2011) ....................30

*Karakus v. Wells Fargo Bank, N.A.*,
941 F.Supp.2d 318 (E.D.N.Y. 2013) ....................30, 32

*LabMD, Inc. v. F.T.C.*,
678 F. App'x 816 (11th Cir. 2016) ....................22

*Mississippi v. Louisiana*,
506 U.S. 73 (1992)....................8

*Mistretta v. United States*,
488 U.S. 361 (1989)....................14

*Mountain Valley Pipeline, LLC v. N. Carolina Dep't of Env't Quality*,
990 F.3d 818 (4th Cir. 2021) ....................7

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950)....................20

*Muncy v. Centex Home Equity Co.*,
No. 1:14CV00016, 2014 WL 5326436 (W.D. Va. Oct. 20, 2014)........................................33

*N.C. Coastal Fisheries Reform Group v. Capt. Gaston, LLC*,
76 F.4th 291 (4th Cir. 2023) ..................................................................................16

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)...................................................................................................8

*Ruffin v. Lockheed Martin Corp.*,
659 F. App'x 744 (4th Cir. 2016) ..........................................................................24

*Salt Lake City Corp. v. Sekisui SPR Ams., LLC*,
No. 2:17-cv-01095, 2018 WL 4688356 (D. Utah Sept. 28, 2018)
(unpublished) .........................................................................................................34

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)...........................................................................................11, 15

*Springfield Parcel C, LLC v. United States*,
124 Fed. Cl. 163 (2015) ..........................................................................................12

*Stamm v. Barclays Bank*,
960 F.Supp. 724 (S.D.N.Y. 1997) ..........................................................................30

*Touby v. United States*,
500 U.S. 160 (1991).................................................................................................14

*United States v. Mingo*,
964 F.3d 134 (2d Cir. 2020)....................................................................................15

*West Virginia v. EPA*,
597 U.S. 697 (2022)...................................................................................16, 17, 18

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001).................................................................................................15

**Constitutions and Statutes**

U.S. Const. art. I, § 1...............................................................................................14

U.S. Const., Amdts. V, XIV .....................................................................................20

5 U.S.C. § 552(a)(1)(E)..............................................................................................19

5 U.S.C. § 552(a)(2)(E)..............................................................................................19

5 U.S.C. § 553(c) ...................................................................................................6, 20

5 U.S.C. § 706 .......... 6

5 U.S.C. § 706(2)(A),(C) .......... 7, 19

12 U.S.C. § 289 .......... 12

12 U.S.C. §§ 342-361 .......... 12

12 U.S.C. § 5497 .......... 9, 13

12 U.S.C. § 5497(a)(1) .......... 7, 9

12 U.S.C. § 5497(c)(1) .......... 9

12 U.S.C. § 5512(b)(2)(A) .......... 6, 20

12 U.S.C. § 5531(a) .......... 14

12 U.S.C. § 5531(b) .......... 4, 14

12 U.S.C. § 5531(c)(1) .......... 21, 29

12 U.S.C. § 5531(c)(1)(A) .......... 22, 25

12 U.S.C. § 5531(c)(1)(A-B) .......... 15

12 U.S.C. § 5531(c)(1)(B) .......... 28

12 U.S.C. § 5531(c)(2) .......... 18, 21, 23, 26, 27

12 U.S.C. §5531(c) .......... 21

12 U.S.C. §5536(a)(1)(B) .......... 21

12 U.S.C. § 5531(d) .......... 15

12 U.S.C. § 5531(d)(2)(A) .......... 29

12 U.S.C. § 5531(d)(2)(B) .......... 33

12 U.S.C. § 5564(g)(1) .......... 34

15 U.S.C. § 45 .......... 22

15 U.S.C. § 1601(a) .......... 3

15 U.S.C. § 1601 *et seq*. .......... 2

15 U.S.C. § 1605 .......... 23

15 U.S.C. § 1638(a) .......... 3, 31

15 U.S.C. § 1639(h) .......... 3

15 U.S.C. §1639c(a) .......... 3

15 U.S.C. §1639c .......... 32

15 U.S.C. §1665e .......... 3, 32

15 U.S.C. § 1650 .......... 3

31 U.S.C. § 1341- 42 .......... 12, 13

31 U.S.C. §1341(a) .......... 12

Ala. Code § 5-18-15(d) .......... 24

Ala. Code § 5-18-15(d)(1) .......... 5

S.C. Code Ann. § 37-3-201(3) .......... 23

S.C. Code Ann. § 37-3-210(4) .......... 5

S.C. Code Ann. § 37-3-204(1)(g) .......... 5

Tex. Fin. Code § 342.252 .......... 5

Tex. Fin. Code § 342.256 .......... 5

**Rules and Regulations**

12 C.F.R. § 1026 .......... 2

12 C.F.R. § 1026, Appendix H to Part 1026 - - Closed End Model Forms and Clauses, H-11 Installment Loan Sample .......... 3

12 C.F.R. § 1026.17 .......... 3

12 C.F.R. § 1026.17(a) .......... 3

12 C.F.R. § 1026.20(a) .......... 24

Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020) .......... 5, 29

**Other Authorities**


Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024) ....................8, 11, 13

Bd. Of Governors of the Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements* (last updated Mar. 26, 2024) ....................9

Bd. Of Governors of the Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* (Apr. 2024)....................10

Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Balance Sheet Developments (May 2023) ....................13

CFPB, *Financial Report Of The Consumer Financial Protection Bureau* (Nov. 15, 2022) ....................13

CFPB, *Financial Report of the CFPB* 45–46, 68 (Nov. 15, 2023) ....................13

CFPB, Truth in Lending Act (TILA) Examination Procedures (Oct. 22, 2021) ....................31

CFPB, Unfair, Deceptive or Abusive Acts or Practices ("UDAAPs") Examination Procedures (Oct. 1, 2012) ....................21, 22, 24, 26, 27

Cong. Research Serv., *Why Is The Federal Reserve Operating At A Loss* (Jan. 23, 2023) ....................13

Encyclopedia of Banking and Finance (10th ed. 1994) ....................9

*Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024) ....................7, 8

*Financial Report of the CFPB* 45-46, 68 (Nov. 15, 2023) ....................13

*Financial Report Of The Consumer Financial Protection Bureau* 7 (Nov. 15, 2022) ....................12

FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) ....................22, 24

Merriam-Webster Dictionary....................9

Nasdaq, *Glossary of Stock Market Terms*....................10

Oxford Dictionary of Accounting (4th ed. 2010) ....................9

Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017) ....................4

Payday, Vehicle Title, and Certain High-Cost Installment Loans, 84 Fed. Reg. 4252 (Feb. 14, 2019) ....................4, 17, 20, 29

Sec. & Exch. Comm'n, Compliance and Disclosure Interpretations, Question 103.01 (last updated Dec. 2022) ....................10

Sec. & Exch. Comm'n, *Beginners' Guide to Financial Statements* (Jan. 12, 2014)....................10

Stanley I. Langbein, *Federal Income Taxation of Banks & Financial Institutions* § 13:33 (2024)....................9

Defendants respectfully submit this Memorandum in Support of their Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) ("Motion"). For the reasons detailed below, this Court should grant the Motion and dismiss with prejudice all counts asserted by the Consumer Financial Protection Bureau ("CFPB") in the above-captioned Complaint ("Complaint").

## INTRODUCTION

Defendants are state-licensed, state-examined companies that provide installment loans to consumers through a network of brick-and-mortar storefronts in Alabama, Georgia, Oklahoma, South Carolina, Tennessee, and Texas. (ECF 1, ¶ 21). Defendants comply with applicable federal and state consumer lending laws and regulations, including the federal Truth in Lending Act ("TILA") and its implementing Regulation Z. Defendants also clearly and conspicuously disclose the fees, finance charges, and other terms of their loans. That is why the Complaint is missing TILA, Regulation Z, and deception claims.

Rather than exercising its rulemaking authority under TILA or the Consumer Financial Protection Act ("CFPA"), the CFPB seeks to create new compliance obligations through this litigation and similar lawsuits against other companies. This effort to sidestep the public rulemaking process seeks to supplant state law; disregard the plain language of the CFPA, TILA, and Regulation Z; and bypass the Administrative Procedure Act ("APA"). The Court should reject the CFPB's attempt to do so.

The CFPB also lacks any constitutionally-appropriated funds from the "combined earnings" of the Federal Reserve System to prosecute this case, because, due to rising interest rates, the Federal Reserve's expenses have exceeded its revenue since September 2022. Without any surplus, the Federal Reserve had no "combined earnings" to transfer to the CFPB before, during, and after the CFPB filed the Complaint in August 2023.

## BACKGROUND

The Complaint is novel because it alleges that certain practices, which are lawful under applicable federal and state laws (*e.g.*, charging origination fees and insurance premiums, requiring borrowers to make timely payments, and offering refinancing in certain situations), are unfair and abusive under the CFPA. (ECF 1, ¶¶ 97-128). It also alleges that Defendants' refinancing offers are abusive under the CFPA because they allegedly take unreasonable advantage of consumers' lack of understanding and consumers' inability to protect their interests. (ECF 1, ¶¶ 109-119). The Complaint, however, does not assert any TILA violations or allege deception under the CFPA. It also fails to explain how consumers lacked information to make informed decisions about their initial loans or their subsequent loans. Finally, the Complaint fails to identify any federal law that requires Defendants to assess a prospective borrower's ability to repay before making a loan because TILA and Regulation Z only impose ability-to-repay requirements for certain types of consumer credit, but *not* for installment loans.

Installment loans, like Defendants' loans, are nothing new. They have existed for decades and are heavily regulated under state law, TILA, and Regulation Z. These laws and regulations govern the lending process from disclosures to fees, methods for computing interest, and collections. The CFPB cannot amend TILA and Regulation Z or supplant state laws to impose new disclosure, ability-to-repay, and other requirements, which would be sweeping regulatory changes, by judicial fiat.

### I. TILA and Regulation Z Disclosure Requirements

The primary federal statute and regulation governing consumer credit are TILA (15 U.S.C. § 1601 *et seq.*) and its implementing Regulation Z (12 C.F.R. § 1026). They impose an array of obligations on companies extending consumer credit, including disclosure requirements, so consumers can "compare more readily the various credit terms available to [them] and avoid the

uninformed use of credit." 15 U.S.C. § 1601(a). Congress enacted TILA to address the very issues raised in the Complaint by mandating highly-prescribed disclosures and requiring an assessment of a consumer's ability to repay for certain credit products. *Id.*

Defendants exclusively offer closed-end, installment loans. TILA and Regulation Z require creditors to provide detailed disclosures before making an installment loan. *See* 15 U.S.C. § 1638(a); 12 C.F.R. § 1026.17. The requirements include the clear and accurate disclosure of a loan's (1) annual percentage rate of interest; (2) finance charge; (3) amount financed; (4) total number of payments; and (5) total sale price. *Id*. Regulation Z also dictates how this information is presented to consumers. *See* 12 C.F.R. § 1026.17(a); 12 C.F.R. § 1026, Appendix H to Part 1026 - Closed End Model Forms and Clauses, H-11 Installment Loan Sample.

Here, the Complaint is notably missing allegations that Defendants deceived consumers, misrepresented loan terms, or failed to provide disclosures required by TILA, Regulation Z, or state laws. Instead, the CFPB alleges that Defendants should have provided additional disclosures that federal law specifically reserves for credit products not offered by Defendants. *See, e.g.*, 15 U.S.C. § 1639 (high-cost mortgages); 15 U.S.C. § 1650 (private education loans). Apparently unsatisfied with Congress and the Federal Reserve Board's (agency with TILA rulemaking authority before the CFPB) policy judgments about the applicability of these disclosure requirements, and unwilling to amend Regulation Z itself, the CFPB overreaches its authority under the CFPA.

## II. TILA and Regulation Z Ability-to-Repay Requirements

Congress has amended TILA twice to require certain creditors to conduct ability-to-repay analysis before extending certain types of consumer credit. In particular, credit-card issuers and mortgage lenders must consider a consumer's ability to repay before originating those products.

*See* 15 U.S.C. §§ 1639(h), 1639c(a), 1665e. No similar requirement exists for other forms of consumer credit, including installment loans. Limiting the ability-to-repay requirement to two credit products makes it abundantly clear that Congress carefully considered when lenders should conduct ability-to-repay analysis, and made a policy choice to limit the requirement to credit cards and mortgages.

Since its inception, the CFPB assumed rulemaking authority under TILA and Regulation Z from the Federal Reserve Board. The CFPB can also promulgate rules to address unfair and abusive acts or practices under the CFPA. 12 U.S.C. § 5531(b). With these rulemaking authorities, the CFPB previously considered a potential rule that would have imposed an ability-to-repay requirement for certain types of closed-end credit products. More specifically, in November 2017, the CFPB issued a rule for certain high-cost installment loans and payday loans ("Potential Rule"). *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017). The Potential Rule included a requirement, among others, for covered lenders who offer certain types of consumer credit, including payday loans, vehicle-title loans, and installment loans, to assess an applicant's ability to repay. *Id*.

However, before the Potential Rule went into effect, the CFPB rescinded the ability-to-repay underwriting provision, while keeping other sections. *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 84 Fed. Reg. 4252 (Feb. 14, 2019) (hereinafter "Notice of Proposed Rulemaking"). In doing so, the CFPB concluded the "evidence underlying the identification of the unfair and abusive practice in the Mandatory Underwriting Provisions of the 2017 Final Rule is not sufficiently robust and reliable to support that determination, in light of the impact those provisions [would] have on the market." *Id*. at 4253. The CFPB reached this decision to rescind the ability-to-repay requirement after analyzing market data and receiving input from industry

stakeholders during the rulemaking process. *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020). The recission of the ability-to-repay requirement conveyed to the public, including Defendants, that the requirement would remain limited to mortgages and credit cards, and that not assessing a consumer's ability to repay is neither "unfair" nor "abusive" under the CFPA.

Despite Congress' and the CFPB's collective policy decisions *not* to require ability-to-repay analysis for installment loans in TILA, Regulation Z, or the CFPA, the Complaint is replete with ability-to-repay-related allegations, arguing that Defendants' alleged failure to comply with the non-existent requirement is somehow "unfair" and "abusive" under the CFPA. (ECF 1, ¶¶ 3, 29, 33, 43, 98, 109, 116, 125, 127).

The Court should reject the CFPB's use of litigation to create new compliance requirements for Defendants and, by extension, the broader consumer credit industry. This is especially true when the alleged conduct fits squarely within controlling federal statutory and regulatory requirements designed to address the issues at hand (*e.g.*, disclosures and assessing ability to repay). To hold otherwise would enable the CFPB's efforts to evade legislative and rulemaking processes, dramatically alter the regulatory landscape, disrupt the industry's reliance on TILA and Regulation Z when offering products, and ultimately reduce consumers' access to credit products.

**III. Origination Fees and the Rule of 78 Accounting Method Under State Laws**

In addition to TILA and Regulation Z's requirements, state laws govern interest rates, whether origination fees and other fees can be charged, and how creditors can compute rates and handle refunds. For example, many states permit origination fees (*see, e.g.*, Tex. Fin. Code § 342.252 (providing for an "acquisition charge" that is not considered interest), § 342.256 (providing that acquisition charges are "considered to be earned at the time a loan is made" and

"not subject to refund")), and allow creditors to compute refunds using the Rule of 78 (*see, e.g.*, Ala. Code § 5-18-15(d)(1); S.C. Code Ann. §§ 37-3-210(4), 37-3-204(1)(g) (defining "sum of the balances method")). The Complaint, however, alleges that charging origination fees and using the Rule of 78 are part of Defendants' unfair and abusive conduct, even though the practices comply with state laws. (ECF 1, ¶¶ 81, 82, 84). This is yet another attempt by the CFPB to manufacture claims by ignoring controlling state and federal laws and misusing the CFPA.

LEGAL STANDARD

Fed. R. Civ. P. 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Rule 12(c) motions are subject to the same standard as motions to dismiss under Rule 12(b)(6). *Deutsche Bank Nat'l Trust Co. v. I.R.S.*, 361 F. App'x 527, 529 (4th Cir. 2010). Accordingly, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Courts may consider matters outside of the complaint, including facts from the public record and exhibits to the pleadings that are integral to the complaint. *See Drager v. PLIVA USA, Inc.,* 741 F.3d 470, 474 (4th Cir. 2014). However, "labels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertion[s]" devoid of factual enhancement are not sufficient. *Twombly,* 550 U.S. at 555, 557.

Agencies must give the public a meaningful opportunity to engage in notice-and-comment before issuing rules. *See Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982); 5 U.S.C. § 553(c). The CFPA imposes additional rulemaking requirements on the CFPB, such as a cost-and-benefit analysis and assessing the impact to consumers' access to financial products. 12 U.S.C. § 5512(b)(2).

Under the APA, a court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. After that review, the court shall set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A), (C); *see also Mountain Valley Pipeline, LLC v. N. Carolina Dep't of Env't Quality*, 990 F.3d 818, 826 (4th Cir. 2021).

## ARGUMENT

The Court can take multiple paths to the same conclusion—dismissal with prejudice of all claims—in deciding this Motion. First, there are overarching constitutional, statutory, and procedural/fairness reasons the Court should grant this Motion before considering the substance of the allegations in the Complaint (*infra*, §§ I-IV). Second, even if the Court moves beyond the threshold issues, the CFPB fails to allege facts sufficient to state a claim for unfair or abusive acts or practices (*infra*, §§V-VII) under the CFPA. Third, assuming *arguendo* the CFPB sufficiently pleads any CFPA claims, they are time-barred, at least in part (*infra*, § VIII).

### I. The CFPB Lacks Constitutionally-Authorized Funds to Prosecute this Case

The CFPB lacks constitutionally-appropriated funds to bring this enforcement action. Congress created a unique funding mechanism for the CFPB with the Federal Reserve System's "combined earnings" as the only source of the agency's funding. 12 U.S.C. § 5497(a)(1). The U.S. Supreme Court, in *CFPB v. Comm. Fin. Servs. Ass'n of Am., Ltd.* ("CFSA"), held that this funding structure complies with the Constitution's Appropriations Clause because the Federal Reserve transfers "*surplus* funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury" to the CFPB, and therefore, the CFPB's funds are effectively "drawn from the Treasury." 601 U.S. 416, 425 (2024) (emphasis added). Thus, under *CFSA*, the Federal Reserve's surplus funds are the *only* constitutionally-authorized appropriations

that can fund the CFPB's operations. But the Federal Reserve has had no "earnings" since September 2022, when its costs began to exceed its income. *See generally*, Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve Banks Combined Quarterly Financial Report* 2, 25 (Mar. 31, 2024)[1](hereinafter "March 2024 Financial Statement"). Since the CFPB has lacked constitutionally-authorized (*i.e.*, surplus) funds since September 2022, this lawsuit, which was filed in August 2023, should be dismissed.

### *A. "Combined Earnings" Refers to the Federal Reserve System's Profits*

When interpretating a statute, courts start with its plain language. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). A statute's plain meaning is determined by reference to the statutory language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Id.* at 341. Courts may reference dictionaries as a source of the statutory language's plain meaning, *Mississippi v. Louisiana*, 506 U.S. 73, 78 (1992), and where a statute uses language that has an established legal meaning, courts presume that Congress intended for the language to take on its established meaning. *Field v. Mans*, 516 U.S. 59, 69 (1995). Additionally, "where Congress has used technical words or terms of art, it [is] proper to explain them by reference to the art or science to which they [are] appropriate." *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (citation omitted) (alterations in original). Likewise, "[i]nterpretations such as those in opinion letters[,] . . . policy statements, agency manuals, and enforcement guidelines" are "entitled to respect" to the extent that they have the "power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (citations omitted).

Under the statutory text of 12 U.S.C. § 5497 and the Supreme Court's ruling in *CFSA*, the CFPB is properly funded under the Constitution only if the Federal Reserve has "combined

[1] Available at https://www.federalreserve.gov/aboutthefed/files/quarterly-report-20240517.pdf.

earnings" to transfer to the CFPB. 12 U.S.C. § 5497(a)(1); *CFSA*, 601 U.S. at 425. Only these constitutionally-appropriated funds shall pay the CFPB's expenses in carrying out its duties. 12 U.S.C. § 5497(c)(1); *CFSA*, 601 U.S. at 418. "Combined earnings," in turn, refers to the Federal Reserve System's *profits*. Thus, if the Federal Reserve System has no profits, it has no "earnings" to transfer, and the CFPB lacks constitutionally-appropriated funds to prosecute this lawsuit.

Dictionaries, including financial dictionaries and accounting dictionaries, consistently define "earnings" as the "net income or profit" of a business. *See Earnings*, Oxford Dictionary of Accounting (4th ed. 2010); *accord Earnings*, Encyclopedia of Banking and Finance (10th ed. 1994) (defining "earnings as [p]rofits; net income"). "[E]arnings and profits basically are increased by all items of income . . . and reduced by all expenses . . . and all distributions." Stanley I. Langbein, *Federal Income Taxation of Banks & Financial Institutions* § 13:33 (2024). The American Heritage Dictionary provides that "earnings" are "business profits," *Earnings*, American Heritage Dictionary, while the Merriam-Webster Dictionary explains that "[e]arnings" are "the balance of revenue after deduction of costs and expenses," *Earnings*, Merriam-Webster Dictionary.

"Earnings" also clearly means "profits" under well-established accounting principles. S*ee Corning*, 417 U.S. at 201 (noting that "it is proper to explain" a statute's use of "technical words" "by reference to the art or science to which they are appropriate" (citation omitted) (alterations omitted). The Board of Governors of the Federal Reserve prepares its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve System Audited Annual Financial Statements* (last updated Mar. 26, 2024),[2] while the Federal Reserve Banks prepare their financial statements in accordance with

[2] Available at https://www.federalreserve.gov/aboutthefed/audited-annual-financial-statements.htm

the Financial Accounting Manual for Federal Reserve Banks ("Financial Accounting Manual"), which the Board of Governors of the Federal Reserve developed specifically to address the "nature and function of a central bank," Bd. of Governors of the Fed. Rsrv. Sys., *Financial Accounting Manual for Federal Reserve Banks* at iii (Apr. 2024)[3]. Both GAAP and the Financial Accounting Manual provide that "earnings" means profits. *See id.* § 12.60 (stating that remittances are paid from "net earnings"); *accord* Sec. & Exch. Comm'n, Compliance and Disclosure Interpretations, Question 103.01 (last updated Dec. 2022) ("Earnings' means *net* income [i.e., profit] as presented in the statement of operations under GAAP.") (emphasis added); *see also Christensen*, 529 U.S. at 587. Other leading financial institutions have adopted the same accounting-based definition of "earnings." For instance, the Nasdaq defines "Earnings" as "[n]et income for the company during a period," Nasdaq, *Glossary of Stock Market Terms* (defining "Earnings"), and the Securities and Exchange Commission similarly equates "net earnings" with "net profit." Sec. & Exch. Comm'n, *Beginners' Guide to Financial Statements* (Jan. 12, 2014).

The Federal Reserve's own financial statements support the conclusion that it understands its "earnings" to mean its "profits." In the context of remittances to the U.S. Treasury, the Federal Reserve uses the term "earnings" to mean the "residual *net* earnings . . . after providing for the costs of operations, payment of dividends, and the amount necessary to maintain each Federal Reserve Bank's allotted surplus cap." *See* Federal Reserve Form H.4.1 § 6.8 (emphasis added).[4] Furthermore, the Federal Reserve's financial statements include "[e]arnings remittances to the Treasury" as one of the final line items, calculated *after* accounting for its assets, income,

---

[3] Available at https://www.federalreserve.gov/aboutthefed/files/BSTfinaccountingmanual.pdf.

[4] Forms H.4.1 are weekly reports, contained in a database available at: https://www.federalreserve.gov/releases/h41/.

liabilities, and expenses and thereby demonstrating that "earnings" are the profits remaining after expenses are deducted from income. *See* March 2024 Financial Statement, *supra* at 3.

Courts have similarly used "earnings" to refer to profits. In the context of corporate finance—which uses the substantially same accounting terminology as the Federal Reserve—the Supreme Court has explained that the "natural meaning" of the term "undivided profits" is "undistributed earnings." *Edwards v. Douglas*, 269 U.S. 204, 214–15 & n.4 (1925). To reach this conclusion, the Supreme Court relied upon the Committee on Accounting Terminology of the American Association of Public Accountants' explanation that "undivided profits" had the same meaning as "earnings or profits." *Id*. at 215 n.4. The Fourth Circuit is in accord, and has equated "earnings" with "profits" in the context of corporate income. *De-Treville v. United States*, 445 F.2d 1306, 1309 (4th Cir. 1971).

### *B. The CFPB's Unconstitutionally-Funded Actions Must Be Invalidated*

Courts have held as unconstitutional the acts of government agents lacking lawful authority and have invalidated such unconstitutional acts. Congress has also codified this principle in the Antideficiency Act, which prohibits agency action when an agency lacks appropriated funds or spends in excess of its funding.

Where an official "exercise[s] . . . power that the actor did not lawfully possess," *Collins v. Yellen*, 594 U.S. 220, 258 (2021), the "remedy in those cases" is "invalidation of the unlawful actions," *Comm. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022) (citation omitted), *rev'd and remanded on other grounds*, *CFSA*, 601 U.S. 416. Agencies must draw upon valid appropriations to take actions because proper funding is fundamentally "a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority." *CFPB v. All American Check Cashing, Inc.*, 33 F.4th 218, 242 (5th Cir. 2022) (en banc) (Jones, J., concurring). Invalidation as a remedy for

unconstitutional spending extends to an agency's authority to "maintain [a] suit or otherwise enforce a demand." *Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020) (if an agency action is unconstitutional, the "appropriate disposition would be to reverse . . . *and dismiss the case*." (emphasis added)).

The Antideficiency Act calls for the same conclusion: an agency cannot take lawful actions when it lacks constitutionally-authorized funds. 31 U.S.C. §§ 1341–42; *see also* Gov't Accountability Off., *Antideficiency Act Resources*. Instead, the Antideficiency Act requires agencies to cease operations when they are unfunded. 31 U.S.C. §§ 1341(a). And courts must invalidate government actions taken without constitutional appropriations to support the unfunded actions. *See, e.g.*, *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 190 (2015).

### *C. The CFPB Lacks Constitutionally-Appropriated Funds to Bring this Action*

Here, the CFPB lacked authority to bring this action because the Federal Reserve has (and at all relevant times, had) no "combined earnings" to transfer to the CFPB. The Federal Reserve is funded outside of congressional appropriations from interest on securities acquired through open-market operations, fees received from depository institutions, and interest on loans to depository institutions. *See generally* 12 U.S.C. §§ 342–361. After covering its operating costs, paying dividends, and setting aside a mandated surplus, the Federal Reserve consolidates the net earnings of its twelve banks and remits the "combined earnings" to the U.S. Treasury. 12 U.S.C. § 289. Due to rising interest rates, however, the Federal Reserve has not generated sufficient revenue to cover its expenses since September 2022, and accordingly ceased making certain periodic remittances to the Treasury. *See* Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve

Balance Sheet Developments (May 2023)[5]; CFPB, *Financial Report Of The Consumer Financial Protection Bureau* 7 (Nov. 15, 2022) (providing that the cap on CFPB's potential funding was about $734 million in fiscal year 2022) (hereinafter "FY2022 CFPB Report"). When its expenses exceed its income, the Federal Reserve registers the loss as a deferred asset on its balance sheet, and any "positive net income" in future years is directed to eliminating this deferred asset before remittances to the Treasury resume. Cong. Research Serv., *Why Is The Federal Reserve Operating At A Loss* (Jan. 23, 2023).

Despite the publicly-reported shortfall since September 2022, the Federal Reserve has continued to transfer funds to the CFPB, but because the Federal Reserve has failed to generate profits in those periods, those funds are not derived from its "combined earnings." *See* 12 U.S.C. § 5497; March 2024 Financial Statement, *supra* at 2, 25; CFPB, *Financial Report of the CFPB* 45–46, 68 (Nov. 15, 2023)[6] (hereinafter "FY2023 CFPB Report"); *CFSA*, 601 U.S. at 425. As a result, the Federal Reserve's fund transfers to the CFPB since September 2022 are unlawful.

Without proper funding from the Federals Reserve, the CFPB has lacked lawful funding for this lawsuit and its overall operations.[7] Therefore, the CFPB's actions since September 2022 are not constitutionally authorized and violate the Antideficiency Act. *See CFSA*, 51 F.4th at 642;

---

[5] Available at https://www.federalreserve.gov/publications/files/balance_sheet_developments_report_202305.pdf.

[6] Available at https://files.consumerfinance.gov/f/documents/cfpb_final-financial-report-fy_2023-11.pdf.

[7] The CFPB carried over surplus funds at the end of fiscal year 2022, FY2022 CFPB Report at 97 ($401 million in net assets), and the end of fiscal year 2023 on September 30, 2023, FY2023 CFPB Report at 51–52 (Nov. 15, 2023) ($203.4 million in net assets available). However, the CFPB's expenses exceeded its balance, and the CFPB relied upon the Federal Reserve's transfer of funds to finance its operations. FY2023 CFPB Report at 68. Without the Federal Reserve's funds, the CFPB would have accrued a net loss of $135 million. *Id.*

31 U.S.C. §§ 1341–42. Accordingly, the Court should dismiss this lawsuit. *See Collins*, 594 U.S. at 258; *CFSA*, 51 F.4th at 642.

## II. The Court Should Dismiss the Complaint Because it is the Product of an Unconstitutional Delegation of Congressional Power

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. Inherent in that assignment of power to Congress is a restriction on its further delegation. *See Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion). Thus, Congress may "obtain[] the assistance of its coordinate Branches," *Mistretta v. United States*, 488 U.S. 361, 372 (1989), but only "[s]o long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Touby v. United States*, 500 U.S. 160, 165 (1991) (citation omitted); *see Consumers' Rsch. v. Fed. Commc'ns Comm'n*, __ F.4th __, No. 22-60008, 2024 WL 3517592, at *1 (5th Cir. July 24, 2024) (holding that congressional delegation of taxing power to FCC and FCC's sub-delegation of the same violated the nondelegation doctrine and, consequently, the Constitution).

### *A. The CFPB's Vast Authority to Determine What Constitutes Unfair or Abusive Acts or Practices Violates the Nondelegation Doctrine*

Under the CFPA, the CFPB "may take any action . . . to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law" in connection with certain consumer products and services. 12 U.S.C. § 5531(a). The CFPA also gives the CFPB the authority to promulgate rules identifying what conduct is unfair, deceptive, or abusive. 12 U.S.C. § 5531(b). The CFPA, however, provides no sufficiently intelligible principles to guide the CFPB's determination about what is an unfair or abusive act or practice.

With respect to "unfairness," the CFPA merely provides that the CFPB cannot bring a claim for an unfair act or practice unless the CFPB also determinates that the act or practice "is likely to cause substantial injury to consumers which is not reasonably avoidable" and that substantial injury "is not outweighed by countervailing benefits." 12 U.S.C. § 5531(c)(1)(A-B). The CFPA similarly authorizes the CFPB to declare an act or practice abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or takes unreasonable advantage of either (1) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (2) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (3) the reasonable reliance by the consumer on the covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d). But none of this legislation provides a guide to determining what is "unfair" or "abusive" in the first place. As a result, the CFPA falls short of delineating an "intelligible principle" for the CFPB. *See United States v. Mingo*, 964 F.3d 134, 138 (2d Cir. 2020).

### *B. The Breadth of the CFPB's Authority Amplifies the Constitutional Violations*

The CFPB's immense regulatory impact on the nation's economy and financial institutions renders Congress' unguided delegation even more problematic under the nondelegation doctrine and, as discussed below, the major questions doctrine. The Dodd-Frank Act, which includes the CFPA, grants to the CFPB enforcement powers that put it in "an entirely different league" from other regulatory agencies, with authority to "levy[] knee-buckling penalties against private citizens." *Seila Law LLC*, 591 U.S. at 222 n.8. The Supreme Court has recognized that the CFPB has "authority over a significant portion of the U.S. economy." *Id.* at 203. Given this authority, it was incumbent upon Congress to "provide substantial guidance" about the standards the CFPB may enforce. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 475 (2001) (holding that

Congress must "provide substantial guidance on setting . . . standards that affect the entire national economy"). Congress' decision to provide the CFPB with only "vague terms," before setting the CFPB loose to exert its vast powers, fails to provide the necessary guidance under the nondelegation doctrine. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). The Court should therefore dismiss all counts with prejudice.

## III. The CFPB's Attempt to Create New Compliance Requirements Violates the Major Questions Doctrine

The major questions doctrine instructs courts to consider certain issues that "contextually inform [a court's] understanding of a statute's meaning." *N.C. Coastal Fisheries Reform Group v. Capt. Gaston, LLC*, 76 F.4th 291, 296 (4th Cir. 2023). The major questions doctrine "requires clear congressional authority for agency action in 'extraordinary cases' when the 'history and breadth' and 'economic and political significance' of the action at issue gives us 'reason to hesitate before concluding that Congress' meant to confer such authority" to an agency. *Id.* (citing *West Virginia*, 597 U.S. at 697, 721) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).

As its name suggests, the major questions doctrine applies when the question at issue (*i.e.*, the authority the agency claims to have) has significant political and economic consequences. *Id.* (collecting cases). Other "hallmarks" triggering major questions review include instances when an agency's proposed construction of a statute would yield "an extraordinary grant of regulatory authority" or when the statute's "structure indicates that Congress did not mean to regulate the issue in the way claimed." *Id.* (collecting cases). Likewise, a reviewing court can draw the same inference when there is a "different 'distinct regulatory scheme' already in place to deal with the issue which would conflict with the agency's newly asserted authority." *Id.* (citations omitted).

Based on these principles, the Supreme Court recognized that "sweeping grants of regulatory authority are rarely accomplished through 'vague terms' or 'subtle device[s].'" *Chamber of Commerce of United States of America v. CFPB*, 691 F.Supp.3d 730, 740 (E.D. Tex. 2023) (citing *West Virginia*, 597 U.S. at 723). Instead, courts must "presume that Congress intends to make major policy decisions itself," rather than leaving them to agencies. *Id*. And, if the major questions doctrine applies, "something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to *clear congressional authorization* for the power it claims." *See id.* (emphasis added).

The major questions doctrine applies to all counts in the Complaint. Whether the CFPB can mandate new disclosure, ability-to-repay, and other requirements for installment loans when the requirements do not exist under TILA or the CFPA is undoubtedly a question of major economic and political significance. The CFPB itself arrived at this conclusion when it previously considered new ability-to-repay requirements as part of the Potential Rule and ultimately decided to rescind it. *See* Notice of Proposed Rulemaking, at 4264.[8] Indeed, the CFPB noted that extending the ability-to-repay requirement would create substantial burdens for the financial services industry, adversely impact capital markets, and substantially restrict consumer choice and access to credit. *See id.*

In this case, the CFPB lacks clear congressional authorization in the CFPA or TILA to create new requirements through litigating unfair and abusive claims. In fact, the CFPA says the opposite and prohibits the CFPB from using policy preferences as the primary basis for

[8] "In short, the Mandatory Underwriting Provisions of the Rule would impose substantial burdens on industry, significantly constrain lenders' offering of products, and substantially restrict consumer choice and access to credit. All this would occur notwithstanding the judgments that the various States have made to permit lenders to offer and consumers to choose such products subject to certain limitations."

determining whether conduct is unfair. 12 U.S.C. § 5531(c)(2). Permitting the CFPB to expand its regulatory authority through this lawsuit would ignore several "hallmarks" alerting the Court to apply the major questions doctrine: (1) the issues presented in this case pose significant political and economic consequences; (2) the breadth of the CFPB's power to litigate unfair or abusive practice claims would be enormous; (3) Congress has already considered and enacted disclosure, ability-to-repay, and other requirements in specific circumstances; and (4) the CFPB would misuse its enforcement authority under the CFPA to rewrite federal and state laws without following the appropriate legislative or rulemaking processes.

It should not be lost on this Court that the CFPB's flip-flopping on whether to impose an ability-to-repay requirement for installment loans—which has profound implications for consumer credit markets—underscores why major policy decisions weighing the proper balance between consumer protection and access to credit are best left to the elected legislature. *See West Virginia*, 597 U.S. at 723 ("We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'").

Because neither the CFPA nor TILA give the CFPB clear congressional authorization to impose additional requirements, and TILA expressly limits the ability-to-repay requirement to credit cards and mortgages, the CFPB cannot bring claims based on the alleged failure to comply with non-existent obligations. The Court should dismiss all counts in the Complaint with prejudice.

## IV. Administrative Law and Constitutional Principles of Fairness Require Dismissal of All Counts

Throughout the Complaint, the CFPB alleges it is unfair and abusive to refinance loans that Defendants allegedly knew or should have known that borrowers were unlikely to timely repay. As discussed earlier, although TILA and Regulation Z prescribe a host of obligations, including

disclosure and ability-to-repay requirements, neither they nor the CFPA require Defendants to provide the additional disclosures discussed in the Complaint or assess an applicant's ability to repay an installment loan. To the contrary, Congress declined to amend TILA to add such requirements, and the CFPB recently considered and expressly rejected an ability-to-repay requirement for loans like the ones offered by Defendants. For these reasons, imposing such requirements through this litigation would be inequitable and antithetical to well-established principles of Constitutional and administrative law.

### *A. CFPA and APA Rulemaking Requirements*

This Court should not permit the CFPB to evade the procedural safeguards in the notice-and-comment rulemaking process or the safeguards in the APA prohibiting agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). The APA sets forth the process by which agencies, like the CFPB, create rules and regulations.[9] The APA also requires actual notice of changes in law.[10] Here, the Complaint attempts to hold Defendants liable for failing to comply with (non-existent) rules through novel interpretations of the CFPA, even though the CFPB previously declined to include the same requirement (assess ability to repay before making installment loans) in a final rule that it promulgated under the same statute. The Court should not

[9] "Interpretations such as those in opinion letters, like interpretations contained in policy statements, agency manuals, and enforcement guidelines, . . . lack the force of law . . . ." *Christensen.*, 529 U.S. at 587.

[10] "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1)(E). "A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if (i) it has been indexed and either made available or published as provided by this paragraph; or (ii) the party has actual and timely notice of the terms thereof." 5 U.S.C. § 552(a)(2)(E).

permit the CFPB's end run around the CFPA and APA's rulemaking requirements. *See*, *e.g.*, 12 U.S.C. § 5512(b)(2)(A); 5 U.S.C. § 553(c).

***B. Due Process***

Under the Fifth and Fourteenth Amendments, the federal government and states cannot deprive individuals of "life, liberty, or property, without due process of law." U.S. Const., Amdts. V, XIV. Due process requires that parties receive fair notice before being deprived of property. *See, e.g.*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1330, 1333–34 (D.C. Cir. 1995). The fair notice requirement applies in the civil administrative enforcement context. "'[E]lementary fairness compels clarity" in the statements and regulations setting forth the actions with which the agency expects the public to comply. *Id.* at 1329 (citation omitted).

The CFPB's claims present a "serious fair-notice problem" because, not only was fair warning absent about the new compliance obligations discussed in the Complaint, the CFPB affirmatively indicated to Defendants and the public that they need not consider an applicant's ability to repay for installment loans. *See Bittner v. United States*, 598 U.S. 85, 102 (2023) (recognizing a "fair-notice problem" where a number of the government's own guidance documents contradicted the government's position in the litigation); *see also* Notice of Proposed Rulemaking (rescinding the ability-to-repay requirement in the Potential Rule). The CFPB, therefore, cannot seek to retroactively apply requirements that do not exist, and were never announced, as a matter of law.

## V. The Court Should Dismiss Count I

### *A. The Complaint Fails to State a Plausible Claim for Relief for Unfair Practices in Violation of the CFPA*

Count I alleges that Defendants unfairly pushed payment-stressed borrowers into refinancing their existing loans in violation of the CFPA. *See* 12 U.S.C. §§ 5531(c), 5536(a)(1)(B). The unfairness claim should be dismissed because the Complaint fails to plead facts sufficient to state a plausible claim for relief. The CFPB does not allege (and cannot allege) that Defendants' practices described in the Complaint violate applicable federal laws. Instead, the CFPB attempts to impose its policy preference to require ability-to-repay assessments for installment loans, when Congress (and the CFPB) expressly chose not to do so. The CFPA expressly limits the CFPB's authority to determine whether conduct is "unfair":

> The Bureau shall have *no authority* under this section to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, *unless* the Bureau has a reasonable basis to conclude that—
>
> (A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; *and*
>
> (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition.

12 U.S.C. § 5531(c)(1) (emphasis added). Unlike TILA and Regulation Z, the CFPA does not mention—much less require—that lenders assess a consumer's ability to repay. Instead, the CFPA provides that public policy considerations cannot serve as a primary basis for determining unfairness. 12 U.S.C. § 5531(c)(2).

To the extent the Court considers this claim despite Sections I – IV, *supra*, the three-part test set forth in the Federal Trade Commission ("FTC") Act applies to the CFPB's unfairness claim under the CFPA. *See* CFPB, Unfair, Deceptive or Abusive Acts or Practices ("UDAAPs")

Examination Procedures (Oct. 1, 2012) (hereinafter "UDAAP Examination Procedures"); *see also* *Chamber of Commerce*, 691 F. Supp. 3d. at 742. To determine whether an act or practice is unfair, courts consider whether the act or practice: (1) causes or is likely to cause substantial injury to consumers; (2) which is not reasonably avoidable by consumers; and (3) the substantial injury is not outweighed by countervailing benefits to consumers or competition. *See FTC v. Walmart Inc.*, 664 F. Supp. 3d 808, 836 (N.D. Ill. 2023). Courts will also consider whether an act or practice violates an *established* public policy. *Walmart Inc.*, 664 F. Supp. at 836; *see also* FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) (hereinafter the "FTC Unfairness Policy Statement").

As discussed below, Count I fails to satisfy any of the three elements, and the CFPB's desire to expand its authority beyond the plain language of the CFPA contravenes the major questions doctrine.

1. <u>The Complaint Fails to Allege that Defendants' Acts or Practices Are Likely to Cause Substantial Injury to Consumers</u>

The first element is substantial injury, or the likelihood of substantial injury, to consumers. 12 U.S.C. § 5531(c)(1)(A). Substantial injury often involves monetary harm, such as when sellers coerce consumers into purchasing unwanted goods or services or when consumers buy defective goods or services on credit, but are unable to assert against the creditor claims or defenses arising from the transaction. FTC Unfairness Policy Statement. "Merely speculative harms" are unavailing. UDAAP Examination Procedures, p. 2; FTC Unfairness Policy Statement; *see also* *LabMD, Inc. v. F.T.C.*, 678 F. App'x 816, 820 (11th Cir. 2016) (analyzing 15 U.S.C. § 45).

Here, the Complaint alleges the following injuries: (1) the recurring imposition of upfront fees and front-loading collection of Defendants' unearned interest and insurance premiums; (2) the

resulting increase in the length of indebtedness and the total cost of borrowing; and (3) the subsequent need to undertake harmful default-avoidance measures. (ECF 1, ¶¶ 99–101). These allegations fail to establish the first unfairness element because the alleged injuries are not "injuries" caused by Defendants' practices. Instead, the allegations merely recite risks fundamental to any loan: assuming a debt, paying fully-disclosed fees and finance charges permitted by law, and making timely payments to avoid consequences permitted by law (*e.g.*, late fees, credit reporting, refinancing, default). Each theory of substantial injury in the Complaint is addressed below.

First, the Complaint points to the alleged "repeated imposition of upfront fees and front-loading of their collection of unearned interest and insurance premiums, which steadily erodes borrowers' available credit and makes it harder for them to pay off their loans." (ECF 1, ¶ 99). TILA, Regulation Z, and applicable state laws permit these fees, subject to disclosure requirements and other restrictions. *See* 15 U.S.C. § 1605 (providing that permissible finance charges include interest, a "[s]ervice or carrying charge," a "[l]oan fee, finder's fee, or other similar charge," fees related to an investigation or obtaining a credit report, and a "[p]remium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss" whether the fees are paid in cash or financed); *see also* S.C. Code Ann. § 37-3-201(3) (allowing for precomputed loans). The assessment of—and obligation to pay—fully-disclosed, legally-permissible fees is not an "injury" caused by an unlawful act or practice. If they were unlawful, as the Complaint suggests, every consumer loan could be deemed unfair. And the CFPB's apparent policy preference that Defendants and other creditors refrain from charging these fees cannot be the primary basis for determining unfairness. 12 U.S.C. § 5531(c)(2).

Second, the Complaint alleges substantial injury to consumers because borrowers face an increase in the period of indebtedness and the total cost of borrowing. (ECF 1, ¶ 100). This allegation is insufficient for a few reasons. At the outset, this claim is entirely speculative and insufficient to establish substantial injury. *See* UDAAP Examination Procedures, p. 2; FTC Unfairness Policy Statement. Moreover, as discussed above, TILA, Regulation Z, and state laws expressly permit refinancing, subject to disclosures and other requirements. *See* 12 C.F.R. § 1026.20(a) (providing the disclosure requirements for refinancings); *see, e.g.*, Ala. Code § 5-18-15(d) (referencing refinancings when discussing Rule of 78 and refunds). More fundamentally, default is always a risk with loans, and refinancing is a permissible and common way to mitigate that risk. By definition, refinancing requires extending the period of indebtedness and increasing the total cost of borrowing in exchange for potentially avoiding late fees, default, and other negative consequences. Merely characterizing legally-permissible business activity as an "injury," without pleading facts plausibly establishing injury, is insufficient as a matter of law. *See, e.g.*, *Ruffin v. Lockheed Martin Corp.*, 659 F. App'x 744, 745-46 (4th Cir. 2016).

Finally, the Complaint alleges substantial injury because, following a refinancing, borrowers "must undertake harmful default-avoidance measures." (ECF 1, ¶ 101). That allegation is convoluted legalese for borrowers managing their finances to fulfill their obligation to repay loans. It ignores that making timely payments is fundamental to getting a loan and that timely payments *avoid* the alleged harm (defaults). The CFPB's theory seeks to turn on its head how loans operate by alleging that undertaking "default-avoidance measures" (making timely payments) causes harm, rather than avoids it. As with the previous two alleged injuries, the CFPB fails to allege anything beyond well-established obligations associated with any loan or refinance. The alleged harm is also speculative because the Complaint does not plead any specific instances

when consumers actually suffered a substantial injury beyond assuming the routine obligations and risks associated with loans.

For these reasons, the Complaint fails to allege substantial injury, or the likelihood of substantial injury, to consumers, which warrants dismissal of Count I.

2. The Complaint Fails to Allege a Substantial Injury that is Not Reasonably Avoidable by Consumers

The second element requires a showing that any substantial injury "is not reasonably avoidable by consumers." 12 U.S.C. § 5531(c)(1)(A). When determining whether injuries were reasonably avoidable, courts look to whether the consumer had a free and informed choice. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (*quoting F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010)). Importantly, "[a]n alleged injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." *Davis.*, 691 F.3d at 1168–69 (citing *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)).

Here, the Complaint alleges that borrowers could not reasonably avoid the injuries purportedly caused by Defendants' refinancing practices for three reasons: (1) their only means of avoiding refinancing their loans is by either defaulting or undertaking expensive default-avoidance measures; (2) they cannot reasonably anticipate how the successive refinancing's attendant fees and costs erode their available credit; and (3) they cannot avoid refinancing by taking no action (*i.e.*, remaining delinquent). (ECF 1, ¶¶ 102-104).

At the outset, it is worth repeating the Complaint never claims that Defendants deceived consumers under the CFPA or failed to provide required disclosures under TILA or Regulation Z. Indeed, the fees, total cost of credit, extension of the repayment period, consequences for late

payments and non-payments, and other refinancing terms and conditions were fully disclosed in compliance with applicable laws. Consumers therefore had "free and informed" choices and could have reasonably avoided any alleged injury. *See Davis*, 691 F.3d at 1168–69.

The CFPB alleges that borrowers could not reasonably avoid injuries because their only ways to avoid refinancing were defaulting or pursuing "expensive default-avoidance measures," and "[a]n injury is not reasonably avoidable if the only means to avoid it would impose their own substantial harms." (ECF 1, ¶ 102). The Complaint conspicuously lacks any legal authority to support this conclusion. To the contrary, the CFPB's own UDAAP Examination Procedures contradict this theory because analyzing "reasonable avoidance" does *not* turn on "whether a consumer could have made a better choice." UDAAP Examination Procedures, p. 2. This allegation also misses the mark because it ignores that borrowers could have reasonably avoided the situation in the first place by not getting the *initial* loan. The Complaint does not allege any violations in connection with Defendants offering or originating the initial loans to consumers. Rather, the CFPB focuses exclusively on a borrower's choices after they get the initial loan and essentially require that Defendants provide the borrower with a way to avoid all negative consequences of falling behind, such as defaulting and harmful default-avoidance measures. (ECF 1, ¶ 101). But Defendants are not required to give borrowers ways to avoid *all* negative (outcomes. Instead, Defendants offered certain borrowers the option to refinance their loans as a way to avoid late fees and defaults. Some borrowers applied for and received refinancing (after Defendants provided all required disclosures), while other borrowers did not. Again, the CFPB cannot advance its policy preferences through unfairness claims (*see* 12 U.S.C. § 5531(c)(2)), especially when it has expansive rulemaking authorities under the CFPA, TILA, and Regulation Z, which the agency has declined to exercise for installment loans.

Second, the CFPB asserts that the alleged injuries were not reasonably avoidable because borrowers were unable to reasonably anticipate how recurring refinancing erodes their available credit. (ECF 1, ¶ 103). The CFPB argues that no alternatives exist besides refinancing because the borrowers are financially vulnerable. This allegation ignores that borrowers willingly applied for and, after getting all required disclosures, accepted the initial loans and the subsequent terms and conditions of the refinancing. The Complaint also improperly seeks to impose a requirement that does not exist in the CFPA, TILA, or Regulation Z, namely the "requirement" to disclose how refinancing may impact a borrower's available credit. The CFPB does not allege (and cannot allege) that such a requirement applied to Defendants. Nor does the CFPB assert that Defendants have impermissibly withheld information from borrowers necessary to make an informed decision or refinanced loans without the borrowers' knowledge or consent. *See* UDAAP Examination Procedures, p. 2 (describing circumstances that are not reasonably avoidable). Instead, the CFPB continues to improperly impose new requirements on Defendants through litigation rather than rulemaking. Not only is this impermissible (*see Chamber of Commerce*, 691 F. Supp. 3d at 746), but conclusory allegations also fail to establish that consumers lacked "free and informed" choices (*see Davis*, 691 F.3d at 1168–69).

Lastly, the CFPB argues the alleged injuries were not reasonably avoidable because borrowers could not simply remain delinquent, since prolonged delinquency results in additional consequences, such as late fees, negative credit reporting, home visits, potential repossession, and the possibility of litigation. (ECF 1, ¶ 104). As with the earlier allegations, these injuries are speculative and nothing more than a recitation of well-known risks associated with any loan product. And the CFPB's policy preferences regarding how Defendants and other creditors should handle borrowers who fail to make timely payments cannot be the primary basis for unfairness

claims. 12 U.S.C. § 5531(c)(2). Accordingly, the Complaint fails to allege that any alleged substantial injury is not reasonably avoidable by consumers; therefore, the Court should dismiss Count I.

3. The Complaint Fails to Allege the Purported Substantial Injury is Not Outweighed by Countervailing Benefits to Consumers or to Competition

The third element requires that the alleged substantial injuries not be outweighed by countervailing benefits to either consumers or to competition. 12 U.S.C. § 5531(c)(1)(B). The CFPB concedes that borrowers can benefit "from delaying default and from the ability to skip an upcoming payment by refinancing." (ECF 1, ¶ 105). However, the CFPB contends these benefits are outweighed by the harms from long-term indebtedness, refinancing costs, the impact on available credit, and the risk of future default. (ECF 1, ¶ 105). This conclusory attempt to downplay the benefits of refinancing is unavailing. In fact, the CFPB acknowledges that the borrowers at issue had expenses exceeding their monthly incomes, (ECF 1, ¶ 26(d)), had limited access to credit, (ECF 1, ¶ 103), and that borrowers benefited from Defendants' loans and refinancing options, which allow them to pay for other debts and basic living expenses. (ECF 1, ¶ 101).

Instead of fairly weighing these important benefits against the potential harms, the CFPB summarily concludes, without explanation, that the balance is in its favor. The non-existent balancing of benefits is particularly troubling when *all* of the risks purporting to tip the scales in the CFPB's favor relate to conduct that complies with applicable law governing how Defendants offer their loan products to consumers. Coupled with the fact that the CFPB previously rescinded the ability-to-repay requirement from the Potential Rule because it would "substantially restrict consumer choice in the marketplace and limit access to credit," the Complaint clearly fails to

consider the countervailing benefits of Defendants' installment loans. *See* Notice of Proposed Rulemaking, at 4264. The CFPB's failure to conduct this analysis is fatal to Count I.

## VI. The Court Should Dismiss Count II

### *A. The Complaint Fails to State a Plausible Claim for Relief for Abusive Practices in Violation of the CFPA*

The CFPB "shall not" declare an act or practice abusive unless it takes unreasonable advantage of a "lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A). Here, the CFPB fails to allege facts supporting a plausible inference that consumers lacked an understanding of the risks, costs, or conditions of the loan products. The CFPB separately fails to allege that Defendants took "unreasonable advantage" of any purported lack of understanding. For either reason, Count II should be dismissed with prejudice.

#### 1. The Complaint Fails to Allege a Lack of Understanding

Whether a consumer lacks an understanding of the material risks, costs, or conditions of their loan products turns on whether they had a "free and informed choice."[11] *Davis.*, 691 F.3d at 1168; *see also* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020) (stating that "free and informed consumer choice [is] the best regulator of the market"). This reliance upon "free and informed" consumer choice as the "best regulator of the market" is sensible because consumers may act to avoid injury before it occurs if they have

[11] According to the CFPB, the "lack of understanding" element contemplated by 12 U.S.C. § 5531(d)(2)(A) "should be treated as similar to the requisite level of understanding for reasonable avoidability" under 12 U.S.C. § 5531(c)(1), which governs "unfairness" claims as further discussed *supra*. *See* Payday, Vehicle Title, & Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020).

reason to anticipate the impending harms and the means to avoid it. *See Davis*, 691 F.3d at 1168-1169 (citing *Orkin Exterminating Co.*, 849 F.2d at 1356-57).

Separately, "a reasonable consumer is responsible for reading and familiarizing herself with the terms of the agreement she freely enters into." *Karakus v. Wells Fargo Bank, N.A.*, 941 F.Supp.2d 318, 342 (E.D.N.Y. 2013); *see also Stamm v. Barclays Bank*, 960 F.Supp. 724, 731 (S.D.N.Y. 1997). A "reasonable consumer" is also charged with "know[ing] the state of her own finances and whether or not she can afford a certain monthly loan payment." *Karakus*, 941 F.Supp.2d at 340; *see also Hayrioglu v. Granite Cap. Funding, LLC*, 794 F.Supp.2d 405, 412 (E.D.N.Y. 2011).

Count II contains four allegations related to consumers' purported lack of understanding. The Complaint alleges that consumers lack an understanding that refinancing may: (a) prolong their time in debt; (b) require payment of another origination fee; (c) require payment of another upfront origination fee and additional pre-computed interest and insurance premiums; and (d) make them more likely to refinance again and incur a high risk of eventual default. (*See* ECF 1, ¶ 109(a-d)).

As a threshold matter, this Court should not accept as true the speculative allegation that a consumer who refinances once is "more likely to refinance again." (ECF 1, ¶ 109(d)). The same tenet applies to the threadbare recital of the CFPA and the conclusory allegation that consumers lacked an understanding of their loans, without any factual enhancements. *See Iqbal*, 556 U.S. at 663-64; *Twombly*, 550 U.S. at 557. Looking beyond these pleading deficiencies, the substance of the CFPB's allegations fare no better.

Count II alleges that Defendants engaged in abusive practices because consumers lacked an understanding of the loan products' fundamental terms—specifically, how long the repayment

schedule will last (ECF 1, ¶ 109(a)), origination fees associated with refinancing (ECF 1, ¶ 109(b)), and the calculation of interest and insurance premium costs associated with the refinance (ECF 1, ¶ 109(c)). Although the allegations underlying the CFPB's unfairness and abusive claims are squarely regulated by TILA and Regulation Z, the Complaint does not allege that Defendants failed to provide the comprehensive disclosures required by TILA and Regulation Z. TILA was enacted to specifically address the Complaint's allegations:

> TILA is intended to ensure that credit terms are disclosed in a meaningful way so consumers can compare credit terms more readily and knowledgeably. Before its enactment, consumers were faced with a bewildering array of credit terms and rates. It was difficult to compare loans because they were seldom presented in the same format. Now, all creditors must use the same credit terminology and expressions of rates.

CFPB, Truth in Lending Act (TILA) Examination Procedures (Oct. 22, 2021) (hereinafter "TILA Examination Procedures"). Consistent with TILA's express requirements, Defendants fully disclosed each loan's terms and conditions, including *all* of the so-called "abusive" fees and terms referenced in the Complaint. The CFPB cannot plead its way around this fact. And, even if it could, the Complaint does not offer factual allegations explaining how consumers' decisions were neither free nor informed. To the contrary, all TILA and Regulation Z-mandated terms were disclosed "in a meaningful way" to ensure that consumers were making free, informed decisions balancing the material risks, costs, or conditions of the loan products against their unique financial situation and needs. TILA Examination Procedures, at p. 18. Pairing these mandated disclosures (which Defendants provided) with the common-sense principle that consumers are responsible for "reading and familiarizing" themselves with the terms of agreements and for "knowing the state of [their] own finances and whether or not they can afford a certain monthly loan payment," the CFPB does not allege that consumers lacked an understanding of the material risks, costs, or

conditions. *Karakus*, 941 F.Supp.2d at 340, 342. Accordingly, Count II should be dismissed with prejudice.

2. The Complaint Fails to Allege that Defendants Took Unreasonable Advantage of Any Purported Lack of Understanding

These same issues extend to the CFPB's failure to sufficiently plead that Defendants took "unreasonable advantage" of consumers' purported lack of understanding. In conclusory fashion, the Complaint alleges that Defendants took unreasonable advantage of consumers' "lack of understanding of the material risks, costs, and conditions" of refinancing loans, including how such refinances: (a) prolong their time in debt and the total cost of borrowing (ECF 1, ¶ 116); (b) erode their available credit, increase their total cost of borrowing, and increase the difficulty in eventually paying off their debt (ECF 1, ¶ 117); and (c) make them "likely . . . to become trapped in a cycle of debt." (ECF 1, ¶ 118).

To the extent the CFPB's "unreasonable advantage" narrative centers on the presentation of the terms of a loan product to the consumer, there is no allegation (nor can there be) that Defendants failed to comply with TILA or Regulation Z. Unhappy with the outcome compelled by applicable statutes and regulations, this lawsuit is little more than a thinly-veiled attempt to create abusive liability under the CFPA where such liability does not exist under TILA or Regulation Z. As discussed *supra*, this position runs afoul of the major questions doctrine and other canons of statutory construction.

To the extent the CFPB's "unreasonable advantage" allegation suggests that Defendants should consider consumers' ability to repay, this theory also fails. Unlike residential mortgages and credit cards, *see* 15 U.S.C. §§ 1639c, 1665e, Congress does not require an ability-to-repay analysis for the loan products offered by Defendants. Nor do any of the extensive credit-disclosure rules and regulations require Defendants to disclose its internal risk assessment to consumers, and

courts routinely reject efforts to impose such obligations through litigation where they are not imposed by statute. *See, e.g.*, *Anderson v. Franklin*, No. 2:09-cv-11096, 2010 WL 742765, at *8 (E.D. Mich. Feb. 26, 2010) (collecting cases); *accord Muncy v. Centex Home Equity Co.*, No. 1:14CV00016, 2014 WL 5326436, at *4 (W.D. Va. Oct. 20, 2014); *Bradshaw v. SLM Corp.*, No. C 12-06376 JSW, 2014 WL 12629968, at *4 (N.D. Cal. May 29, 2014).

In sum, Count II should be dismissed because the Complaint fails to allege the requisite lack of understanding by consumers or that Defendants took unreasonable advantage of any purported lack of understanding. And the Court should reject the CFPB's attempt to fabricate an abusiveness claim when the conduct at issue falls squarely within, and complies with, applicable laws.

## VII. The Court Should Dismiss Count III

### *A. The Complaint Fails to State a Plausible Claim for Relief for Abusive Practices (Count III) in Violation of the CFPA*

This Court should also dismiss with prejudice Count III, which alleges that Defendants took unreasonable advantage of the "inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B). The pleading deficiencies fatal to the CFPB's lack of understanding and Defendants' taking unreasonable advantage of this purported lack of understanding theories (*supra*, § VI (A)(1-2)) are equally applicable here. In addition, the CFPB fails to offer a single factual allegation explaining how or why consumers could not protect their interests in connection with the loan products at issue. In the absence of these specific allegations, the CFPB turns yet again to the notion that Defendants' "abusive practice" is failing to conduct an ability to repay analysis (ECF 1, ¶¶ 125, 127) and collecting fees, interest, and insurance premiums (ECF 1, ¶ 128) in connection with a refinance. For these reasons, and the reasons discussed at length *supra*, which

implicate the major questions doctrine and preclude the CFPB from recharacterizing legally-permissible practices as violations of the CFPA through litigation, the Court should dismiss Count III with prejudice.

## VIII. All Counts are Barred, In Whole or In Part, by the Applicable Statute of Limitations

The CFPA provides that "no action may be brought under this title more than three years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). The CFPB does not plead in the Complaint the date it discovered any alleged CFPA violation; therefore, the CFPB has not raised a plausible inference that the CFPA claims began to accrue within the three years immediately preceding the filing of the Complaint. *See, e.g.*, *Salt Lake City Corp. v. Sekisui SPR Ams., LLC*, No. 2:17-cv-01095, 2018 WL 4688356, at *11 (D. Utah Sept. 28, 2018) (unpublished) (holding that to invoke the discovery rule, a plaintiff must "plead the time and manner of the discovery of the cause of action, as well as facts showing the inability to discover the action sooner through the exercise of reasonable diligence"). The Complaint purports to assert claims for a seven-year period from 2013 to 2020 (ECF 1, ¶ 6); however, to the extent those claims arise from conduct that occurred before August 22, 2020 (three years before the filing of the Complaint), such claims are barred by the statute of limitations and should be dismissed.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court dismiss with prejudice all counts in the Complaint and award any further relief deemed just and proper.

Dated: July 30, 2024

Respectfully submitted,

*/s/ William M. Wilson III*

William M. Wilson III (Fed. Bar No. 7611)
WYCHE, P.A.
200 E. Broad Street, Suite 400
Greenville, South Carolina 29601
Telephone: 864.242.8294
Facsimile: 864.235.8900
bwilson@wyche.com

William J. Farley III (Fed. Bar No. 12004)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone: 704.998.4099
Facsimile: 704.998.4051
will.farley@troutman.com

Chris J. Willis (GA #766297, *pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.3000
Facsimile: 404.885.3900
chris.willis@troutman.com

James Kim (NY #3018397, *pro hac vice*)
Sarah E. Pruett (NY #5154422, *pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue,
New York, New York 10022
Telephone: 212.704.6000
Facsimile: 212.704.6288
james.kim@troutman.com
sarah.pruett@troutman.com

*Counsel for Defendants*