**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**(GREENVILLE DIVISION)**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION; COVINGTON CREDIT OF ALABAMA, INC.; SOUTHERN FINANCE OF TENNESSEE, INC.; COVINGTON CREDIT OF GEORGIA, INC.; SOUTHERN FINANCE OF SOUTH CAROLINA, INC.; COVINGTON CREDIT OF TEXAS, INC.; COVINGTON CREDIT, INC.; and QUICK CREDIT CORPORATION,<br><br>Defendants. | ) | Case No. 6:23-cv-4177-JDA |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS


Table of Authorities ..... ii

I. INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

II. THE MOVANT'S BURDEN ..... 2

III. ARGUMENTS & AUTHORITIES ..... 3

A. The Bureau's funding is valid and provides no basis for dismissal. ..... 3

1. Under its plain meaning, the "combined earnings of" the Federal Reserve System refers to the System's income. ..... 3

2. Defendants' bespoke definition of "earnings" is wholly atextual. ..... 5

3. The broader statutory scheme confirms the Bureau's reading and refutes Defendants'. . 9

4. Dismissal would not be warranted in any event. ..... 12

B. This enforcement action does not involve an unconstitutional delegation of legislative power. ..... 13

C. This enforcement action is not barred by the major questions doctrine. ..... 15

D. The Complaint states a plausible unfairness claim under the CFPA. ..... 17

1. Defendants caused their payment-stressed borrowers substantial injury. ..... 18

2. The injury was not reasonably avoidable. ..... 21

3. The injury is not outweighed by countervailing benefits to consumers or competition. 25

E. The Complaint states plausible abusiveness claims under the CFPA. ..... 25

1. Defendants took unreasonable advantage of their payment-stressed borrowers' lack of understanding. ..... 25

2. Defendants took unreasonable advantage of their payment-stressed borrowers' inability to protect their interests. ..... 28

F. The Bureau's lawsuit comports with APA and fair-notice requirements. ..... 30

G. The Bureau's claims are timely. ..... 32

# Table of Authorities

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014) .......... 9
*Am. Fin. Servs. Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) .......... 18, 20, 21, 25
*Anderson v. Franklin*,
No. 2:09-cv-11096, 2010 WL 742765 (E.D. Mich. Feb. 26, 2010) .......... 27
*Atl. Refin. Co. v. FTC*,
381 U.S. 357, 367 (1965) .......... 17
*BCFP v. Fifth Third Bank, N.A.*,
No. 1:21-CV-262, 2023 WL 7325956 (S.D. Ohio Sept. 26, 2023) .......... 27
*Bittner v. United States*,
598 U.S. 85 (2023). .......... 31
*Bradshaw v. SLM Corp.*,
No. C 12-06376 JSW, 2014 WL 12629968 (N.D. Cal. May 29, 2014) .......... 27
*CFPB v. All Am. Check Cashing, Inc.*,
No. 3:16-cv-356, 2018 WL 9812125 (S.D. Miss. Mar. 21, 2018) .......... 14
*CFPB v. All Am. Check Cashing, Inc.*
33 F.4th 218 (5th Cir. 2022) .......... 14
*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) .......... 3, 6, 14
*CFPB v. D&D Mkt'g*,
No. CV 15–9692 PSG, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) .......... 30
*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) .......... passim
*CFPB v. Morgan Drexen, Inc.*,
60 F. Supp. 3d 1082 (C.D. Cal. 2014) .......... 14
*CFPB v. Navient Corp.*,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) .......... 19, 22, 30, 31
*CFPB v. Ocwen Fin. Corp.*,
No. 17-80495-CIV, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) .......... 30, 31
*CFPB v. Think Finance, LLC*,
No. CV 17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) .......... 24
*Cmty. Fin. Serv's. Assoc. of America, Ltd. v. CFPB*,
104 F.4th 930 (5th Cir. 2024) .......... 14
*Cmty. Fin. Serv's. Assoc. of America, Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) .......... 14
*Consumers' Research v. FCC*,
109 F.4th 743 (5th Cir. 2024) .......... 14

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ........................................ 2
*FTC v. Accusearch,*
570 F.3d 1187 (10th Cir. 2009) ........................................ 17, 19
*FTC v. Direct Benefits Grp., LLC*,
No. 6:11-CV-1186-ORL-28, 2013 WL 3771322 (M.D. Fla. July 18, 2013)........................ 22
*FTC v. Kochava, Inc.*,
671 F. Supp. 3d 1161 (D. Idaho 2023) ........................................ 13, 15
*FTC v. LoanPointe, LLC*,
525 F. App'x 696 (10th Cir. 2013) ........................................ 20
*FTC v. Neovi*,
604 F.3d 1150 (9th Cir. 2010) ........................................ 22
*FTC v. Sperry & Hutchinson Co.,*
405 U.S. 233 (1972)........................................ 27
*FTC v. Windward Mktg., Ltd.*,
No. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997)........................ 21
*FTC v. Wyndham Worldwide Corp.*,
10 F. Supp.3d 602 (D. N.J. 2014)........................................ 22, 31
*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) ........................................ 17, 22
*GenBioPro, Inc. v. Sorsaia*,
No. 3:23-0058, 2023 WL 5490179, (S.D. W. Va. Aug. 24, 2023)........................ 16
*Goodman v. Praxair, Inc.*,
494 F.3d 458 (4th Cir. 2007) ........................................ 32
*Gundy v. United States*,
588 U.S. 128 (2019)........................................ 13, 14
*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ........................................ 7
*Lynch v. Jackson*,
853 F.3d 116 (4th Cir. 2017) ........................................ 26
*Muncy v. Centex Home Equity Co.*,
No. 1:14CV00016, 2014 WL 5326436 (W.D. Va. Oct. 20, 2014) ........................ 27
*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston, LLC*,
76 F.4th 291 (4th Cir. 2023)........................................ 15, 16
*Orkin Exterminating Co. v. FTC*,
849 F.2d 1354 (11th Cir. 1988) ........................................ 18, 22
*Palisades Collections LLC v. Short*s,
552 F.3d 327 (4th Cir. 2008) ........................................ 9
*Royal Oil Corp. v. FTC*,
262 F.2d 741 (4th Cir. 1959) ........................................ 20
*Simpson v. CDM Smith, Inc.,*
No. CV 20-4090, 2021 WL 1299564 (D.S.C. Feb. 23, 2021)........................ 32

*Smith v. Steinkamp*,
318 F.3d 775 (7th Cir. 2003) ........ 24
*Spiegel v. FTC*,
540 F.2d 287 (7th Cir. 1976)........ 20
*Springfield Parcel C, LLC v. United States*,
124 Fed. Cl. 163 (2015). ........ 12
*United States v. Bruce*,
950 F.3d 173 (3d Cir. 2020) ........ 13
*United States v. Morrison*,
449 U.S. 361, (1981) ........ 12
*United States v. Serafini*,
826 F.3d 146 (4th Cir. 2016) ........ 3
*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 15

**Statutes**

12 U.S.C. § 243 ........ 11
12 U.S.C. § 289 ........ 11
12 U.S.C. § 289(a) ........ 11
12 U.S.C. § 289(a)(1)-(3)........ 5
12 U.S.C. § 289(a)(3)(B) ........ 5
12 U.S.C. § 5390(n)(2) ........ 4
12 U.S.C. § 5465(c) ........ 4
12 U.S.C. § 5491(a) ........ 11
12 U.S.C. § 5497(a)(1)........ 3, 6, 11
12 U.S.C. § 5511 ........ 10
12 U.S.C. § 5531(a) ........ 31
12 U.S.C. § 5531(c)(1)........ 15, 17, 20
12 U.S.C. § 5531(d) ........ 25
12 U.S.C. § 5531(d)(2)(A)........ 26
12 U.S.C. § 5531(d)(2)(B) ........ 28
12 U.S.C. § 5564(a) ........ 31
12 U.S.C. § 5564(g)(1) ........ 32
15 U.S.C. § 78u-6(g)(5)(D)........ 4
Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq* ........ 12
Pub. L. No. 111-203, § 210(n)(2)........ 4
Pub. L. No. 111-203, § 806(c) ........ 4
Pub. L. No. 111-203, § 922(a) ........ 4

**Other Authorities**

156 Cong. Rec. S5870 (daily ed. July 15, 2010) ........ 10
Alicia Tuovila, Investopedia, *Earnings*: *Company Earnings Defined, With Example of Measurement* (Jul. 19, 2024), www.investopedia.com/terms/e/earnings.asp ........ 7

*Earnings*, Black's Law Dictionary (12th ed. 2024) ........................................................................ 3
*Earnings*, Black's Law Dictionary (9th ed. 2009) ............................................................................ 3
*Earnings*, Oxford English Dictionary (online ed. 2024)................................................................... 3
Federal Reserve Banks Combined Financial Statement for the Years Ended Dec. 31, 2023 and 2022. ............................................................................................................................ 9
Federal Reserve System*, The Fed Explained: What the Central Bank Does* (Aug. 2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf .................................. 4
Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1* (Aug. 15, 2024), https://www.federalreserve.gov/releases/h41/20240815/. .............................. 8
Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm. .................. 4, 5
Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* (Apr. 2024), https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf........................ 8
*Federal Reserve, The Federal Reserve Banks Combined Financial Statements as of and for the years Ended December 31, 2012 and 2009 and Independent Auditors Report, 5* (2010), https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2010.pdf.................. 12
S. Rep. No. 111-176 (2010) ........................................................................................... 10, 17
U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* (Sept. 2002) ........................................................................................................................ 10

# I. INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about loan-churning practices that prey on the vulnerabilities of borrowers who have run out of options. Defendants target borrowers who are struggling to repay their existing loans and, using an array of coercive servicing and collections practices, steer them into a series of unaffordable, fee-laden refinances. With each consecutive refinance, Defendants harvest a new round of upfront fees, drain their borrowers' available credit, and make reborrowing again (and again, and again) more likely. In numerous cases, these loan-churning practices trapped payment-stressed borrowers who took out loans of just a few months in cycles of refinances that lasted many years. Defendants trapped these borrowers because serial refinancing is a central component of their profitability.

Rather than address the merits of these allegations, Defendants devote most of their argument to far-fetched constitutional challenges. Despite the Supreme Court's 7-2 rejection of the most recent challenge to the Bureau's funding mechanism, Defendants first argue that when Congress funded the Bureau with the "earnings" of the Federal Reserve System, it actually intended the Bureau to receive only the "surplus" of funds that would otherwise be deposited in the general fund of the Treasury, after the payment of (non-Bureau) expenses and other obligations. This reading contradicts the relevant statute's plain language, the ordinary meaning of "earnings," and Congress's stated purpose in crafting the Bureau's funding mechanism.

Defendants next argue that this case is the product of an unconstitutional delegation of legislative power. But the nondelegation doctrine doesn't apply here because the Bureau is exercising only executive power to enforce a statutory prohibition that Congress wrote itself, not a regulation. Besides, as numerous courts have recognized, Congress met the nondelegation doctrine's requirements through the CFPA's detailed definitions of unfair or abusive conduct.

Defendants then argue that the Bureau's case against an installment lender with a regional, six-state footprint implicates "major questions" of "national policy." But whether the particular combination of tactics Defendants use to trap vulnerable borrowers violates the CFPA's prohibitions on unfair or abusive conduct isn't a major question of national significance. Congress crafted the flexible unfairness and abusiveness standards to empower the Bureau to address a broad array of specific business practices, as the Bureau is doing here. And while Defendants also raise a due process challenge, they had fair notice—from the text of the CFPA and even from the previous rulemakings to which they point—that their specific conduct might be deemed unfair or abusive.

Once they finally turn to the merits, Defendants' arguments fare no better. They argue that their compliance with federal and state disclosure laws is effectively a shield to CFPA liability. They cite no authority for this proposition—likely because every court to have considered this argument has rejected it. They also argue that their loan agreements permit their loan-churning practices. But this is irrelevant; the CFPA prohibits unfair and abusive practices even if the wrongdoing party had a contractual right to use them. Finally, Defendants argue that their disclosures were a panacea for the harms caused by their loan-churning practices. But disclosing to captive borrowers how they're being held captive does not set them free.

## II. THE MOVANT'S BURDEN

On a motion for judgment on the pleadings, the Court accepts that all well-pleaded facts alleged in the Complaint are true and draws all reasonable inferences in the plaintiff's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (applying standard for a Rule 12(b)(6) motion to a Rule 12(c) motion). Then, the Court should only grant the motion if "it

appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Id.*

## III. ARGUMENTS & AUTHORITIES

### A. The Bureau's funding is valid and provides no basis for dismissal.

Despite the Supreme Court's recent decision upholding the Bureau's funding, *see CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) (*CFSA*), Defendants contend that a problem remains. Congress authorized the Bureau to draw its funding from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Defendants read the word "earnings" to refer not to the money generated by the Federal Reserve System (from income on investments, payments for services provided, and other sources) but only to the "surplus" amount of this income that is left over after the payment of (non-Bureau) expenses and other obligations and that would "otherwise be deposited into the general fund of the Treasury." Defs' Mem. Supp. Mot. J. Pleadings 7, ECF No. 71 (Mem.). Defendants are wrong. Their self-serving interpretation of the word "earnings" is contrary to ordinary meaning, lacks support in the text of § 5497 or the broader statutory context, and would be unworkable to boot.

#### 1. Under its plain meaning, the "combined earnings of" the Federal Reserve System refers to the System's income.

It is a "'fundamental canon of statutory construction' that 'words will be interpreted as taking their ordinary, contemporary, common meaning.'" *United States v. Serafini*, 826 F.3d 146, 149 (4th Cir. 2016) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The ordinary, common meaning of "earnings" is "revenue" or "income" generated from labor, services, or investments. *See Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. See INCOME."); *Earnings*, Black's Law Dictionary (9th ed. 2009) (same); *Earnings*, Oxford English Dictionary (online ed. 2024)

("[T]he money made through working, trade or business activity, etc."; "The income produced by invested capital.").

That ordinary meaning clearly fits here. The bulk of the money generated by the Federal Reserve comes from "interest earned on the securities [the Federal Reserve] owns—securities acquired in the course of the Federal Reserve's open market operations." Federal Reserve System*, The Fed Explained: What the Central Bank Does*, at 4 (Aug. 2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf. Most of the rest comes from "fees received for priced services provided to depository institutions—such as check clearing, funds transfers, and automated clearinghouse operations . . . ." *Id.* The statute's reference to the Federal Reserve System's "earnings" refers to this "[r]evenue gained from . . . services, from the investment of capital, or from assets." *Earnings*, Black's Law Dictionary.

Confirming this interpretation, the term "earnings" is used in just the same way throughout the Dodd-Frank Act—the law that established the Bureau—to refer to income or money earned. *See* Pub. L. No. 111-203, § 210(n)(2), 124 Stat 1376, 1506 (2010) (directing the FDIC to deposit "interest and other *earnings* from investments" into Orderly Liquidation Fund) (codified at 12 U.S.C. § 5390(n)(2)); § 806(c) (authorizing Reserve Banks to "pay *earnings* on balances maintained by or on behalf of" certain systemically important financial entities) (codified at 12 U.S.C. § 5465(c)); § 922(a) (requiring SEC to report "the amount of *earnings* on investments" made from its Investor Protection Fund) (codified at 15 U.S.C. § 78u-6(g)(5)(D)).

Although last year the Federal Reserve's "sum total of expenses exceeded estimated earnings," the Federal Reserve continues to generate many billions of dollars in earnings, much of it from interest income on securities. Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023*

(Jan. 12, 2024) (reporting that income from this source alone "totaled $163.8 billion in 2023") (hereinafter, "FRB 2024 Release"), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm. The statute authorizes the Bureau to draw and spend money from those earnings.

**2. Defendants' bespoke definition of "earnings" is wholly atextual.**

The Federal Reserve Act provides that income generated by the Federal Reserve Banks goes first to paying the Banks' expenses (including assessments levied by the Federal Reserve Board), then toward paying dividends to the Banks' shareholders (private banks), and then into the surplus funds maintained by each Federal Reserve Bank, up to a specified cap. *See* 12 U.S.C. § 289(a)(1)-(3). If funds remain after making all those payments, the Federal Reserve Banks transfer any excess net earnings for deposit in the Treasury's general fund on a weekly basis. *Id.* § 289(a)(3)(B); *see also* FRB 2024 Release (describing weekly remittances).

Defendants claim that the reference to "combined earnings" in § 5497 refers not to the income generated by the Federal Reserve System but only to the amount of those earnings that would otherwise go to Treasury. In other words, Defendants claim that "combined earnings" can only refer to any money that remains after the Federal Reserve Banks pay their necessary expenses (though somehow not including the expense of paying assessments levied to fund the Bureau), dividends to their shareholders, and deposits into their surplus funds.

Recently, and due largely to the impact of changing interest rates resulting from the Federal Reserve's implementation of monetary policy, the Reserve Banks have not consistently generated excess net earnings and thus "[m]ost . . . suspended weekly remittances to the U.S. Treasury in September 2022." FRB 2024 Release n.4 (also noting that "certain Reserve Banks . .

. [have] continued to remit excess earnings to the U.S. Treasury intermittently"). Defendants say this means the Bureau cannot validly draw and spend any money. Defendants are wrong.

Defendants first claim that in *CFSA* the Supreme Court held that "the Federal Reserve's surplus funds are the *only* constitutionally-authorized appropriations that can fund the CFPB's operations." Mem. at 7-8 (emphasis in original). But the Court held nothing of the sort. The Court referenced the Federal Reserve's transfers to Treasury only to address the "threshold" question of whether the Bureau's funding transfers from the Federal Reserve are even "subject to the requirements of the Appropriations Clause[,]" given that the Clause limits only when money may be "'drawn *from the Treasury*[.]'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7) (emphasis added). After noting the parties' agreement that the Appropriations Clause applies, the Court simply explained that money destined for the general fund of the Treasury qualifies as money "drawn from the Treasury":

> The Bureau draws money from the Federal Reserve System. 12 U.S.C. § 5497(a)(1). And, surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury. § 289(a)(3)(B). Whatever the scope of the term 'Treasury' in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies.

*Id.* In making this observation, the Court did not say that the "combined earnings of the Federal Reserve System" used to fund the Bureau must come from the net earnings remitted weekly to the Treasury. It did not interpret the term "combined earnings" at all, which is hardly surprising given that the parties did not dispute it and the question presented did not encompass it.

Defendants next rely on a British dictionary of accounting, a finance encyclopedia, a federal income tax treatise, and the secondary definitions offered by two online dictionaries. Mem. at 9. To begin, Defendants do not address the fact that the first two definitions in their online dictionaries—"something (as wages) earned" in Merriam-Webster and "salary or wages"

in the American Heritage Dictionary—support the Bureau. They simply ignore them. Next, even Defendants' cited accounting dictionary notes that "there has been considerable debate as to [the] definition" of the term even as used in the specialized context of private company's accounting practices. *Oxford Dictionary of Accounting* at 161 (4th ed. 2010). But it is true that in particular circumstances, the term can be used to refer to a private company's "after-tax net income" or "profits." *See, e.g.*, Alicia Tuovila, Investopedia, *Earnings*: *Company Earnings Defined, With Example of Measurement* (Jul. 19, 2024), www.investopedia.com/terms/e/earnings.asp.

For two reasons, that does not help Defendants. First, Defendants' argument overlooks that "in all statutory construction, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) (citing *Bilski v. Kappos*, 561 U.S. 593, 603 (2010)). Here, there is no reason to think that Congress, when providing for the funding of a new agency from the money generated by the country's central bank, had in mind a specialized meaning of "earnings" that can sometimes apply in the very different context of private companies.

And second, Defendants' position is not actually that the statute's reference to "earnings" means "after-tax net income" or "profits," as it sometimes does in the private-company context. They urge a far narrower understanding of "earnings," namely what is left over after the payment of (among other things) dividends to stockholders of the Reserve Banks. But even in the private-company context, "earnings" are not what is left over after dividends are paid; rather, earnings are used to *pay* dividends. *See, e.g.*, *Earnings*, Investopedia.com (explaining that a "company's earnings"—in that context, "its profits"—"can be used to reward stockholders with dividends"). In other words, Defendants first ignore the ordinary meaning of "earnings" in favor of a

specialized definition sometimes used for private companies, then abandon that definition for an even narrower one with no basis in any recognized understanding of the term.

Defendants next appeal to the Financial Accounting Manual for Federal Reserve Banks, weekly statements on the Federal Reserve balance sheet, and the Federal Reserve's annual financial statements. Mem. at 9-11. But those sources directly contradict Defendants' position. They use the term "earnings" to refer to money earned by the Banks, before the Banks make various payments.

Start with the Accounting Manual. It explains that the Banks' income—not to be confused with a term that nets out expenses like "profits"—is the sum of the various "earnings" of the Banks. Federal Reserve, *Financial Accounting Manual for Federal Reserve Banks* (Apr. 2024) at 47-48 (explaining that "income" includes, *inter alia*, "interest earnings on loans," "earnings from investments denominated in foreign currencies," and "other earnings").[1] By contrast, the Accounting Manual describes the money remitted to Treasury as "*excess* earnings"—that is, the money left after deducting "the cost of operations, payment of dividends, and reservation of an amount necessary to maintain [the Banks'] surplus" account. *Id*. at 53 (emphasis added).

The same goes for the weekly statements, which also say that the Banks "remit residual *net* earnings to the U.S. Treasury" and that they cease doing so when "earnings are not sufficient to provide for the cost of operations, payment of dividends, and maintaining surplus." Federal Reserve, *Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, fig. 6 & n.8 (Aug. 15, 2024) (emphasis added).[2]

---

[1] *Available at* https://www.federalreserve.gov/aboutthefed/files/bstfinaccountingmanual.pdf.
[2] *Available at* https://www.federalreserve.gov/releases/h41/20240815/.

The annual financial statements make the point yet again: Weekly remittances to Treasury are suspended "if earnings become less than the costs of operations, payment of dividends, and reservation of an amount necessary to maintain the Reserve Banks' allocated portion of the aggregate surplus limitation . . . ." Federal Reserve Banks Combined Financial Statement for the Years Ended Dec. 31, 2023 and 2022 at 21-22.[3]

Defendants further claim that the Federal Reserve Board prepares these annual financial statements in accordance with Generally Accepted Accounting Principles (GAAP). Defendants say that under GAAP, "'earnings' means profits." Mem. at 9-10. But while the Board's approach to preparing its annual financial statements is generally consistent with GAAP, the Board has adopted specific accounting principles "that differ from [GAAP]" in certain respects, "[d]ue to the unique nature of the Reserve Banks' powers and responsibilities as part of the nation's central bank . . . ." Annual Statement 2023 at 9 (emphasis added). And as just noted, the annual financial statements use the term "earnings" to refer to earned income, not "profit."

Far from supporting Defendant's position, the language used across the Federal Reserve's financial statements and similar materials that Defendants cite reflects the understanding that "earnings" means simply income or money earned.

**3. The broader statutory scheme confirms the Bureau's reading and refutes Defendants'.**

"[A] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme … because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014); *accord Palisades Collections LLC v. Short*s, 552 F.3d 327, 331 (4th Cir. 2008). Here,

---

[3] *Available at* https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2023.pdf.

the broader statutory context confirms that the term "earnings" in § 5497 means income or money earned, not the gerrymandered definition Defendants have concocted.

Congress created the Bureau after the 2008 financial crisis to prevent future crises by ensuring that the federal consumer financial laws are adequately enforced. *See, e.g.*, 12 U.S.C. § 5511 (specifying purposes and objectives of the Bureau). Congress deemed "the assurance of adequate funding" to be "absolutely essential" for the new agency, and so it funded the Bureau as it did. S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. S5870, 5928 (daily ed. July 15, 2010) (statement of Sen. Dodd) ("The conference report requires the Federal Reserve System to *automatically fund* the CFPB. . . . This will ensure that the CFPB has the resources it needs to perform its functions . . . .") (emphasis added).

Giving the statutory language its ordinary meaning is consistent with this context because it ensures that the Bureau is adequately funded from the money generated by the Federal Reserve. By contrast, on Defendants' view, the Congress that created the Bureau set up the new agency so that it would be intermittently and unpredictably mothballed, potentially unable to carry out its statutory role overseeing the financial markets at precisely those times that economic disruptions were causing shortfalls at the Federal Reserve.[4] That is not a plausible reading of the statute.

Defendants' interpretation would be unworkable in other ways as well and fails to account for how the Federal Reserve actually operates. Each of the 12 Reserve Banks remits its

[4] The Congress that enacted Dodd-Frank would surely have been aware, particularly in the immediate wake of the 2008 financial meltdown, of the possibility of such shortfalls. *See* U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 11 (Sept. 2002) (reporting that, from 1989 to 2001, "11 of the 12 Reserve Banks reported a total of 352 weeks in which earnings were less than expenses and losses"). The possibility of shortfalls is the reason that each Reserve Bank maintains a surplus fund, "to act as a cushion to absorb losses." *Id.* at 3.

excess net earnings to Treasury each week. *See* FRB 2024 Release; 12 U.S.C. § 289. But by statute, the Bureau draws money either annually or quarterly. 12 U.S.C. § 5497(a)(1). How, in Defendants' view, would a court determine the amount that the Bureau could validly draw in a given year or quarter? Defendants incorrectly claim, for example, that "the Federal Reserve has had no 'earnings' since September 2022," Mem. at 8, *but see* FRB 2024 Release (noting that "certain Reserve Banks . . . continued to remit excess earnings to the U.S. Treasury intermittently")—yet across 2022 *as a whole*, the Federal Reserve remitted billions of dollars to Treasury, *see id*. Defendants' reading would require courts to play auditor not only to the Federal Reserve but to the Bureau, since they would also need to somehow determine when the Bureau drew the particular moneys that it spent on a challenged agency action. These absurd consequences provide another reason, if any were needed, to reject Defendants' view.

The Federal Reserve Act also undermines Defendants' favored interpretation of "earnings." The Federal Reserve Act establishes a waterfall for the use of the Federal Reserve Banks' earnings, and under that waterfall, transfers to the Bureau fall in the first tier. In particular, the Banks first satisfy all their "necessary expenses," before paying stockholders their dividend entitlement, depositing funds in the Banks' surplus funds until they reach a cap, and then remitting remaining "net earnings" to Treasury. 12 U.S.C. § 289(a). The necessary expenses of the Banks include semiannual assessments that the Federal Reserve Board levies on the Banks "to pay the Board's estimated expenses." *Id.* § 243. And, under the CFPA, the expenses of the Federal Reserve Board in turn include the amounts that the Board must transfer to the Bureau—itself part of the Federal Reserve System—from the Federal Reserve System's earnings to meet the Bureau's funding needs. *See id.* § 5491(a) (establishing the Bureau "in the Federal Reserve System"); *id.* § 5497(a)(1) (providing the Board "shall transfer" the amount the Bureau requests).

Thus, the Federal Reserve Board has since the Bureau's creation levied assessments on the Banks to obtain funding needed to cover both the Board's own expenses and the funds it must transfer to the Bureau[5]—and those assessments are "necessary expenses" of the Banks, paid first under the Federal Reserve Act.

**4. Dismissal would not be warranted in any event.**

Even if Defendants' claim were correct, it would not require dismissing this action. Congress has the power of the purse, and, in establishing the consequences for unauthorized expenditures, it has not provided that actions taken using funds that were not actually appropriated must be undone. *See generally* Anti-Deficiency Act, 31 U.S.C. § 1341 *et seq.* Defendants point, Mem. at 12, to the Federal Circuit's conclusion in *Springfield Parcel C, LLC v. United States*, that a government agency without an appropriation could not validly enter a contract requiring it to pay money. 124 Fed. Cl. 163, 190 (2015). But Defendants provide no good reason to transplant that holding to the entirely different context of a government enforcement action. Dismissing this action would not undo the Bureau's expenditures associated with filing the complaint or restore any funds to the federal fisc. Moreover, that remedy would fail to take sufficient account of the interests of other parties, including the consumers harmed by Defendants' violations. *See generally United States v. Morrison*, 449 U.S. 361, 364 (1981) (explaining that courts must craft remedies that do "not unnecessarily infringe on competing interests").

[5] *See, e.g.*, *Federal Reserve, The Federal Reserve Banks Combined Financial Statements as of and for the years Ended December 31, 2012 and 2009 and Independent Auditors Report, 5* (2010) (listing "Bureau of Consumer Financial Protection" among "Assessments" under the Banks' combined Operating Expenses for 2010, the Bureau's first year of operations), *available at* https://www.federalreserve.gov/aboutthefed/files/BSTcombinedfinstmt2010.pdf.

**B. This enforcement action does not involve an unconstitutional delegation of legislative power.**

Defendants' non-delegation argument, Mem. at 14, fails because the nondelegation doctrine "applies only to delegations by Congress of legislative power; it has no application to exercises of executive power." *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020); *see also FTC v. Kochava, Inc.*, 671 F. Supp. 3d 1161, 1179–80 (D. Idaho 2023) (explaining that nondelegation doctrine does not "limit Congress in granting agencies the authority to seek judicial enforcement of the laws they administer"). The Bureau's action to enforce the CFPA is a quintessential exercise of executive power.[6] By "seek[ing] judicial enforcement of the laws [it] administer[s]," the Bureau does not exercise any legislative power, so there is "no relevant delegation of legislative authority to which the Court could apply nondelegation principles." *Kochava*, 671 F. Supp. 3d at 1179–80. Defendants cite to no contrary authority applying that doctrine to an executive agency's action to enforce a statute.

In any event, even if the nondelegation doctrine had some application here, it would not warrant dismissal because Congress stayed firmly within that doctrine's bounds when it wrote the CFPA. As Defendants acknowledge, Mem. at 14, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform," *Gundy v. United States*, 588 U.S. 128, 135 (2019) (cleaned up). Congress generally violates the requirement only if it "'fail[s] to articulate *any* policy or standard' to confine discretion." *Id.* at 146 (citation

[6] Defendants note that the statute grants the Bureau authority under the CFPA to write rules identifying and preventing unfair and abusive practices. Mem. at 14 (citing 12 U.S.C. § 5531(b)). While that authority must comply with the nondelegation doctrine (and does), the Bureau has not exercised that authority in any way relevant here: In this action, the Bureau alleges only that Defendants violated prohibitions Congress itself wrote into the CFPA. *See* Compl. ¶¶ 96–129, ECF No. 1.

omitted). Courts rarely find such a failure, *see id.* ("Only twice in this country's history . . . have we found a delegation excessive."), which explains why Defendants fail to cite a single case declaring a statutory delegation to an agency unconstitutional.[7]

The CFPA provisions on unfair and abusive practices easily clear that constitutional bar for statutory delegation. The statute describes at length and with great specificity what constitutes an "unfair" or "abusive" act or practice." 12 U.S.C. § 5531(c)–(d). Defendants themselves recite the multi-pronged provisions defining what is "unfair" or "abusive" under the statute. Mem. at 15 (citing 12 U.S.C. § 5531(c), (d)). The specificity of these provisions compares favorably with that of statutory delegations that the Supreme Court has approved in the past, including "delegations . . . to regulate in the 'public interest,'" to "set 'fair and equitable' prices and 'just and reasonable rates,'" and "to issue whatever air quality standards are 'requisite to protect the public health.'" *Gundy*, 588 U.S. at 146 (citations omitted). It therefore comes as no surprise that the courts that have considered nondelegation challenges to the CFPA's unfairness and abusiveness provisions have held that those provisions are constitutional. *Cmty. Fin. Serv's. Assoc. of America, Ltd. v. CFPB*, 51 F.4th 616, 633–35 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024), *reinstated in relevant part*, 104 F.4th 930 (2024), *pet. for r'hrg en banc on other grounds pending*; *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089–1090 (C.D. Cal. 2014); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 906 n.25 (S.D. Ind. 2015); *CFPB v. All Am. Check Cashing, Inc.*, No. 3:16-cv-356, 2018 WL 9812125, at *3 (S.D. Miss. Mar. 21, 2018), *vacated on other grounds*, 33 F.4th 218 (5th Cir. 2022); *cf. also*

---

[7] The closest they get is *Consumers' Research v. FCC*, 109 F.4th 743, 777-78 (5th Cir. 2024) (cited at Mem. at 14). There, however, the Fifth Circuit found a constitutional problem in "the combination" of a "sweeping delegation" to an agency and that agency's "unauthorized subdelegation" to a private entity, not in the delegation itself. *Id.* at 778.

*Kochava*, 671 F. Supp. 3d at 1180 n.16 (holding FTC Act's virtually identical unfairness standard did not violate nondelegation doctrine).

To find a nondelegation problem anyway, Defendants first contend that the statute does not actually "provide[] a guide to determining what is 'unfair' or 'abusive,'" Mem. at 15—apparently because the statute says that the Bureau "shall have no authority" to declare a practice unfair or abusive "unless" the statutory standard is met, 12 U.S.C. § 5531(c)(1), (d)(1), rather than saying a practice "is" unfair or abusive "only if" the statutory standard is met. It's unclear why that variation in phrasing would make any difference—and those provisions provide an intelligible principle for the Bureau to follow. Defendants also contend that "substantial guidance" is required given the "breadth of the CFPB's authority." Mem. at 15 (capitalization altered). But the CFPA provides such guidance. The case Defendants rely on held that a law directing an agency to set air quality standards that are "requisite to protect the public health" with "an adequate margin of safety" provided "substantial" enough guidance for regulations "affect[ing] the entire national economy." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465, 475–76 (2001). The CFPA's detailed provisions on what can count as "unfair" and "abusive" provide at least equally substantial guidance.

**C. This enforcement action is not barred by the major questions doctrine.**

Defendants' argument that this enforcement proceeding violates the major questions doctrine, Mem. at 16–18, also fails on multiple fronts. That doctrine "requires clear congressional authorization for agency action in 'extraordinary cases' when the 'history and breadth' and 'economic and political significance'" of the relevant action give "'reason to hesitate before concluding that Congress meant to" authorize the agency's action. *N.C. Coastal*

*Fisheries Reform Grp. v. Capt. Gaston, LLC*, 76 F.4th 291, 296 (4th Cir. 2023) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022)).

To begin, this proceeding is not an "extraordinary case" presenting a major question. In claiming otherwise, Defendants argue that "mandat[ing] new disclosure, ability-to-repay, and other requirements" would have "major economic and political significance." Mem. at 17. Putting aside the questionable premise that ability-to-repay or disclosure requirements present a major question, the Bureau isn't seeking to impose any such requirements on installment lenders here. The Bureau instead alleges that multiple aspects of the way Defendants conduct their lending—e.g., prioritizing borrowers likely to refinance despite indicia they will be unable to pay, marketing equally unaffordable refinances as "fresh starts" and "solutions" to borrower distress, incentivizing employees to push refinances, and using an array of coercive servicing and collections tactics—collectively induce or pressure vulnerable borrowers into serially reborrowing. The Bureau's Complaint contains detailed factual allegations that these loan-churning practices caused substantial injury to consumers and took unreasonable advantage of them in a manner that is unfair and abusive under the CFPA. Compl. ¶¶ 96–129. Particularly given that the Bureau is "acting narrowly pursuant to [its] explicit grant of authority" to apply the CFPA's prohibitions to that particular set of facts, no major question is at issue here. *See GenBioPro, Inc. v. Sorsaia*, No. 3:23-0058, 2023 WL 5490179, at *4 (S.D. W. Va. Aug. 24, 2023).

The fact that, as Defendants put it, Congress elsewhere "enacted disclosure, ability-to-repay, and other requirements," Mem. at 18, does not change the analysis. That other laws impose other requirements gives no "reason to hesitate" before concluding that Congress intended for the Bureau to be able to address unfair and abusive practices like Defendants' under

the CFPA, even though other laws may not proscribe those practices. The whole point of the CFPA's prohibition on unfair and abusive practices is to enable the Bureau to take action against "practices that have not yet been contemplated by more specific laws." *See FTC v. Accusearch,* 570 F.3d 1187, 1194 (10th Cir. 2009) (discussing similar unfairness provision in FTC Act) (citing *Spiegel, Inc. v. FTC*, 540 F.2d 287, 291–94 (7th Cir. 1976) (finding practice unfair even though it complied with state law)).

Indeed, Congress clearly intended to, and did, vest the Bureau with the flexibility "to apply the rule enacted by Congress to particular business situations." *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367 (1965) (citing H.R. Rep. No. 63-1142, at 19 (1914) (Conf. Rep)) (describing substantially similar FTCA provision on which the CFPA's unfairness prohibition is modeled). By design, "the term [unfairness] [i]s a flexible concept with evolving content." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015) (cleaned up). So too for "the more flexible, expansive standard" for addressing abusive conduct. *ITT Educ. Servs.*, 219 F. Supp. 3d at 905; *see also* S. Rep. No. 111-176, at 172 (2010) ("The addition of 'abusive' [to 'unfair' or 'deceptive'] will ensure that the Bureau is empowered to cover practices where providers unreasonably take advantage of consumers."). The Bureau has followed Congress's design in bringing this action to address a particular constellation of lending practices that is both unfair and abusive under the flexible standards Congress laid down.

**D. The Complaint states a plausible unfairness claim under the CFPA.**

Under the CFPA, an act or practice is unfair if it "causes or is likely to cause substantial injury to consumers," where such substantial injury "is not reasonably avoidable by consumers" and "is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1). As the Complaint alleges, Defendants:

(i) underwrote refinanced loans to prioritize borrowers who had refinanced many times before, despite exhibiting objective indicia of payment stress (Compl. ¶¶ 38-41, 98.);

(ii) bombarded payment-stressed borrowers with solicitations touting refinances as a "fresh start, "best option," and "solution" to their financial distress (*Id.* at ¶¶ 6, 47-49, 98);

(iii) limited the feasible alternatives to refinancing with a "pay 2 or renew" requirement for borrowers who could not afford to make even one payment, let alone the two or more payments that the company required to get current (*Id.* at ¶¶ 50-53, 58-59, 98);

(iv) incentivized branch-level personnel to refinance as many payment-stressed borrowers as possible, and as often as possible, while reprimanding employees who did not meet the company's refinance standards (*Id.* at ¶¶ 60-68);

(v) took notional security interests in payment-stressed borrowers' household goods or cars and used the threat of repossession as leverage to induce refinancing during the collections process (*Id.* at ¶¶ 69, 72-73, 98); and

(vi) made in-person visits to the homes of delinquent borrowers to induce them to refinance. *Id.* at ¶¶ 74-75, 98.

These loan-churning practices steered payment-stressed borrowers into refinancing on unaffordable terms to avoid the cascading negative consequences of prolonged delinquency or default. And they satisfy each element of the CFPA's unfairness standard.

**1. Defendants caused their payment-stressed borrowers substantial injury.**

By trapping payment-stressed borrowers in cycles of debt, Defendants caused them substantial injury. The relevant injury under the unfairness standard is typically monetary harm. *See, e.g., Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988); *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985). Here, the Complaint alleges that, with each successive refinance, payment-stressed borrowers incurred a new round of upfront fees, steadily increasing repayment obligations, and steadily declining cash disbursements to help cover their

expenses. Compl. at ¶¶ 77-79, 85-91. These serial refinancers also became even more likely to refinance under payment stress again or eventually default. *Id.* at ¶¶ 25, 41.

Further, payment-stressed refinancers had to undertake costly default-avoidance measures—such as forgoing payment on other debts or basic living expenses—to make the payments on their unaffordable loans. *Id.* at ¶ 101. These injuries were especially substantial for the nearly 10,000 borrowers who were trapped in uninterrupted cycles of debt to Defendants for more than seven years on their short-term loans. *Id.* at ¶ 91.

Defendants argue that the Complaint's alleged injuries are not substantial injuries because they "merely recite risks fundamental to any loan." Mem. at 23. But the "risks fundamental to any loan" do not include refinancing every few months over several years, steadily increasing repayment obligations accompanied by steadily declining available credit with each successive refinance, and refinancing on terms that are equally, if not more, unaffordable as the loans that preceded them. Indeed, Defendants' lending model is unusual precisely because it enables them to profit from borrowers' recurring failure to retire their debts. *See generally* Compl. ¶¶ 1-6.

Defendants next contend that the repeated imposition of upfront fees and front-loaded collection of interest are not well-pleaded injuries because they are fully disclosed under TILA and otherwise authorized by state laws. Mem. at 23. But this is irrelevant. The Bureau has not alleged violations of TILA or state law. And Defendants' compliance with these other laws, even if true, does not shield them from liability for violating the CFPA. Again, the whole point of the CFPA is to enable the Bureau to "take action against unfair practices that have not yet been contemplated by more specific laws." *Accusearch*, 570 F.3d at 1194. So, their compliance with "other statutory, regulatory, and contractual obligations does not relieve [them] of [their] obligation to refrain from committing acts that are unlawful under the [CFPA]." *CFPB v. Navient*

*Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *8 (M.D. Pa. Aug. 4, 2017); *see also, e.g., Royal Oil Corp. v. FTC*, 262 F.2d 741, 743 (4th Cir. 1959) (conduct authorized by state law may nevertheless be unfair). Further, it's no defense to an unfairness claim that a wrongdoing creditor had the contractual right to act as they did, *see ITT Educ. Servs.*, 219 F. Supp. 3d at 915, *Am. Fin. Servs. Ass'n*, 767 F.2d at 973, or that they were pursuing money that was legally owed to them, *see FTC v. LoanPointe, LLC*, 525 F. App'x 696, 701 (10th Cir. 2013) (contractually conferred right to garnish wages for payday loan collection was nevertheless unfair under the circumstances); *Spiegel v. FTC*, 540 F.2d 287, 292-93 (7th Cir. 1976) (legal practice to collect on a valid debt can be unfair).

Defendants also contend that the increased length and cost of borrowing from serially refinancing is not a well-pleaded injury because it's speculative, legally permissible, and the inevitable consequence of all refinancing. Mem. at 24. That refinancing is legal is beside the point for all the reasons set forth above. And the argument that this is speculative ignores that the unfairness standard references injuries that were caused, *or were likely to be caused*, by Defendants' unlawful conduct. 12 U.S.C. § 5531(c)(1) (emphasis added). Nor was the harm from repeatedly refinancing inevitable. Refinancing can, in some cases, be beneficial for borrowers, such as when they obtain a lower interest rate that reduces, rather than increases, their total cost of borrowing over the life of the loan; or, when borrowers refinance just once to meet a temporary, emergency hardship without doing so repeatedly for years on end. But that's not what happened here; borrowers incurred a new round of upfront fees, had their available credit steadily eroded, and got the same nearly triple-digit annual interest rates with each successive refinance. Compl. ¶¶ 77-91. Nor did refinancing enable borrowers to avoid harm by not defaulting. Mem. at 26. Indeed, many refinancers end up eventually defaulting anyway. Compl.

¶¶ 25, 41. And for those who did not eventually default, refinancing simply replaced the harms of default with the harms of being trapped in long-term, unaffordable debt.

Finally, Defendants argue that borrowers who undertook costly default-avoidance measures to make the payments on their refinanced loans were not harmed because "default-avoidance measures" merely means doing what's required to make timely payments. Mem. at 24. But what Defendants dismiss as "convoluted legalese" is just simple household math. Consumers with meager incomes—the very people that Defendants target—often struggle to make ends meet. Compl. ¶ 26. And when they have more expenses to pay than income to pay them, *id.* at ¶ 32, they face costly choices between making the payment on their loan with Defendants or meeting their other bills and necessary living expenses.

The Complaint pleads facts sufficient for the Court to infer that borrowers—who, as the Defendants' own employees acknowledge, "are screaming they don't have the money" to make their loan payments—suffered, or were likely to suffer, injury from Defendants' loan-churning practices. Compl. ¶¶ 51-53. They either fell further behind or defaulted on their loans from Defendants or missed the payments on other bills and obligations as they came due. Both outcomes are harmful, and neither of them is speculative: they are the foreseeable consequence of being snared in Defendants' debt trap.

**2. The injury was not reasonably avoidable.**

Payment-stressed refinancers could not reasonably avoid the injuries caused by Defendants' loan-churning practices because they lacked "a free and informed choice that would have enabled them to avoid the unfair practice." *FTC v. Windward Mktg., Ltd.*, No. 1:96-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997) (citing *Am. Fin. Servs. Ass'n*, 767 F.2d at 976). To have a "free and informed choice," borrowers must "have reason to anticipate

the impending harm and the means to avoid it." *Orkin Exterminating*, 849 F.2d at 1365 (citations omitted). An injury is not *reasonably* avoidable if the only means of avoiding it would impose harm of its own, including through the expenditure of significant time, effort, or money. *See, e.g., FTC v. Neovi*, 604 F.3d 1150, 1158 (9th Cir. 2010) (injury not reasonably avoidable where "reimbursement required a substantial investment of time, trouble, aggravation, and money"); *FTC v. Direct Benefits Grp., LLC*, No. 6:11-CV-1186-ORL-28, 2013 WL 3771322, at *14 (M.D. Fla. July 18, 2013).

Finally, as other courts have recognized, whether an injury is reasonably avoidable is a highly fact-dependent question that's ill-suited for resolution as a matter of law at the pleadings stage. *See Navient*, 2017 WL 3380530, at *21 (denying motion to dismiss because dismissal "would require this Court to rule, as a matter of law, that borrowers understood the disclosures that were made to them so that they had 'reason to anticipate the impending harm and the means to avoid it'"); *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp.3d 602, 625 (D. N.J. 2014), *aff'd* 799 F.3d 236 (3d Cir. 2015).

Defendants' payment-stressed refinancers lacked the free and informed choice required to avoid injury. Defendants made sure of this by giving them only two options: refinance their way out of delinquency or come up with the two (or more) payments required to get current. Compl. ¶¶ 50-53. And if borrowers chose to remain delinquent rather than reborrow, Defendants made in-person visits to their homes and threatened (a) repossession of their household goods or cars, (b) collections lawsuits, and (c) negative credit reporting, all of which would even further limit the borrowers' already scarce credit options. *Id.* at ¶ 104. Further, because Defendants' borrowers are typically credit-constrained and lack access to more favorable credit alternatives than the fee-laden refinances peddled by Defendants, they comprise a "highly susceptible class[] of

purchasers" over whom Defendants "exercise[d] undue influence," which rendered whatever choice they had "an illusory one." *ITT Educ. Servs.*, 219 F. Supp. 3d at 916-17 (observing that "the 'choice' enjoyed by students, even assuming they fully understood its nature, was an illusory one" and reasoning that "an injury may not be reasonably avoidable where a defendant exercises undue influence over highly susceptible classes of purchasers") (citations and quotations omitted); *see also Wendorf v. Landers*, 755 F. Supp. 2d 972, 979 (N.D. Ill. 2010) (holding that plaintiff states a claim under Illinois's analogue to the FTCA where "the defendant's conduct gave plaintiff no reasonable alternative" to suffering the injury in question)

Nor did borrowers have reason to anticipate the harms they would suffer by being trapped in long-term debt to Defendants. These borrowers had no reason to anticipate how Defendants' repeated imposition of upfront fees and front-loaded collection of interest drained their available credit. Borrowers had no reason to anticipate that Defendants would make-in person visits to their homes if they became severely delinquent. And borrowers especially had no reason to anticipate that Defendants would refinance their loans on equally unaffordable terms because Defendants profited from borrowers' recurring failure to retire their debts. It would be more reasonable for borrowers to anticipate that their interests and the interests of their lender are closely aligned with respect to debt payoff, because that's how a well-functioning borrower-lender relationship works.

Defendants argue that borrower injuries were reasonably avoidable because they could have chosen not to take out their initial loans. Mem. at 25-28. This argument fails because it misconstrues the Bureau's allegations and focuses on the wrong phase of Defendants' debt trap. The Complaint alleges violations arising from Defendants' post-origination loan-churning practices, not from their initial loan-approval decisions. *See CFPB v. Think Finance, LLC*, No.

CV 17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018) (rejecting argument that borrowers could avoid injury by not borrowing in the first place, reasoning "[c]ustomers could not have avoided the alleged injury—Defendants' attempted collection of amounts that the consumer allegedly did not owe—by declining the loan" because "[t]he customer's contract already had been made at the time that Defendants collected on the loans"). While borrowers who became delinquent had the theoretical option not to take out their initial loans, *but cf. Smith v. Steinkamp*, 318 F.3d 775, 776 (7th Cir. 2003) (observing that payday loan borrowers "*must* be desperate, since the annual percentage rate of the loans is disclosed to them in clear and conspicuous type on the loan instrument") (emphasis in original) (Posner, J.), Defendants ensured that their options—repay in full, reborrow, or default—were much more limited once they were already in a loan. Repaying in full was practically impossible because, as Defendants' own employees repeatedly acknowledged, these borrowers were "screaming they don't have the money to pay you," and "are begging for help." Compl. ¶ 51. And if these borrowers managed to repay in full, it was only because they had to forgo payment or default on their other obligations to make their payments to Defendants. Again, Defendants knew this, because they repeatedly refinanced the loans of borrowers with negative free incomes and with multiple other credit accounts that were in serious delinquency or collections. *Id.* at ¶¶ 32-33.

Defendants also argue that their disclosures made borrower injuries reasonably avoidable. This simply ignores that many of their loan-churning practices were revealed only after borrowers were already stuck in their unaffordable loans. *See Think Finance*, 2018 WL 3707911, at *8. This argument also erroneously conflates "access to information" with "free and informed choice." *See ITT Educ. Servs.*, 219 F. Supp. 3d at 915-16 ("Without abandoning the common law's presumption that parties should be held to the terms of contracts to which they freely

agreed, our inquiry into 'unfair' practices under the statute requires us to look past form and into substance.") (citation omitted). The Hobson's choice that Defendants' loan-churning practices gave borrowers was an illusory one.

#### 3. The injury is not outweighed by countervailing benefits to consumers or competition.

Whether the harm from Defendants' loan-churning practices is outweighed by countervailing benefits to consumers or competition "is a particularly fact-dependent issue," and ill-suited for resolution as a matter of law. *ITT Educ. Servs.*, 219 F. Supp. 3d at 917 (citing *Am. Fin. Servs. Ass'n*, 767 F.2d at 986-88). While payment-stressed refinancers may have benefited from a temporary reprieve from default, that benefit was, for many, outweighed by the cumulative cost of repeatedly refinancing. Compl. ¶¶ 24, 105. The Complaint's alleged facts also support an inference that most refinancing decisions were driven by a frequently recurring need to skip an unaffordable payment, rather than a genuinely temporary emergency hardship. *Id.* at ¶¶ 89-91. It did not benefit borrowers to repeatedly refinance a loan they could not afford. This is sufficient to satisfy the countervailing-benefits prong of an unfairness claim at the pleadings stage.

### E. The Complaint states plausible abusiveness claims under the CFPA.

The CFPA prohibits Defendants from engaging in abusive acts or practices by "taking unreasonable advantage" of consumers. 12 U.S.C. § 5531(d). Defendants violated two of the abusiveness provisions in the CFPA in connection with their loan-churning practices.

#### 1. Defendants took unreasonable advantage of their payment-stressed borrowers' lack of understanding.

The CFPA prohibits acts or practices that "take unreasonable advantage" of "the lack of understanding on the part of the consumer of the material risks, costs, or conditions of the

product or service." 12 U.S.C. § 5531(d)(2)(A). According to the Merriam-Webster Dictionary, to "take advantage" means to "use to advantage" or to "profit by" or "impose on." *See Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017) ("We start as we must with the plain language of the statute because 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (citations omitted). So, Defendants violate this prohibition if they unreasonably profit from or impose on consumers' lack of understanding of the material risks, costs, or conditions of refinancing under payment stress. This claim is amply supported by the allegations in the Complaint.

First, the Complaint alleges that borrowers lacked an understanding that refinancing on equally unaffordable terms only deepens, rather than solves, their problems. Compl. ¶¶ 47-50, 116. Defendants exploited this lack of understanding by marketing refinances as "fresh starts," "solutions," and the "best option" for resolving a borrower's delinquency. *Id.* at ¶¶ 6, 47-50, 116. But refinancing under these conditions prolongs the borrowers' time in debt, increases their total borrowing costs, and provides only a meager cash benefit. *Id.* at ¶¶ 6, 32, 89-91. Similarly, borrowers lacked an understanding of how Defendants' use of the Rule of 78s[8]—an anachronistic and often befuddling accounting method—and reimposition of upfront fees make every new refinance incrementally more costly (for the borrower) than the one that preceded it. Compl. ¶¶ 83-84. Indeed, this dynamic is abstruse enough that it had to be spelled out for Defendants' own executive leadership, who learned that the company pads its bottom line the more frequently that borrowers refinance. *Id.*

---

[8] Rule of 78s, available at https://en.wikipedia.org/wiki/Rule_of_78s.

Second, by harvesting upfront fees and front-loading their collection of unearned interest and insurance premiums, Defendants directly profited from borrowers' lack of understanding of how repeated refinancing steadily erodes their available credit, increases their total borrowing costs, and makes eventual payoff even more onerous. Compl. ¶¶ 77-91.

Defendants disregard these allegations when they claim that TILA and other disclosures were a panacea for borrowers' lack of understanding. Mem. at 30. And the only authorities that Defendants cite are inapposite for at least two reasons: (i) those cases involved allegations of common-law fraud or mistake, not violations of unfairness or abusiveness prohibitions, and (ii) the allegations arose from mortgage lenders' failure to adequately assess ability to repay, not from post-origination loan-churning practices such as those outlined in the Bureau's Complaint. *See Anderson v. Franklin*, No. 2:09-cv-11096, 2010 WL 742765 (E.D. Mich. Feb. 26, 2010) (mortgage lender's failure to assess ability to repay insufficient to state common-law claim for constructive fraud); *Muncy v. Centex Home Equity Co.*, No. 1:14CV00016, 2014 WL 5326436 (W.D. Va. Oct. 20, 2014) (mortgage lenders have no common-law duty to assess ability to repay); *Bradshaw v. SLM Corp.*, No. C 12-06376 JSW, 2014 WL 12629968 (N.D. Cal. May 29, 2014) (denying rescission of mortgage based on failure to assess ability to repay).

None of this is relevant because the CFPA's statutory UDAAP prohibitions were designed to expand, rather than simply replicate, common-law avenues of relief. *E.g., FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 239–40 (1972) ("When Congress created the Federal Trade Commission in 1914 and charted its power and responsibility under § 5, it explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply."); *BCFP v. Fifth Third*

*Bank, N.A.*, No. 1:21-CV-262, 2023 WL 7325956, at *8 (S.D. Ohio Sept. 26, 2023) (observing that "the CFPA's unfairness and abusiveness provisions attach novel and significant legal consequences to conduct not previously penalized under the law"). The CFPA's abusiveness standard does not require the Bureau to prove that Defendants deceived payment-stressed refinancers, or even that they contributed to borrowers' lack of understanding. It simply requires that they took unreasonable advantage of that lack of understanding, for example by unreasonably profiting. Defendants' compliance with TILA and state laws governing limited aspects of their loan products, even if true, is no shield to liability for violating the CFPA.

**2. Defendants took unreasonable advantage of their payment-stressed borrowers' inability to protect their interests.**

The CFPA prohibits acts or practices that "take unreasonable advantage" of "the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B). Defendants violated this prohibition by unreasonably profiting from consumers' inability to protect their interests in selecting or using a refinanced loan.

Defendants' payment-stressed borrowers had at least three interests in selecting or using a refinanced loan: (i) meeting their immediate cash needs; (ii) repaying their loan according to its terms without needing to re-borrow or undertake costly default-avoidance measures; and (iii) mitigating their risk of eventual default. Compl. ¶ 124. These borrowers couldn't protect their interests for a variety of reasons. They were typically credit-constrained and have few, if any, more favorable credit alternatives available to them. *Id.* at ¶¶ 2, 26, 103. Moreover, because of the way that Defendants structured their loans, the immediate cash benefit from refinancing was often very meager—in many cases, less than the first payment due on the refinanced loan, and in some cases, just enough to pay for a cup of coffee. *Id.* at ¶ 89. This is so because Defendants'

repeated imposition of upfront fees and non-actuarial refund of unearned interest imposes a prepayment penalty on refinancers and drains their available credit with each successive refinance. *Id.* at ¶ 81. So, as payment-stressed borrowers moved from one refinance to the next, they sunk deeper into debt, with steadily increasing repayment obligations accompanied by steadily declining cash disbursements. *Id.* at ¶¶ 85-88.

Payment-stressed refinancers also couldn't protect their interest in selecting an affordable loan when they refinanced. Defendants' refinanced loans carry the same, if not more, onerous repayment terms as the loans they replace, and those terms were non-negotiable. Payment-stressed refinancers also couldn't protect their interest in mitigating eventual default. With each successive refinance, Defendants' borrowers became even more likely to refinance again in the future. And because each successive refinance increased their total repayment obligations and eroded their available credit, payment-stressed borrowers became even more likely to eventually default.

Further, Defendants' coercive servicing and collections practices ensured that payment-stressed refinancers could not protect these interests. Once these borrowers were in an unaffordable loan that they were legally obligated to repay, they faced imminent harms from prolonged delinquency and default. These included the accumulation of late fees, as well as Defendants' threats to repossess their household goods, furnish negative information to credit reporting agencies, file collections lawsuits, and garnish wages. To protect against these imminent harms, these borrowers had limited options, all of which imposed harms of their own. Defendants exploited borrowers' inability to protect these interests because serial refinancing is a central component of their profitability.

Once again, the theoretical option that borrowers had to walk away from their loans and cease doing business with Defendants is insufficient to defeat the Bureau's abusiveness claim. The court in *CFPB v. ITT Educational Services* rejected a similar argument, reasoning that although consumers "never lost the theoretical power to defend their interests, in the sense that they could have walked away from ITT entirely and refused to take out new debt," the standard for inability to protect interests "refers to oppressive circumstances—when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of the defendant." 219 F. Supp. 3d at 919. The same reasoning applies here. While Defendants' payment-stressed borrowers technically always had the option to walk away from their loans, they could not do so without suffering an array of harms associated with defaulting. Once these borrowers fell behind on their loans, Defendants were in an "excessively stronger position" from which they exerted leverage over them. Using this leverage, Defendants steered borrowers into a cycle of unaffordable refinances that only deepened their financial distress.

**F. The Bureau's lawsuit comports with APA and fair-notice requirements.**

Defendants complain that the Bureau should have issued rules proscribing their specific conduct and that enforcing the CFPA's prohibition of unfair and abusive practices against them violates their due process right to fair notice. Mem. at 18-20. They are wrong on both fronts.

On the first, they cite no authority for the proposition that the Bureau should have issued a rule instead of bringing an enforcement action; this is likely because every court to have considered the argument has rejected it. *See generally CFPB v. Ocwen Fin. Corp.*, No. 17-80495-CIV, 2019 WL 13203853, at *17 (S.D. Fla. Sept. 5, 2019) (holding CFPB not required to engage in rulemaking before bringing enforcement action to address violations of statutory UDAAP prohibition); *Navient*, 2017 WL 3380530, at *7 (same); *CFPB v. D&D Mkt'g*, No. CV

15–9692 PSG, 2016 WL 8849698, at *7 (C.D. Cal. Nov. 17, 2016) (same); *see also, e.g., Wyndham Worldwide*, 10 F. Supp. 3d at 618 ("Circuit Courts of Appeal have affirmed FTC unfairness actions in a variety of contexts *without* preexisting rules or regulations specifically addressing the conduct-at-issue.") (emphasis in original). The CFPA authorizes the Bureau to engage in rulemaking and litigation to address unfair, deceptive, or abusive practices, but nothing in the Act makes rulemaking a predicate to enforcement. 12 U.S.C. §§ 5531(a), (b), 5564(a).

Second, Defendants argue that the Bureau's "novel interpretations" of the CFPA deprived them of the constitutionally required due process and fair notice. Mem. at 19. But this, too, is a well-settled question: "[m]any courts have rejected [the] argument that the CFPA left defendants without fair notice of what acts or practices the CFPB considers unfair, deceptive, or abusive." *See generally Ocwen*, 2019 WL 13203853, at *18 (collecting cases). The CFPA's prohibitions on unfair and abusive acts or practices—economic regulations that do not impose criminal penalties or impinge on constitutionally protected rights, and therefore do not trigger any heightened notice requirements—include detailed definitions that afford Defendants sufficiently fair warning of what is proscribed.

The lone case that Defendants cite, *Bittner v. United States*, does not help them because it involved a statute that carried criminal penalties and therefore triggered the rule of lenity. 598 U.S. 85, 103 (2023). *See Navient*, 2017 WL 3380530, at *8 (more lenient standard for assessing fair-notice problems applies in civil context). Nor can Defendants credibly claim that they lacked fair notice because the Bureau previously "indicated" that "lenders need not consider an applicant's ability to repay for installment loans." Mem. at 20. That's a non sequitur. The Bureau does not allege here that Defendants improperly failed to assess an applicant's ability to repay; it alleges that Defendants consciously targeted existing borrowers who Defendants knew could not

repay and then used coercive servicing and collections practices to push those borrowers into fee-laden refinances for years on end. Compl. ¶¶ 32-33, 44-53, 57. Whether Defendants assessed borrowers' ability to repay their initial loans has nothing to do with it.

**G. The Bureau's claims are timely.**

The CFPA has a three-year statute of limitations that begins to run only "after the date of discovery of the violation to which the action relates." 12 U.S.C. § 5564(g)(1). To prove that the Bureau's claims are time-barred, Defendants must therefore show that the Bureau discovered the alleged violations before August 22, 2020. *E.g., Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (limitations is an affirmative defense on which defendant's bear burden of proof). In the Fourth Circuit, the Bureau has no obligation to anticipate an affirmative defense or plead facts sufficient to defeat it. *Simpson v. CDM Smith, Inc.,* No. CV 20-4090, 2021 WL 1299564, at *4 (D.S.C. Feb. 23, 2021) ("A plaintiff need not anticipate in the complaint an affirmative defense that may be raised by the defendant; it is the defendant's burden to plead an affirmative defense."). Dismissal on limitations grounds is warranted only when the allegations in the complaint plainly show that the claim is time-barred. *See Goodman*, 494 F.3d at 464. The Bureau's Complaint does not contain any allegations that plainly show that the Bureau discovered the alleged violations before August 22, 2020; nor do Defendants even attempt to identify any such allegations. Defendants' limitations argument thus borders on the frivolous and should be rejected.

Dated: September 4, 2024

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Cara Petersen
*Principal Deputy Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

/s/ David Hendricks
John Thompson (NM Bar No. 139788)
Admitted Pro Hac Vice
Meghan Sherman (NY Bar No. 4473120)
Admitted Pro Hac Vice
Gregory W. Jones (IL Bar No. 6313157)
Admitted Pro Hac Vice
Andrea Matthews (MA Bar No. 694538)
Admitted Pro Hac Vice
Derick Koo Sohn Jr. (CA Bar No. 272758)
Admitted Pro Hac Vice
David Hendricks (SC Bar No. 10547)
*Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
202-435-7270 (Thompson)
202-435-9165 (Sherman)
202-573-1372 (Jones)
202-407-2324 (Matthews)
202-403-7895 (Sohn)
312-610-8967 (Hendricks)
Fax: 703-642-4585
john.thompson@cfpb.gov
meghan.cater@cfpb.gov
gregory.jones.@cfpb.gov
andrea.matthews@cfpb.gov
derick.sohn@cfpb.gov
david.hendricks@cfpb.gov
*Attorneys for the Consumer Financial Protection Bureau*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ David Hendricks
David Hendricks
Consumer Financial Protection Bureau