**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION; COVINGTON CREDIT OF ALABAMA, INC.; SOUTHERN FINANCE OF TENNESSEE, INC.; COVINGTON CREDIT OF GEORGIA, INC.; SOUTHERN FINANCE OF SOUTH CAROLINA, INC.; COVINGTON CREDIT OF TEXAS, INC.; COVINGTON CREDIT, INC.; and QUICK CREDIT CORPORATION,<br><br>Defendants. | Civil Action No.: 6:23-CV-04177-JDA |

**DEFENDANTS HEIGHTS FINANCE HOLDING CO. f/k/a SOUTHERN MANAGEMENT CORPORATION, COVINGTON CREDIT OF ALABAMA, INC., SOUTHERN FINANCE OF TENNESSEE, INC., COVINGTON CREDIT OF GEORGIA, INC., SOUTHERN FINANCE OF SOUTH CAROLINA, INC., COVINGTON CREDIT OF TEXAS, INC., COVINGTON CREDIT, INC., AND QUICK CREDIT CORPORATION'S ("DEFENDANTS") REPLY TO THE CONSUMER FINANCIAL PROTECTION BUREAU'S ("CFPB") OPPOSITION TO DEFENDANTS' <u>RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

# TABLE OF CONTENTS


**TABLE OF CONTENTS** ........................................................................................... i

**TABLE OF AUTHORITIES** ........................................................................................ ii

**INTRODUCTION** ...................................................................................................... 1

**ARGUMENT** ............................................................................................................ 2

I. The CFPB Lacks Constitutionally-Authorized Funds ........................................... 2

A. The Supreme Court's Decision in CFSA Rejects the CFPB's Interpretation ........................................................................................ 2

B. Dodd-Frank Supports the Reading that "Earnings" Means "Surplus" ........................................................................................................ 3

C. For Entities, Dictionaries Instruct that "Earnings" Means "Profits" ......... 5

D. Dismissal is the Proper Remedy ............................................................. 6

II. The CFPB's Power to Self-Define Its Powers Violates the Nondelegation Doctrine ..................................................................................................... 6

III. The CFPB's Claims Violate the Major Questions Doctrine ................................. 7

IV. The Complaint Fails to Plausibly Plead Unfairness in Count I ............................ 9

V. The Complaint Fails to Plausibly Plead Abusive Conduct in Count II ............... 12

VI. The Complaint Fails to Plausibly Plead Abusive Conduct in Count III .............. 14

**CONCLUSION** ........................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**

*Allstates Refractory Contractors, LLC v. Su*,
79 F.4th 755 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 2490 (2024) .......... 7

*BCFP v. Fifth Third Bank, N.A.*,
No. 1:21-CV-262, 2023 WL 7325956 (S.D. Ohio Sept. 26, 2023) .......... 14

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) .......... 8

*CFPB v. CFSA, Ltd.*,
601 U.S. 416 (2024) .......... passim

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) .......... 9

*CFPB v. Navient Corp.*,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) .......... 9

*Chamber of Commerce of United States v. CFPB*,
691 F. Supp. 3d 730 (E.D. Tex. 2023) .......... 7, 8

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) .......... 12

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) .......... 11

*F.T.C. v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) .......... 9, 10

*F.T.C. v. Direct Benefits Grp., LLC*,
2013 WL 3771322 (M.D. Fla. July 18, 2013) .......... 11

*F.T.C. v. LoanPointe, LLC*,
525 F. App’x 696 (10th Cir. 2013) .......... 9

*F.T.C. v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) .......... 11

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 14

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) .......... 14

*Hayrioglu v. Granite Cap. Funding, LLC*,
794 F. Supp. 2d 405 (E.D.N.Y. 2011) ........ 13

*Karakus v. Wells Fargo Bank, N.A.*,
941 F. Supp. 2d 318 (E.D.N.Y. 2013) ........ 13

*LabMD, Inc. v. F.T.C.*,
678 F. App'x 816 (11th Cir. 2016) ........ 10

*N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) ........ 8

*Orkin Exterminating Co., Inc. v. F.T.C.*,
849 F.2d 1354 (11th Cir. 1988) ........ 13

*Radzanower v. Touche Rose & Co.*,
426 U.S. 148 (1976) ........ 14

*Royal Oil Corp. v. F.T.C.*,
262 F.2d 741 (4th Cir. 1959) ........ 9, 10

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........ 6

*United States v. Hansen*,
599 U.S. 762 (2023) ........ 5

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........ 8, 14

**Statutes**

12 U.S.C. § 243 ........ 4

12 U.S.C. § 289 ........ 2, 3, 4, 5

12 U.S.C. § 5367 ........ 4

12 U.S.C. § 5381 ........ 4

12 U.S.C. § 5491 ........ 4

12 U.S.C. § 5497 ........ 2, 3, 4, 5

12 U.S.C. § 5511 ........ 14

12 U.S.C. § 5531 ........ 1, 4, 15

15 U.S.C. § 1639c ........ 4

15 U.S.C. § 45 .......... 10

**Other Authorities**

CFPB, Notice of Proposed Rulemaking, 84 Fed. Reg. 4252 (Feb. 14, 2019) .......... 7

CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020) .......... 13

CFPB, Truth in Lending Act (TILA) Examination Procedures (Oct. 22, 2021) .......... 13

CFPB, Unfair, Deceptive or Abusive Acts or Practices ("UDAAPs") Examination Procedures (Oct. 1, 2012) .......... 10

Financial Accounting Manual for Federal Reserve Banks, Appendix B.1 (Jan. 2023) .......... 5

FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) .......... 10

Matter of Customs Serv. Payment of Overtime Pay, 1981 U.S. Comp. Gen. LEXIS 139 (Comp. Gen. May 6, 1981) .......... 6

*Profit*, Merriam-Webster Dictionary (all websites last visited Sept. 16, 2024) .......... 6

U.S. Census Bureau, Selected Characteristics of Households by Total Money Income: HINC-01 (2023) .......... 8

U.S. Const. art I, § 9 .......... 2

## INTRODUCTION

The CFPB bears the burden of showing that its prosecution of this case and its legal theories in the Complaint are unambiguously within the bounds of controlling statutes. Yet its brief fails to cite any relevant authority explaining why this Court should rewrite or override TILA, Regulation Z, the CFPA, or state consumer lending laws.[1] It also does not cure the Complaint's failure to plausibly plead, among other required elements, that Defendants' borrowers were harmed, lacked an understanding of the risks and costs of their loans, or were prevented from making free and informed choices. The pleading deficiencies in the Complaint are unsurprising because Congress, and the CFPB itself, expressly declined to impose the disclosure and ability-to-repay requirements that form the foundation for the CFPB's claims. Moreover, the CFPB's brief entirely ignores Congress's mandate that public policy considerations cannot serve as a primary basis for determining unfairness under the CFPA. 12 U.S.C. § 5531(c)(2).

The CFPB's efforts to distort statutory text are just as glaring in its self-serving misreading that the Federal Reserve's "combined earnings"—the only constitutionally-appropriated source of the agency's funding—means the Federal Reserve's gross revenue. The U.S. Supreme Court's recent ruling in *CFPB v. CFSA, Ltd.*, 601 U.S. 416 (2024), the plain text of the Dodd-Frank Act, and statutes governing the flow of funds within the Federal Reserve System, instruct that "combined earnings" means surplus or profits. Congress gave the CFPB a mechanism to seek other funds in the event of a shortfall, but the CFPB has not utilized it. As a result, the CFPB has lacked lawful funding since the Fall of 2022.

[1] Capitalized terms in this reply have the same meaning as Defendants' opening brief.

ARGUMENT

**I. The CFPB Lacks Constitutionally-Authorized Funds**

The CFPB has no constitutionally-appropriated funds to pursue this enforcement action. (ECF 71, at 7–14). The CFPB's *only* appropriated funds come from the "combined earnings" of the Federal Reserve, *i.e.*, the "*surplus funds* in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *CFSA*, 601 U.S. at 425 (emphasis added). Numerous dictionaries, secondary sources, and court decisions—explaining that an entity's "earnings," 12 U.S.C. § 5497(a)(1), are its "profits," (ECF 71, at 8–11),—are consistent with the Supreme Court's explanation that "surplus" funds available to the CFPB are the Federal Reserve's remaining funds after paying expenses. The Supreme Court's decision in *CFSA* and the plain language of Dodd-Frank, therefore, reject the CFPB's interpretation that an entity's "earnings" somehow means its gross income without regard to its expenditures. The CFPB does not deny that the Federal Reserve has lacked "surplus funds" to send to the CFPB since the Fall of 2022. *See generally* (ECF 91, at 3–12). As a result, the CFPB cannot lawfully pursue this lawsuit.

***A. The Supreme Court's Decision in CFSA Rejects the CFPB's Interpretation***

The CFPB's central argument that "earnings" means income is irreconcilable with the Supreme Court's analysis of the CFPB's funding structure. In *CFSA*, the Supreme Court explained the Federal Reserve's "combined earnings," from which it can transfer funds to the CFPB, are funds that are "otherwise [to] be deposited into the general fund of the Treasury." *CFSA*, 601 U.S. at 425. The Supreme Court concluded that, because the "surplus funds" (*i.e.*, profits) would otherwise be deposited into the Treasury under 12 U.S.C. § 289(a)(3)(B), the funds are considered "drawn from the Treasury" and therefore the funding structure complies with the Constitution's Appropriations Clause. *Id.* (quoting U.S. Const. art I, § 9). The CFPB's interpretation of "earnings" to mean "income" is incompatible with *CFSA* because the Federal Reserve's "income"—unlike

its surplus—is not otherwise deposited into the Treasury. The CFPB ignores this binding precedent, which forecloses its "earnings" argument, and does not even attempt to address the Supreme Court's use of the term "*surplus*" or its reliance on 12 U.S.C. § 289(a)(3)(B).

### *B. Dodd-Frank Supports the Reading that "Earnings" Means "Surplus"*

Contrary to the CFPB's assertion, there is good "reason to think that Congress," (ECF 91, at 7), decided to limit the Federal Reserve's transfers to the CFPB to its "surplus funds," *CFSA*, 601 U.S. at 425. In Dodd-Frank, Congress created a new federal agency during a financial crisis, and Congress sensibly told the agency (the CFPB) that it could draw upon the Federal Reserve's surplus funds that would otherwise flow to the "general fund of the Treasury." 12 U.S.C. § 289(a)(3)(B); *CFSA*, 601 U.S. at 425. However, if no surplus funds exist in a given year, Congress expressly gave the CFPB an alternative source of funding by permitting the CFPB to ask Congress to appropriate the needed funds. 12 U.S.C. § 5497(e)(1) (directing the CFPB to submit a report to the President and Congress in the event of a potential shortfall).[2] The back-up funding expressly provided in Dodd-Frank entirely refutes the CFPB's argument that reading "earnings" to mean "surplus" somehow contradicts Congress' desire to ensure that the CFPB is adequately funded and not "unpredictably mothballed." (ECF 91, at 10). Under Section 5497(e), if the CFPB has insufficient funds, the CFPB must request an appropriation from Congress, as most federal agencies do every year. If the CFPB had simply followed that procedure, there would be no question about its funding. But it failed to do so.

Moreover, there is nothing "unworkable" about the Federal Reserve using the common definition of "earnings" when deciding whether it can transfer funds to the CFPB. (ECF 91, at 10–

[2] For the CFPB's first five years, Congress gave the agency pre-set amounts to be appropriated if the agency's Director requested funds. 12 U.S.C. § 5497(e)(2).

11). Once this Court and other courts adjudicate the dispute about the meaning of "earnings," there is every reason to believe the Federal Reserve will implement basic financial accounting. It is, in fact, the CFPB's view of "earnings" that makes no sense, because the CFPB does not explain why Congress would have wanted the CFPB to get funds from the Federal Reserve's income, rather than directly from the "general fund of the treasury," when, as a practical matter, a negative balance in the Federal Reserve's profits would mean the money comes automatically from the Treasury, under the CFPB's view. 12 U.S.C. § 289(a)(3)(B); *CFSA*, 601 U.S. at 425.

The CFPB's other arguments also do not support its attempt to redefine "earnings" as gross income. While the CFPB suggests that "earnings" is used in other areas of Dodd-Frank to refer to income, (ECF 91, at 3–6), Dodd-Frank uses other terms besides "earnings" to refer to income, *see, e.g.*, 12 U.S.C. §§ 5381(b) ("consolidated revenues"), 5311(a)(6)(A) ("gross revenues"), 5367(b)(2) ("revenues"), and uses "income" distinctly from "earnings," *see* 15 U.S.C. § 1639c(a)(3)–(4), (9). The Federal Reserve System's payment structure statutes, which the CFPB cites to in its brief, further demonstrate that "earnings" means "profit" rather than "income." (ECF 91, at 9–12 (citing 12 U.S.C. §§ 289, 243, 5491, 5497)). Under that statutory waterfall, Federal Reserve banks first pay dividends "[a]fter all necessary expenses . . . have been paid or provided for." 12 U.S.C. § 289(a)(1)(A). Second, Federal Reserve banks deposit their "net earnings" into the "surplus funds of" each bank up to a statutory cap. *Id.* § 289(a)(2)–(3)(A). Third, Federal Reserve banks transfer any remaining "earnings" (*i.e.*, "surplus") exceeding the statutory surplus-deposit cap "to the Board of Governors of the Federal Reserve System for *transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury*." *Id.* § 289(3)(B) (emphasis added); *see also CFSA*, 601 U.S. at 425. It is at this point—when the Federal Reserve collects surplus earnings from each Federal Reserve bank—that "earnings" become "*combined* earnings" destined

for the Treasury, which can be diverted to the CFPB in accordance with the Appropriations Clause. *CFSA*, 601 U.S. at 425. Any income below the Federal Reserve banks' surplus-deposit caps is not destined for the Treasury because it *must* be sent to each individual bank's surplus funds. *Id*. And in any event, the Federal Reserve waterfall explicitly uses the term "earnings" to mean "net earnings," and those are the very same "earnings" Congress referred to in Dodd-Frank § 1017 (codified at 12 U.S.C. § 5497(a)(1)), when designating the CFPB's primary funding source.

### *C. For Entities, Dictionaries Instruct that "Earnings" Means "Profits"*

Finding no support in *CFSA*, Dodd-Frank, or the Federal Reserve System's statutory waterfall, the CFPB relies on dictionary definitions saying that individuals' "earnings" are their income from their labor, services, or investments, rather than their profits after their personal expenses. (ECF 91, at 3–4). The CFPB's focus on people, rather than entities, is inapposite and contravenes basic rules of statutory construction. *See United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them. That is just as true when the choice is between ordinary and specialized meanings.").

With that in mind, store clerks would properly say their "earnings" are their income before deducting their personal expenses. Their employers, however, do not use "earnings" in the same manner because, for entities, "earnings" means profits, not income, as numerous dictionaries and other sources that Defendants cited make clear. (ECF 71, at 8–11). Needless to say, the Federal Reserve System is an entity, not an individual.[3] Because space limits constrain Defendants from addressing each of the CFPB's dictionary citations, Defendants respectfully submit that, if this

[3] While the CFPB is correct that corporations pay dividends from earnings, (ECF 91, at 7–8), that does not help its position because a Federal Reserve bank must pay dividends even if it has no earnings. Financial Accounting Manual for Federal Reserve Banks, Appendix B.1 (Jan. 2023). As relevant here, under the plain language of 12 U.S.C. § 289, the Federal Reserve pays funds to the CFPB *only if* it has earnings (surplus funds). *CFSA*, 601 U.S. at 425.

Court reviews the dictionaries, it will see that "earnings" typically means "profits" for entities, while it means "income" for individuals.[4]

### *D. Dismissal is the Proper Remedy*

The CFPB ignores controlling case law requiring dismissal or vacatur of an agency's *unconstitutional* action, such as attempting to take actions without appropriated funds. (ECF 91, at 12). And the Antideficiency Act is abundantly clear: federal agencies cannot use "expenditures which exceed the amount appropriated, but also expenditures which violate statutory restrictions or limitations on obligations or spending," in *any* agency action. *See* Matter of Customs Serv. Payment of Overtime Pay, 1981 U.S. Comp. Gen. LEXIS 139, at *5–6 (Comp. Gen. May 6, 1981). In any event, this Court need not go further than relying upon the binding precedent that requires dismissal because the CFPB has no constitutionally-appropriated funds to "maintain [a] suit or otherwise enforce [a] demand." *Seila Law LLC v. CFPB*, 591 U.S. 197, 233 (2020).

## II. The CFPB's Power to Self-Define Its Powers Violates the Nondelegation Doctrine

The CFPB is more than exercising its executive powers, as its brief claims. (ECF 91, at 13). The CFPA's lack of adequate guidance, along with Congress giving the CFPB the authority to both define and prosecute the conduct it chooses—thereby combining in the CFPB broad legislative and executive authority—contravenes the Constitution's separation of powers, *see Seila Law LLC*, 591 U.S. at 225–27, and the limitation that only after Congress creates laws can "the Executive come in and do its job[:] . . . enforce the laws, not create them." *Allstates Refractory*

[4] The CFPB's discussion of financial statements and related secondary sources also backfires. As the CFPB concedes, the Federal Reserve's financial statements and accounting practices require that it only transfer "*net* earnings" to the Treasury after deducting expenses, dividends, and surplus allocation. (ECF 91, at 8–9). That is the textbook definition of "profit" as "excess of returns over expenditure[s]." *Profit*, Merriam-Webster Dictionary, available at www.merriam-webster.com/dictionary/profit#:~:text=Synonyms%20of%20profit,transaction%20or%20series%20of%20transactions (all websites last visited Sept. 16, 2024).

*Contractors, LLC v. Su*, 79 F.4th 755, 769 (6th Cir. 2023) (Nalbandian, J., dissenting), *cert. denied*, 144 S. Ct. 2490 (2024).

**III. The CFPB's Claims Violate the Major Questions Doctrine**

The CFPB's assertion that it is not seeking to impose new disclosure or ability-to-repay requirements, (ECF 91, at 16), is disingenuous because the Complaint repeatedly relies on allegations that borrowers lacked an understanding of their loans and Defendants took unreasonable advantage of borrowers by offering them loans that they could not afford. (ECF 1, *passim*). Of course, the CFPB does not explicitly say that it wants to impose such requirements, but its claims are predicated on Defendants' alleged (1) failure to provide information beyond the requirements in TILA, Regulation Z, and applicable state lending laws; and (2) failure to assess consumers' ability-to-repay before giving them loans. (ECF 1, ¶¶ 103–05, 109, 117–19, 125–26).

Notably, the CFPB ignores *Chamber of Commerce of United States v. CFPB*, which rejected a similar effort by the CFPB to impose compliance requirements through its UDAAP authority beyond what is required in the squarely controlling statute (the Equal Credit Opportunity Act in that case). 691 F. Supp. 3d 730, 746 (E.D. Tex. 2023). The CFPB also ignores its own findings about the major impact of imposing ability-to-repay requirements on lenders offering installment loans. In deciding to rescind the ability-to-repay requirement for installment loans like Defendants' loans, the CFPB concluded that:

> the Mandatory Underwriting Provisions of the Rule would impose substantial burdens on industry, significantly constrain lenders' offering of products, and substantially restrict consumer choice and access to credit. All this would occur notwithstanding the judgments that the various States have made to permit lenders to offer and consumers to choose such products subject to certain limitations.

CFPB, Notice of Proposed Rulemaking 84 Fed. Reg. 4252, 4264 (Feb. 14, 2019). Here, the Complaint alleges that Defendants' typical borrowers have annual incomes less than $25,000. (ECF 1, ¶ 26). According to U.S. Census data, about 15.8% of Americans have a household income

of less than $25,000.[5] This group alone represents a significant percentage of the population, and therefore, the CFPB's claims raise questions of major economic and political significance. *See e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2372–73 (2023) (finding a major question when the Secretary of Education claimed authority impacting 43 million borrowers).

The CFPB also ignores its decision to rescind an ability-to-repay requirement for installment loans, (ECF 71, at 4), because it highlights that imposing the requirement would stray too far from the CFPB's statutory authority in the CFPA and would supplant state laws. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (When the major questions doctrine applies, the "agency . . . must point to 'clear congressional authorization' for the power it claims.").[6]

The cases cited by the CFPB also support the application of the major questions doctrine. In *N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, the Fourth Circuit found a major question when a "distinct regulatory scheme" already governed the conduct at issue. 76 F.4th 291, 297 (4th Cir. 2023). Here, as discussed at length in Defendants' opening brief, TILA and Regulation Z govern when creditors must assess an applicant's ability-to-repay, and they impose the requirement only on credit cards and mortgages. The remaining cases cited by the CFPB generally discuss its authority to "flexibly" enforce UDAAP prohibitions to "practices that have not yet been contemplated." (ECF 91, at 17). But as noted in Defendants' opening brief, (ECF

---

[5] U.S. Census Bureau, Selected Characteristics of Households by Total Money Income: HINC-01 (2023).

[6] *See also Chamber of Commerce of U.S.*, 691 F.Supp.3d at 740–41:

> States make meaningful choices about what classes are protected or not, what conduct is prohibited or allowed, and what defenses and remedies are available or not. The broad authority staked out by the CFPB, however, would allow the agency to displace the balances struck by the States on those matters. That might be something Congress can authorize. But when the executive branch invokes authority that would "significantly alter the balance between federal and state power," Congress must grant that authority with "exceedingly clear language."

71, at 2–5), Congress previously contemplated proper disclosure and ability-to-repay requirements in TILA, and expressly decided which requirements to impose (and not impose) based on the product type. The major questions doctrine therefore prevents the CFPB from unilaterally adding compliance obligations when Congress has already spoken on the issue.

**IV. The Complaint Fails to Plausibly Plead Unfairness in Count I**

The CFPB's brief does nothing more than highlight the Complaint's deficiencies. To allege substantial injury, the CFPB uses conclusory terms like "steering" and "trapping" to characterize Defendants' alleged "loan-churning practices." (ECF 91, at 18, 23). Yet the CFPB does not allege any facts indicating that Defendants "steered" borrowers into doing anything. Unlike the cases cited by the CFPB, Defendants are not "subver[ting] . . . consumer privacy protections" to target borrowers, *see F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1194 (10th Cir. 2009). Defendants also are not providing incomplete information, *Royal Oil Corp. v. F.T.C.*, 262 F.2d 741, 743 (4th Cir. 1959), deceptive information, *F.T.C. v. LoanPointe, LLC*, 525 F. App'x 696, 701 (10th Cir. 2013), or inaccurate information and forcing borrowers into transactions, *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *21 (M.D. Pa. Aug. 4, 2017). And Defendants are certainly not using threats or coercion to "guid[e] [borrowers] into a precarious position and exploit[ing] that vulnerability." *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 917 (S.D. Ind. 2015).

The Complaint also fails to support the conclusion that Defendants "trap" consumers. To the contrary, the CFPB concedes that the so-called "traps" benefited borrowers facing defaults who have "immediate cash needs" and "few, if any, more favorable credit alternatives available." (ECF 91, at 28; ECF 1, ¶¶ 2, 124). In the end, the Complaint fails to plausibly plead unfair "traps" because refinancings are not traps at all; instead, they are options offered to certain borrowers and choices made by these borrowers to *prevent* harm and to bring their delinquent accounts current.

If the Court looks beyond these labels and considers the allegations the CFPB cites as the

"steering" or the "trapping," there is nothing but practices compliant with federal and state laws, and risks inherent to any loan. As detailed in Defendants' opening brief, (ECF 71, at 23–26), the duration of the repayment schedule and corresponding payment amounts, the refinancing fees, and the calculation of interest and insurance premium costs in connection with refinancing, are fully disclosed to consumers in accordance with TILA, Regulation Z, and applicable state laws.

Perhaps accepting that reality, the CFPB suggests it is irrelevant that Defendants complied with controlling federal and state laws, and that it is likewise irrelevant the purported injuries are simply well-known risks associated with loans. These arguments, however, ignore that TILA and Regulation Z squarely govern the activities at issue, and the CFPB's cases are inapplicable as a result. *See Royal Oil Corp.*, 262 F.2d at 743 (Congress did not address the practice at issue); *Accusearch Inc.*, 570 F.3d at 1194–95 (permitting an unfairness claim for practices that have not yet been contemplated by more specific laws). Here, Congress is far from silent on the relevant issues. Instead, Congress made policy decisions reflected in TILA and Regulation Z directly addressing the Complaint's central issues—disclosure of loan terms and fees to allow consumers to make free and informed decisions, and whether creditors should assess a borrower's ability-to-repay before offering certain products.

The CFPB's attempt to deflect that any alleged injuries to consumers are speculative, (ECF 91, at 20), fares no better. Indeed, the CFPB's position conflicts with its own guidance on unfairness, stating that "[m]erely speculative harms" are unavailing. *See* UDAAP Examination Procedures; FTC Unfairness Policy Statement; *see also LabMD, Inc. v. F.T.C.*, 678 F. App'x 816, 820 (11th Cir. 2016) (analyzing 15 U.S.C. § 45(n)).

Finally, the CFPB attempts to argue default-avoidance measures are a substantial injury within the meaning of the CFPA because, when borrowers have more expenses than income, they

"face costly choices between making the payment on their loan with Defendants or meeting other bills and necessary living expenses." (ECF 91, at 21). The CFPB fails to explain how managing a household budget is "harm" caused by Defendants' refinancing practices. As such, this conclusory allegation fails. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

For the second element, the CFPB fails to demonstrate that any alleged injuries were not reasonably avoidable by borrowers. The CFPB attempts to do so by suggesting that refinances cost borrowers significant time, effort, and money, and by arguing that borrowers "lacked a free and informed choice" because they had "only two options: refinance their way out of the delinquency or come up with the two (or more) payments required to get current." (ECF 91, at 21–22). Again, offering refinances to avoid default or requiring borrowers to bring their delinquent accounts current are lawful business practices prevalent in the marketplace. Under the CFPB's theory, all refinance loans made to delinquent borrowers are potentially unfair under the CFPA. To support its sweeping theory, the CFPB misstates the holdings of cases it relies upon on this point. *See F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (holding consumers could not reasonably avoid their injuries through mitigation because receiving a reimbursement following unauthorized withdrawals required "a substantial investment of time, trouble, aggravation, and money"); *F.T.C. v. Direct Benefits Grp., LLC*, 2013 WL 3771322, at *14 (M.D. Fla. July 18, 2013) ("Consumers incurred charges for products and services they were not seeking, did not want or need, could not afford, and did not intend to purchase. And, the fact that many customers were able to—eventually—obtain refunds from Defendants does not render the injury unavoidable.").[7]

The CFPB also argues the alleged injuries were not reasonably avoidable because

[7] The CFPB also seems to suggest that Defendants' customer base should be afforded special protections as a "highly susceptible class[] of purchasers." (ECF 91, at 22–23). The CFPB does not cite—and Defendants cannot locate—any authority supporting that notion.

borrowers "had no reason to anticipate" the imposition of fees, interest, collection efforts, or the terms, for the refinances. (ECF 91, at 23). This blatantly ignores that each of these purported unanticipated consequences (*i.e.*, loan fees, terms, and conditions) were clearly disclosed as required by TILA, Regulation Z, and applicable state laws. Nowhere does the CFPB dispute the sufficiency, clarity, or substance of Defendants' disclosures, nor does it allege any facts plausibly inferring that the disclosures were deficient and thus unfair. Accordingly, the CFPB's conclusion that borrowers somehow lacked the ability to make the free and informed choice to refinance their loans cannot prevail.

Finally, on the third element, the CFPB offers little in the form of substance, and instead suggests that a balancing of the alleged injuries against the countervailing benefits to consumers or competition is fact-dependent and "ill-suited for resolution as a matter of law." (ECF 91, at 25). This misses the point that the Complaint concedes that Defendants' loans benefited borrowers, (ECF 1, ¶¶ 101, 105), but nonetheless summarily concludes that the balance of these recognized benefits against the alleged injuries is in the CFPB's favor. The CFPB also ignores that *all* of the risks purporting to tip the scales in its favor relate to conduct that complies with TILA, Regulation Z, and state lending laws. (ECF 71, at 28–29).

## V. The Complaint Fails to Plausibly Plead Abusive Conduct in Count II

In the Complaint, the CFPB loses sight of what it must plausibly allege to prevail on this count. The CFPB's brief doubles down on this disconnect.

First, a consumer's "lack of understanding" of the "risks, costs, or conditions" for purposes of liability under the CFPA turns on whether the consumer had a "free and informed choice." *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (citation omitted). The CFPB makes no attempt whatsoever to address *Davis*, or to explain why it is not applicable here. The CFPB also ignores other hallmarks establishing a "lack an understanding" in this context,

including the notion that free and informed consumer choice is the "best regulator of the market" because consumers can act to avoid injury before it occurs if they have reason to anticipate the harms and the means to avoid it. *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1365 (11th Cir. 1988) (citation omitted); *see also* CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382, 44395 (July 22, 2020).

The CFPB is also conspicuously silent in responding to the fundamental tenets that a "reasonable consumer is responsible for reading and familiarizing herself with the terms of the agreement she freely enters into" and "know[ing] the state of her own finances and whether or not she can afford a certain monthly loan payment." *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 340, 342 (E.D.N.Y. 2013); *see also Hayrioglu v. Granite Cap. Funding, LLC,* 794 F. Supp. 2d 405, 412 (E.D.N.Y. 2011). Instead, the CFPB resorts to Defendants' marketing slogans, internal presentations on the Rule 78s, and hyperbolic characterizations of Defendants' alleged "loan-churning practices" to muddy the waters. These allegations—even if accepted as true—are inapposite and add zero factual support to what is otherwise a repeated, conclusory statement that consumers "lacked an understanding" of the "risks, costs, or conditions" of the loan products.

This approach is not surprising because the disclosure of Defendants' loans terms and conditions (*e.g.*, repayment schedule and amounts, associated fees, and calculation of interest and other costs) are squarely regulated by TILA and Regulation Z. Indeed, TILA was enacted to ensure that all of these terms were disclosed "in a meaningful way" so that consumers could make "free and informed" decisions about the material risks, costs, or conditions of a loan relative to their unique financial situations. *See* TILA Examination Procedures, at 18. The CFPB could have alleged in the Complaint that Defendants violated TILA or Regulation Z. They did not (and cannot) make that allegation. The CFPB likewise could have clarified in its brief that Defendants'

disclosures of the "risks, costs, or conditions" of the loan products violated TILA, Regulation Z, or were otherwise deceptive or deficient. Again, they did not (and cannot) offer any alleged violation of applicable federal laws.

The CFPB cites *Sperry & Hutchinson Co.* and *Fifth Third Bank, N.A.* as a way to sidestep these issues. (ECF 91, at 27–28). That attempt is unavailing. First, the salient point from *Sperry & Hutchinson Co.* merely recognizes the obvious—that unfair acts or practices are not specifically codified, and that it would be an "endless task" to attempt to do so. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972). From there, the CFPB advances an expansive interpretation of the CFPA and leaps to the unfounded conclusion that it is irrelevant whether Defendants complied with other federal law (TILA and Regulation Z). Stated otherwise, the CFPB would have this Court believe that the CFPA can displace and supersede controlling federal law when doing so might advance the CFPB's policy or political whims.

This position runs contrary to the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Rose & Co.*, 426 U.S. 148, 153 (1976). "[E]nabling legislation" is also "not an 'open book to which [an] agency [may] add pages and change the plot line.'" *West Virginia*, 597 U.S. at 723 (citation omitted). Rather, Congress mandated that the CFPB enforce the CFPA "consistently" with TILA and other federal law, and the CFPA must therefore be interpreted with TILA as a "symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 133 (2000); 12 U.S.C. § 5511(a). The CFPB's view that TILA and Regulation Z are not relevant cannot be squared with these fundamental principles of statutory construction.

## VI. The Complaint Fails to Plausibly Plead Abusive Conduct in Count III

To prevail on this count, the CFPB must allege that Defendants took unreasonable

advantage of the "inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(2)(B). The same deficiencies discussed above are equally dispositive here. Moreover, and as a threshold matter, the CFPB fails to offer a single factual allegation explaining how or why consumers cannot protect their interests in connection with Defendants' loan products. Instead, the CFPB falls back on a recital of the element coupled with its repeated themes that Defendants failed to conduct ability-to-repay analysis or failed to disclose material loan terms. (ECF 1, ¶¶ 125, 127, 128). Pairing these unrelated concepts with a threadbare, conclusory assertion that they somehow prohibit consumers from protecting their interests is simply not enough.

In fact, the CFPB's attempt to plead this element is fundamentally at odds with the entire concept of refinancing. After all, refinancing a delinquent debt is readily recognized as a decision consumers often make to affirmatively protect their interests against the consequences of default. The CFPB concedes as much in alleging that consumers who refinance do so to protect at least three interests: (1) they satisfy an immediate cash need; (2) they can repay their loan according to its terms without the need to re-borrow or undertake other "default-avoidance" measures; and (3) they mitigate risk associated with default. (ECF 1, ¶ 124; ECF 91, at 28). It is axiomatic to suggest that a consumer's decision to refinance to protect their interests is, at the same time, evidence that the same consumer has no ability whatsoever to protect their interests.

## CONCLUSION

The Court should grant Defendants' Motion for Judgment on the Pleadings.

Dated: September 17, 2024

Respectfully submitted,

*/s/ William M. Wilson III*
William M. Wilson III (Fed. Bar No. 7611)
WYCHE, P.A.
200 E. Broad Street, Suite 400
Greenville, South Carolina 29601
Telephone: 864.242.8294
Facsimile: 864.235.8900
bwilson@wyche.com

William J. Farley III (Fed. Bar No. 12004)
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College Street, Suite 3400
Charlotte, North Carolina 28202
Telephone: 704.998.4099
Facsimile: 704.998.4051
will.farley@troutman.com

Chris J. Willis (GA #766297, *pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.3000
Facsimile: 404.885.3900
chris.willis@troutman.com

James Kim (NY #3018397, *pro hac vice*)
Sarah E. Pruett (NY #5154422, *pro hac vice*)
TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue,
New York, New York 10022
Telephone: 212.704.6000
Facsimile: 212.704.6288
james.kim@troutman.com
sarah.pruett@troutman.com

*Counsel for Defendants*